RECEIVED

FEB 1 0 2014

DEBORAH S. HUNT, Clerk

No. 12-2669

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NATHANIEL BRENT,

Plaintiff-Appellee,

v.

WAYNE COUNTY DEPARTMENT OF HUMAN SERVICES, ET AL,

Defendants,

And

MIA WENK; SHEVONNE TRICE; HEATHER DECORMIER-MCFARLAND; MONICIA SAMPSON; CHARLOTTE MCGEHEE; JOYCE LAMAR,

Defendants-Appellants.

---

## Certificate of service

I Rose Brent certify that I served: **PETITION FOR REHEARING AND REHEARING EN BANC:** by mailing via U.S. Mail on February 16, 2014, upon the following:

Lisa M. Geminick
Attorneys for Defendants-Appellants
P.O. Box 30736
Lansing, MI 48909



Rose Brent

Date: February 16, 2014

RECEIVED

FEB 1 9 2014

DEBORAH S. HUNT, Clerk

No. 12-2669

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NATHANIEL BRENT,

Plaintiff-Appellee,

v.

WAYNE COUNTY DEPARTMENT OF HUMAN SERVICES, ET AL,

Defendants,

And

MIA WENK; SHEVONNE TRICE; HEATHER DECORMIER-MCFARLAND; MONICIA SAMPSON; CHARLOTTE MCGEHEE; JOYCE LAMAR,

Defendants-Appellants.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Julian A. Cook

## PETITION FOR REHEARING AND REHEARING *EN BANC*

Nathaniel Brent
Pro Per
Plaintiff-Appellee
538 South Livernois
Detroit, MI 48209
Dated: February 16, 2014                       (313)841-4591

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-II

TABLE OF APPENDIXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV-VIII

I       INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.     ERRORS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

      A.     Sherrie Brent Did not contact DHS . . . . . . . . . . . . . . . . . . . . . . .2

      B.     Mr. Brent did cite the record to support his claim that the issue was "poor decision making on the part of the youth" . . . . . . . .2

      C.     This Court is in clear error as R.A.B did not sleep in the basement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

      D.     Discovery had not occurred on any of the Defendants to this appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

      E.     Mr. Brent has complained of the removal of the children and challenged the sufficiency of the family court proceeding . . . . 3

III.    FOURTH AMENDMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . .3

IV.   FOURTEENTH AMENDMENT CLAIMS . . . . . . . . . . . . . . . . . . . . 8

      A.   Interrogation of Brent children without consent . . . . . . . . . . . . 8

      B.   Failure to obtain consent or inform Mr. Brent of decisions . . . 9

      C.   Retaliation for a protected act . . . . . . . . . . . . . . . . . . . . . . . 10

      D.   Guardianship document . . . . . . . . . . . . . . . . . . . . . . . . . . .12

      E.   Failure to give access to documents . . . . . . . . . . . . . . . . . . . 14

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# INDEX OF APPENDIXES

1.  Sixth Circuit Order - Dated 2/16/2014

2.  Excerpt from DHS Training Manuals

3.  Excerpt from DHS Training Manuals

4.  Settlement Order Dwayne B v. Granholm E.D. Mich 2:06-cv-13548 – Dated 10/24/2008

5.  Excerpt of PSM 722-8

6.  Michigan Child Welfare Law Manual Chapter 15

7.  Excerpt from SRM 131

8.  Excerpt from SRM 131

9.  Children's Protective Services Safety Assessment-Initial – Dated 1/27/20110

10. Family Risk Assessment of Abuse/Neglect – Dated 1/27/2010

11. ISP – Michigan Department of Human Services Initial Service Plan – Dated 3/22/2010

# TABLE OF AUTHORITIES

## US SUPREME COURT                                    PAGES

*Anderson v. Creighton,*
483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Bolger v. Youngs Drug Products Corp.,*
463 U. S. 60, 74 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Butler v. Michigan,*
352 U. S. 380, 383 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Camara v. Municipal Court,*
387 U.S. 523 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,5,8,10,13,14

*Hope v. Pelzer,*
536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Joint Anti-Fascist Comm. v. McGrath,*
341 U.S. 123 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Katz v. United States,*
389 U.S. 347, 357 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Lorillard Tobacco co. v. Reilly,*
533 U.S. 525 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Malley v. Briggs,*
475 US 335(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Marshall v. Barlow's, Inc.*
436 U.S. 307 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,4

*Mathews v. Eldridge,*
424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) . . . . . . . . . . . . . . . .12

*Michigan v. Tyler,*
436 U.S. 499 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*New Jersey v. T.L.O.,*
469 U.S. 325, 335 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,6

*Parratt in Logan v. Zimmerman Brush Co.,*
455 U.S. 422 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Reno v. American Civil Liberties Union,*
521 U. S. 844, 875 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*See v. City of Seattle,*
387 U.S. 541 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Stanley v. Illinois,*
405 U.S. 645 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Troxel v. Granville,*
530 U.S. 57 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

*United States v. Jeffers,*
342 U.S. 48 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1,7,8

*United States v. Lanier,*
520 U. S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Washington v. Glucksberg,*
521 U.S. 702, 720 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Wyman v. James,*
400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971) . . . . . . . . . . . . . . . .8

SIXTH CIRCUIT                                                     PAGES

*60 Ivy Street Corp. v. Alexander,*
822 F.2d 1432, 1435 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . .1

*Andrews v. Hickman County,*
700 F.3d 845 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6,7

*Bills v. Aseltine,*
52 F.3d 596, 603 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Brandenburg v. Cureton,*
882 F.2d 211, 215 (6th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Brooks v. Rothe,*
577 F.3d 701, 706 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cochran v. Gilliam,*
656 F.3d 300, 305 (6th Cir.2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,6

*Hagans v. Franklin Cnty. Sheriff's Office,*
695 F.3d 505, 508 (6th Cir.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,5

*Holloway v. Brush,*
220 F.3d 767, 776 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,11

*Holzemer v. City of Memphis,*
621 F.3d 512, 527 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Jasinski v. Tyler,*
729 F.3d 531 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Meals v. City of Memphis,*
493 F.3d 720, 729 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.,*
640 F.3d 716, 724(6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,9

*Sutton v. Metro. Gov't of Nashville & Davidson Cnty.,*
700 F.3d 865, 871 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wolfel v. Morris,*
972 F.2d 712, 719 (6th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

## <u>DISTRICTS COURTS WITHIN THE SIXTH CIRCIUT</u> <span style="float:right"><u>PAGES</u></span>

*O'Donnell v. Brown,*
335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004) . . . . . . . . 7

OTHER FEDERAL CIRCUITS                                    PAGES

*Brooks v. George County,*
84 F.3d 157, 165 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13,14

*Calabretta v. Floyd,*
189 F.3d 808 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . 9

*Groten v. California,*
251 F.3d 844 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FEDERAL CONSITUTUION                                     PAGES

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3,8

Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3,4,5,6,7,8,9

42 U.S.C §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,5

MICHIGAN COMPILED LAW                                    PAGES

M.C.L. 700.5201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

M.C.L. 700.5204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

M.C.L. 700. 5213(1)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

M.C.L. 712A.13a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10,11

M.C.L. 712A.19a . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . .. . . . 13

M.C.L. 722.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . 14

M.C.L. 722.627(2)(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

M.C.L. 722.628(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7,13

MICHIGAN COURT RULE                                      PAGES

M.C.R. 3.966(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

## MICHIGAN DEPARTMENT OF HUMAN SERVICES POLICY MANUALS AND OTHER AUTHORITIES

PAGES

FOM 722-9A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Michigan Child Welfare Law Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PSM 722-8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## I.                      <u>INTRODUCTION</u>

This petition for rehearing and rehearing en banc should be granted because the panel decision (Apx 1) both conflicts with U.S. Supreme Court precedents – *Marshall v. Barlow's, Inc.* - 436 U.S. 307 (1978); *New Jersey v. T.L.O.,* 469 U.S. 325, 335 (1985); *United States v. Jeffers* , 342 U.S. 48 (1951); *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) as well as several other U.S. Supreme Court cases applying similar principles, as set forth below –and to ensure uniformity of decisions in this Court, as the panel's decision conflicts with *Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505, 508 (6th Cir.2012); *Cochran v. Gilliam,* 656 F.3d 300, 305 (6th Cir.2011); *Holloway v. Brush,* 220 F.3d 767, 776 (6th Cir. 2000) (en banc); *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.,* 640 F.3d 716, 724(6th Cir. 2011) as well as other cases cited below.

Mr. Brent seeks monetary damages under 42 U.S.C §1983 from several governmental social worker for violations of his Fourth Amendment rights for conducting warrantless searches of his home over his express objections, as well as for violations of his Fourteenth Amendment procedural and substantive due process rights, for the Defendants circumventing the Family Court and denying Mr. Brent of his right of notice and opportunity to be heard both before and after the challenged conduct as stated below. In doing so the Defendants acted in contradiction of Michigan law, previous court orders, as well as the written training manuals and policy of the Department directing their conduct.

## II.                      <u>ERRORS OF FACT</u>

In determining a summary judgment appeal on the bases of immunity, this court is required to view all factual disputes in favor of the non-moving party *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987).This Court made sever factual errors that Mr. Bent believes contributed to the opinion of this court. Each of these errors is addressed separately below.

1

### A. Sherrie Brent Did not contact DHS

This Court claimed that Sherrie Brent contacted DHS to file an incorrigibility report against R.A.B. (Apx 1 at 2).

The record of this case shows that: 1) on February 17, 2010 Ms. Brent went to the Detroit Police Station to ask for help to find R.A.B. (Plaintiff's Response in Opposition to: State Defendants Motion to Dismiss and/or For Summary Judgment Doc# 127 at 3713) 2) the Police refused her request for aid (*id* at 3713) 3) the police gave Ms. Brent information to make a report of incorrigibility (*id* 3629) 4) after Ms. Brent left the police station R.A.B. arrived at the station (*id* at 3629) 5) Officer Coleman came to the Brent home to inform Ms. Brent of R.A.B.'s arrival and investigate the issue (id 3629) 6) Ms. Brent picked R.A.B. up from the police station and 7) Officer Coleman reported the incident to DHS.

There is nothing in the record to indicate the Ms. Brent ever made any attempt to follow through with making any incorrigibility complaint. In fact the first contact between Ms. Brent and DHS is documented in the CPS investigation report when Ms. Wenk contacted Ms. Brent seeking to visit R.A.B. (*id* at 3629)

### B. Mr. Brent did cite the record to support his claim that the issue was "poor decision making on the part of the youth"

Despite this Court's claim that Plaintiff did not cite the record (opinion at 2), page 3 of the BRIEF FOR PLAINTIFF-APPELLEE clearly indicates that this statement is found in the District Court's docket entry 127 at page id 3629. Thus this Court is in clear error.

### C. This Court is in clear error as R.A.B did not sleep in the basement

This Court stated "she demanded that RAB show her the basement of the house **where he slept**," (Apx 1 at 2 emphases added). The record of this case clearly shows that it was a different child that slept in the basement bedroom (Plaintiff's Response in Opposition to: State Defendants Motion to Dismiss and/or

For Summary Judgment Doc# 127 at 3630). In fact one of Mr. Brent's claims is that even if R.A.B. had authority to show Defendants his bedroom and common areas of the home, he was without any authority to show defendants another child's bedroom in an area he did not have authority himself to enter. (Plaintiff's First Amended Complaint doc# 114 at 2301)

## D. Discovery had not occurred on any of the Defendants to this appeal

This Court claimed "Following discovery, the defendants moved for summary judgment." This is in clear error, the very order appealed from clearly states that discovery was stayed as to these defendants on all of Brent's claims (Order Doc# 188 at Pg id 4648) Thus, the record clearly shows that the instant motion and appeal occurred before any discovery was allowed.

## E. Mr. Brent has complained of the removal of the children and challenged the sufficiency of the family court proceeding

The panel's determination that Mr. Brent did not complain of the removal of the children from the home (Apx 1 at 10) and that Mr. Brent does not challenge the sufficiency of the Family Court proceedings (Apx 1 at 18) are inconsistent with the order that was subject to this appeal. The order clearly describes Mr. Brent's challenges to the removal process (Doc# 163 at Pg id 4126) as well as his challenges to the validity of the family court proceedings (*id* at 4118- 4127) Thus, the panel's opinion to the contrary is in clear error.

## III.       FOURTH AMENDMENT CLAIMS

The panel granted Defendants Qualified Immunity based solely on a claim that it was unclear that the Fourth Amendment applied to government social workers. This is contradictory to several U.S. Supreme Court cases holding that the Fourth Amendment applies to all governmental searches. *Camara v. Municipal Court*, 387 U.S. 523 (1967) stated "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and

security of individuals against arbitrary invasions by **governmental officials.**"(emphasis added) *Michigan v. Tyler*, 436 U.S. 499 (1978) made clear "Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment." "The showing of probable cause necessary to secure a warrant may vary with the object and intrusiveness of the search, but the necessity for the warrant persists." (*Id*) "If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." *Marshall v. Barlow's, Inc.* - 436 U.S. 307 (1978). Again in *See v. City of Seattle*, 387 U.S. 541 (1967) the Court stated "we see no justification for so relaxing Fourth Amendment safeguards where the official inspection is intended to aid enforcement of laws prescribing minimum physical standards". Thus, although the U.S. Supreme Court has not decided a case specifically involving a state social worker, it has consistently held that the Fourth Amendment applies to **all governmental searches** regardless of the reason for the search or the title of the official.

Even if it was not already clearly established that the Fourth Amendment applied to all state actors, the social worker exemption would be based upon a claimed need to protect children. This too would be in contradiction to U.S. Supreme Court rulings holding that protection of children is no reason for denying citizens of their constitutionally protected rights (see *Lorillard Tobacco co. v. Reilly* 533 U.S. 525 (2001); *Reno v. American Civil Liberties Union*, 521 U. S. 844, 875 (1997); *Bolger v. Youngs Drug Products Corp.*, 463 U. S. 60, 74 (1983), *Butler v. Michigan*, 352 U. S. 380, 383 (1957)

This Court also applied the wrong standard for "clearly established" question. As the U.S. Supreme Court stated in *Hope v. Pelzer*, 536 U.S. 730 (2002) a right is clearly established "so long as the prior decisions gave reasonable

4

warning that the conduct then at issue violated constitutional rights."(*Id* quoting *United States v. Lanier*, 520 U. S. 259 (1997)). In the instant case it is uncontested that the complained of conduct was a violation of the Fourth Amendment and would be actionable is the actor was a police officer, building inspector, fire fighter, school official, or OHSA inspector. The U.S. Supreme Court has already place the burden of proof upon the official to prove this extraordinary defense.

> "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and **can prove that he neither knew nor should have known** of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)(emphasis added)

As further explained below, even if Defendants attempted to claim they did not know, their own training manuals, and prior court decisions within Michigan in the very least shows they "should have known" that their conduct violated the Fourth Amendment. Further the U.S. Supreme Court has already rejected that immunity should be based upon the title of the violator.

> "we have been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated. An immunity that has as many variants as there are modes of official action and types of rights would not give conscientious officials that assurance of protection that it is the object of the doctrine to provide." *Anderson v. Creighton*, 483 U.S. 635 (1987)

Not only is this Court's decision at odds with a long history of U.S. Supreme Court precedent, it is at odds with this Circuit's own precedent. For example in *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir.2012) the court stated "it defeats the purpose of § 1983 to define the right too narrowly." This Court finding that it was not clear the Mr. Brent rights, while protected from

other government officials was not protected against a government social worker is ludicrous. "What matters is the intrusion on the people's security from governmental interference." *Cochran v. Gilliam*, 656 F.3d 300, 305 (6th Cir.2011). The proper question is if the right was clearly established. In the instant case it is undisputed that Mr. Brent's right to be free of a search of his home over his objections and conducted without a warrant or any well-established exception to the warrant requirement was clearly established. Similar to the U.S. Supreme Court, this Circuit has also made clear "that **government officials** may not subject citizens to searches or seizures without proper authorization." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009)(emphasis added).

This Court has misinterpreted the holding in *Andrews v. Hickman County*, 700 F.3d 845 (6th Cir. 2012). Indeed the primary reason for granting the social workers immunity was that they "reasonably relied upon the Sheriff's officers' assessment of the propriety of entry" (*Id*), a fact not present in the instant case. Further, to the extent the Court claims it was not clear that the Fourth Amendment applied to social workers, it is contradictory to the U.S. Supreme Court's express statement that "It is now beyond dispute that the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers." *T.L.O.* Further "The source of law that clearly establishes such a right is 'precedent from the Supreme Court, the Sixth Circuit, the district court itself, **or other circuits** that is directly on point.' (empahasis added) *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 871 (6th Cir. 2012).( quoting *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010)). Therefore the numerous other Circuits (see *Andrews*) that had already ruled that no social worker exemption existed for Fourth Amendment violations clearly established that social workers like all other government officials were bound by the amendment.

This Court has also ignored the most distinguishing difference between the instant case and *Andrews*. In *Andrews* the Court noted that a decision rendered in Ohio was insufficient to place Tennessee social workers on notice ( see *Id* n. 7). In stark contrast, a reasonable trained social worker in Michigan would have been well aware that there is no social worker exemption to the Fourth Amendment. As pointed out in Appellee's brief, 1) a Federal District Court within the State of Michigan had already stated that no exception for social workers exists (*id* at 36), 2) the DHS training manuals clearly points this out (*id* at 69 see also Apx 2), and 3) in Michigan a social worker must "be trained in the legal duties to protect the state and federal constitutional and statutory rights of children and families from the initial contact of an investigation through the time services are provided." (M.C.L. 722.628(17)). Given that "The standard of objective reasonableness requires us to ask whether every 'officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" *Bills v. Aseltine*, 52 F.3d 596, 603 (6th Cir. 1995) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir.1989), quoting *Dominque*, 831 F.2d at 676; see *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir.1992)), a reasonably trained social worker in Michigan would have been well aware that no exemption to the Fourth Amendment existed. Considering that this Court stated this was a "close question" (Apx 1 at 7) and that the court must draw all reasonable inferences in favor of the nonmoving party *Andrews*, this Court must then assume that the Defendants were aware that no social worker exemption applied to the Fourth Amendment and they were aware of *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004).

This Court has also failed to recognize that the burden was upon the defendants to show an exemption to the warrant requirement ("the burden is on those seeking the exemption to show the need for it" *United States v. Jeffers* , 342

U.S. 48 (1951)). The U.S. Supreme Court has made clear that ""searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Thus, contradictory to the opinion of this Court, until an exemption was established the defendants were required to follow the requirements of the fourth amendment

This Court's opinion is also at odds with *Wyman v. James*, 400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971). Although in that case the Court ruled that no Fourth Amendment violation occurred by terminating benefits, it made clear that "the 'right' to refuse" (*id*) the search still existed. In the instant case it is uncontested that Mr. Brent repeatedly objected to the search of his home, and was therefore denied this right to refuse.

## IV.        FOURTEENTH AMENDMENT CLAIMS

This Court has missed a very important part to the immunity question. In fact the Supreme Court has made it clear "Immunity generally is available only to officials performing discretionary functions." (*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Further, "a reasonably competent public official should know the law governing his conduct." (*id* at 819). As the acts Mr. Brent complains of is the defendants failures to perform the ministerial tasks mandate by law, court orders, and/or their own written policy they are not entitled to immunity for arbitrarily choosing a different course of conduct that was not within their discretion to choose and was contrary to their affirmative duties.

### A. Interrogation of Brent children without consent

Substantive Due process "provides heightened protection against government interference with certain fundamental rights and liberty interests," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), including parents'

fundamental right to make decisions concerning the care, custody, and control of their children *Stanley v. Illinois,* 405 U.S. 645 (1972). More specifically due process protect a parents right to choose whom their child associates with *Troxel v. Granville,* 530 U.S. 57 (2000). Indeed even this Court's precedent requires that any interference with the fundamental rights of the parent be narrowly tailored (*Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.,* 640 F.3d 716, 724(6th Cir. 2011)). In the instant case the District Court found that Defendants have not stated how any of the challenged conduct furthered the states interest (order Doc# 163 at pg id 4158)

In the instant case the Defendants completely usurped Mr. Brent's parental authority over his children within his own home. As with the Fourth Amendment rights shown above, DHS has also recognized and trained their employees, since 2007, that a parent has the constitutional right to prevent access to a child within the sanctity of the home (see Apx 3). "In such a case the worker might seek a court order to assist the investigation or contact the child at some other location." (*Id*) The United States Court of Appeals for the Ninth Circuit said it best, "The government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents." *Calabretta v. Floyd,* 189 F.3d 808 (9th Cir. 1999).

Based upon the U.S. Supreme Court's long history of upholding parental rights, and protecting the sanctity of the family home as well as DHS's own training manual that explicitly states that Mr. Brent was well within his constitutional rights, no reasonably trained social worker within the State of Michigan could have any belief that they could unilaterally override Mr. Brent's parental decisions and interrogate his children inside his home over his objections.

**B. Failure to obtain consent or inform Mr. Brent of decisions**

The Acts Complained of by Mr. Brent were outside of defendants' discretionary authority, therefore they are not entitled to immunity *Harlow*. The Defendants' only defense to these action is that the Family Court had authority to issue orders (Appellants Brief on appeal at 35,36), however, they have been unable to point to any order authorizing their conduct. In fact, a fraudulent document claiming others were the legal guardians of the children (Appellee Brief apx 120 was created and used to circumvent the requirement of obtaining parental consent or a court order. It should be noted that although Defendants make a general claim that Mr. Brent neglected his children, they have not pointed to any record making an allegation against Mr. Brent of being an unfit parent. Contrary to Defendants assertions, Mr. Brent was not named as a respondent in the Family Court petition (Doc# 35 at Pg id 1538) nor did the Court make any finding that Mr. Brent was unfit (Doc# 120 at Pg id 2699). Thus, pursuant to *Troxel* and the cases upon it relied; the state did not have any authority to intervene with Mr. Brent's parental authority to begin with.

With the specific conduct complained of Defendants had two alternatives, either obtain parental consent or a court order. (712A.13a (10)(c)) Defendants' choice to ignore these requirements was outside of their authority and therefore a clear violation of Mr. Brent's procedural and substantive due process rights.

## C. Retaliation for a protected act

This panel ruled that Mr. Brent did not have the right to have Defendants recommend the return of his children nor the right to trial by jury, this Court is in clear error on both counts.

First DHS is required to complete an initial service plan within 30 days of the removal of a child from the home. (M.C.L. 712A.13a(10)(a) *see also* Apx 4 at 19) Further as the Defendants had determined the home was safe for the children, the recommendation to the Court to return the children was not discretionary but

was mandatory (FOM 722-9A at 2), in fact if they did not recommend the return of the children, they were required to describe why it was not in the children's best interest to return home (PSM 722-8 excerpt as Apx 5). Thus, Defendants were required to complete and file with the court, the Initial Service Plan at the latest on March 20, 2010. Mr. Brent and his family was entitled to this as a matter of law. By failing to complete and file the Initial Service Plan as required by law, Defendants denied Mr. Brent of his ability to exercise his other statutory rights under MCL 712A.13a(12) and MCR 3.966(A).

More troubling is this Court's apparent determination that Mr. Brent did not have the constitutional due process right to challenge the allegations. The essence of due process is the requirement that "a person in jeopardy of serious loss [be given} notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123 (1951) at 171-172 (Frankfurter, J., concurring). In the instant case it was the Defendants that initiated the Family Court proceeding. Michigan law only provides one means to contest the petition and that is to go to trial. This Court seems to focus on the jury trial aspect of the case; however the results are the same if Mr. Brent had elected to have the case heard by a referee. Defendant still required Mr. Brent to forfeit his right to contest the petition before they would follow their statutory and court ordered duties.

Finally absolute immunity would not apply to the failure to timely create a service plan as this is an administrative not prosecutional function. Indeed this Court has made it clear in *Holloway v. Brush*, 220 F.3d 767, 776 (6th Cir. 2000) (en banc) that social workers are not entitled to absolute immunity for their out of court actions. This case as in *Holloway* it is the Defendants' failure to perform their duties and failure to notify the court that is at issue, it is the decision to ignore their duties to Mr. Brent, his children and the Court that is at issue. As this Court stated in *Holloway*

11

"Even if Brush could successfully explain how failing to tell the court that Holloway had appeared and wished to assert her parental rights, lying to Holloway about her rights, and failing to inform Holloway that the matter was still pending were intimately connected with the judicial process, she has not explained how they were the functions of an advocate or consistent with her statutory role."

Similarly in the instant case, Defendants cannot show that their decision to not complete and submit the required service plan to the court, their refusal to engage Mr. Brent in the formulation of that plan, and the agency decision to not follow the requirement of law was in any way connected to the judicial phase of the proceedings, much less how they were within their authority. In fact the Defendants' "actions denied the court the opportunity to accept or reject the results of her judgment." (*Id*)

### D. Guardianship document

It is well settled that before the Government can deprive a person of a protected liberty they must provide the person with some sort of hearing. (*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) *Parratt in Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982). Michigan law recognizes and supports this right. Defendant Trice is the one that chose to ignore her requirements under law and Mr. Brent's most basic due process rights.

First Michigan law makes it clear that only a parent or the court can appoint a guardian for a minor (M.C.L. 700.5201). It is uncontested that neither parental consent nor a court authorized the appointment of the Chinavares as guardians. Next before the Court can even consider the appointment of a guardian a petition for such guardianship must be filed with the court M.C.L 700.5204), and then only if parental rights were "terminated or suspended by prior court order" (*id*). Michigan law further requires that "Each living parent of the minor" be given notice of any hearing on the guardian petition (M.C.L. 700. 5213(1)(c)). Even in

the context of a child protective case, only the Court can make the appointment after notice and opportunity to be heard is given (M.C.L. 712A.19a).

*Jasinski v. Tyler*, 729 F.3d 531 (6th Cir. 2013), and cases cited within recognized that state law can provide the bases for a due process claim. In the instant case Michigan Law required that Mr. Brent must be given notice and opportunity to be heard before a guardian was appointed for his children. The law removed any discretionary authority from Ms. Trice and required that she instead turn it over to the court for a decision. Further the court would have been required to dismiss the petition as none of reasons for appointing a guardian under ether MCL 700.5204 or MCL 712A.19a existed. Thus the law "sufficiently mandates a particular substantive outcome" *Jasinski*. Therefore Ms. Trice violated Mr. Brent's substantive and procedural due process rights when she unilaterally made the decision to appoint guardians for his children.

Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 US 335(1986). In the instant case like with all of Plaintiff's claims, the training and policy manuals of DHS clearly show that the defendant knew or should have known she was violating the law. Similar to other claims, the Michigan Child Welfare Law Manual chapter 15 (included as Apx 6) details the requirements for the appointment of a guardian, and references the above statutes. As M.C.L. 722.628(17) requires that Ms. Trice be trained in her duties, it must be assumed that Ms. Trice knew that her conduct was unlawful and violated Mr. Brent's due process rights.

As Ms. Trice did not have discretionary authority to appoint guardians, and failed in her ministerial task of filing a petition and giving Mr. Brent notice, she is not entitled to qualified immunity. *Harlow* made clear "Immunity generally is available only to officials performing discretionary functions." (See also *Groten v. California*, 251 F.3d 844 (9th Cir. 2001) and *Brooks v. George County*, 84 F.3d

157, 165 (5th Cir. 1996). Even this Circuit has recognized this fact. "Under the doctrine of qualified immunity, 'government officials **performing discretionary functions** generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (emphasis added) *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007) (quoting *Harlow*, 457 U.S. at 818)

### E. Failure to give access to documents

First this court mischaracterizes the claim as only being a "discovery violation" although some of the information withheld could have been used in the Family Court proceeding, the issue in this case is the denial of Mr. Brent's right to review all the records after he made written requests for these records. This right was guaranteed by Michigan law (M.C.L. 722.627(2)(f) *see also* M.C.L. 722.30) as well as the written departmental policy See Apx 7 and Apx 8). Thus, Defendants did not have any authority discretionary or otherwise to withhold the information from Mr. Brent, and therefore as previously noted is not entitled to immunity.

As for the "discovery violations" the instant case shows why this Court is limited to legal issues and cannot consider the sufficiency of evidence issue. However to clarify the record, the only document provided to Mr. Brent's counsel by Defendants was the "investigative summary". In a recorded telephone conversation, Defendant Wenk informed Mr. Brent that pursuant to Defendant Sampson this was the only document Mr. Brent was entitled to and they would not provide any further documents. Mr. Brent has come into possession of some documents in May of 2011, that would have shown that on January 27, 2010 1) the Brent parent provided adequate shelter for the children's needs ( Apx 9 at 2 sec. 8) and that the Brents provide the appropriate level of care for their children (Apx 10 at N6). During the course of litigation of the instant case, Mr. Brent received documents from Defendant The Children's Center (not a party to this appeal) that

an Initial Service Plan was signed by Defendants Trice and McGehee on March 23, 2010. This document was required to be submitted to the Family Court and Mr. Brent (see above discussion on the ISP). As clearly shown by the document the Department had already recognized that there was no need to keep the children out of the Brent home (Apx 11 at 20) and that continued separation from the parent was likely to harm the children and the parent-child relationship (*id* at 7). Had these three documents been available during the Family Court proceeding a different result would have been required as these documents are conclusive proof that that although Defendants may have had some concerns, they explicitly recognized that the parents were adequately caring for all of their children's need and therefore there existed no bases for court involvement. This was part of Defendants' attempt to coerce Mr. Brent into forfeiting his right to contest the allegation if the petition as more fully explained above.

Put plainly, Defendants violated their legal duties to disclose this information, thereby violating Mr. Brent's procedural and substantive due process right in an attempt to coerce Mr. Brent to forfeit his due process right of challenging the petition and their conduct.

## V.                                CONCLUSION

For the forgoing reasons, the petition for rehearing or rehearing en banc should be granted.

Respectfully submitted,                        Dated: February 16, 2014

Nathaniel Brent (in pro per)
538 South Livernois
Detroit Michigan 48209
(313) 841-4591

15

## Certificate of Compliance

1. This petition complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as it contains less than 7000 word, excluding those parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii). There is a total of 4960 words including the signature line.

2. This Petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Respectfully submitted,                     Dated: February 16, 2014

Nathaniel Brent (in pro per)
538 South Livernois
Detroit Michigan 48209
(313) 841-4591

# APPENDIX

# 1

NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0108n.06

No. 12-2669

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NATHANIEL BRENT, | ) | **FILED**<br>Feb 06, 2014<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| MIA WENK, SHEVONNE TRICE, | ) | |
| HEATHER DECORMIER-MCFARLAND, | ) | |
| MONICA SAMPSON, CHARLOTTE | ) | OPINION |
| MCGEHEE, and JOYCE LAMAR, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

**Before: COLE, GILMAN, and DONALD, Circuit Judges**

**RONALD LEE GILMAN, Circuit Judge.** Mia Wenk, Shevonne Trice, Heather Decormier-McFarland, Monica Sampson, Charlotte McGehee, and Joyce Lamar appeal the district court's decision denying them absolute and qualified immunity under federal law and governmental immunity under Michigan law. Nathaniel Brent claims that these defendants, all of whom are social workers, violated his constitutional rights when they searched his home without a warrant and temporarily removed his minor children from his custody. For the reasons set forth below, we **AFFIRM IN PART AND REVERSE IN PART** the decision of the district court and **REMAND** the case for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Factual background

The incident that sparked this lawsuit took place on January 17, 2010 when Brent's then 15-year-old son, RAB, arrived at a Detroit police station barefoot and wearing only a pair of shorts. Detroit Police Officer Donald Coleman reported the incident to the Wayne County Department of Human Services (DHS). At the same time RAB's mother, Sherrie Brent, who is not a party to this action, contacted DHS about filing incorrigibility charges against RAB. These events prompted Wenk, a DHS employee, to visit Brent's home on January 20 and 21, 2010.

Brent claims that Officer Coleman failed to file the required paperwork to initiate the DHS investigation, and that Coleman subsequently withdrew his report. According to Brent, Coleman determined that the incident resulted from "poor decision making on the part of the youth." The defendants neither acknowledge nor dispute this assertion, nor does Brent cite the record to support his claim.

In any event, Brent allowed Wenk to enter his living room during the January 20, 2010 visit and permitted her to speak with RAB. He claims that the questioning became leading and suggestive, with Wenk eventually demanding to speak to RAB alone over Brent's objection. Wenk then proceeded to interview his other four children without his knowledge or consent. Finally, she demanded that RAB show her the basement of the house where he slept, again without Brent's consent. Brent alleges that this visit allayed Wenk's concerns and that she decided with her supervisor, Sampson, to investigate the family for alternative bases for child neglect—not those related to the original referral from Officer Coleman.

Wenk contacted Brent the next day, January 21, 2010, to arrange for another visit. Brent did not agree to the visit, but Wenk arrived at his home anyway, along with Sampson and Decormier-McFarland. While Wenk spoke with Brent and his wife, Sampson and Decormier-McFarland walked around the entirety of the house, taking photographs without Brent's consent. Brent makes additional allegations regarding the period from January 21, 2010 to February 18, 2010, but because the district court did not rely on these facts in deciding to deny qualified immunity, we need not address them here.

On February 18, 2010, Wenk filed a neglect petition with the Family Division of the Third Judicial Circuit Court for Wayne County (the Family Court) seeking removal of Brent's five minor children, three of whom are boys and two of whom are girls. The Family Court ordered them removed that same day. Detroit police officers took the children from Brent's custody and placed them in emergency shelters that very evening. The Family Court appointed guardians ad litem the following day. On March 3, 2010, the children were placed with foster families. But on March 26, 2010, the children were removed from those placements and returned to the emergency shelters. The male children were eventually placed in separate foster-care centers.

A jury trial regarding the underlying allegations took place in the Family Court on May 11 to 13, 2010. On June 2, 2010, the Family Court ordered the children released to their parents with a directive that DHS continue to supervise the children. The Family Court terminated this supervision on September 10, 2010, finding that the Brents had improved the conditions in their home and the children's needs were being met.

**B. Procedural background**

Brent filed this lawsuit in February 2010, claiming a multitude of constitutional and state-law violations on the part of the various actors involved with this case. As relevant here, Brent alleged that Wenk, Trice, Decormier-McFarland, and Sampson violated his constitutional rights under the Fourth and Fourteenth Amendments during the January 20 and 21, 2010 visits to his home when they exceeded the scope of Brent's consent to search, misrepresented the purpose of their visit, and photographed the home's interior. He also contends that Wenk, Trice, Decormier-McFarland, Sampson, McGehee, and Lamar denied him various parental rights to make decisions regarding his children in violation of the Fourteenth Amendment's Due Process Clause. Brent further alleges that many of these actions were extreme and outrageous conduct, constituting intentional infliction of emotional distress (IIED) and gross negligence under Michigan law. Finally, he claims that defendant Trice violated MCL § 722.633(1) by failing to report suspected child neglect of RAB while RAB was in the state's custody.

Following discovery, the defendants moved for summary judgment. The district court rejected their claims of qualified and absolute immunity regarding the federal charges and denied state-law immunity on the IIED, gross negligence, and MCL § 722.633(1) claims. This appeal followed.

## II. LEGAL STANDARD—FEDERAL IMMUNITY

### A. Standard of review

"Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo.*" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). The denial of qualified immunity premised on a factual dispute is not immediately appealable. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995). "To the extent that a district court's denial of a claim of qualified immunity turns on an issue of law,

however, the Supreme Court has held that the denial constitutes a final, appealable decision

within the meaning of 28 U.S.C. § 1291." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002).


**B. Absolute immunity**

"[S]ocial workers are absolutely immune only when they are acting in their capacity as

*legal advocates*—initiating court actions or testifying under oath—not when they are performing

administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th

Cir. 2000) (en banc) (emphasis in original). "The official seeking absolute immunity bears the

burden of showing that immunity is justified in light of the function she was performing." *Id.* at

774. "When applied, [t]he defense of absolute immunity provides a shield from liability for acts

performed erroneously, even if alleged to have been done maliciously or corruptly." *Kovacic v.*

*Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013)

(alteration in original) (internal quotation marks omitted).

**C. Qualified immunity**

As set forth in *Andrews v. Hickman County*, 700 F.3d 845 (6th Cir. 2012), we review

district court decisions on qualified immunity as follows:

> First, we determine whether based upon the applicable law, the facts viewed in
> the light most favorable to the plaintiff show that a constitutional violation has
> occurred. Second, we consider whether the violation involved a clearly
> established constitutional right of which a reasonable person would have known.
> Third, we determine whether the plaintiff has offered sufficient evidence to
> indicate that what the official allegedly did was objectively unreasonable in light
> of the clearly established constitutional rights.

*Id.* at 853 (internal quotation marks omitted). We may review the denial of qualified immunity

only "to the extent that the appeal involves the abstract or pure legal issue of whether the facts

alleged by the plaintiff constitute a violation of clearly established law." *Dorsey v. Barber*, 517

F.3d 389, 394 (6th Cir. 2008) (internal quotation marks omitted).

"The inquiry into whether a right was clearly established must be conducted in light of

the specific context of the case. [It must be] sufficiently clear that a reasonable official would

understand that what he is doing violates that right . . . [and] in the light of preexisting law the

unlawfulness must be apparent." *Andrews*, 700 F.3d at 853 (second alteration in original)

(internal quotation marks omitted). "The plaintiff has the burden of establishing that the law was

clearly established at the time of the challenged conduct." *Id.*

## III. FOURTH AMENDMENT CLAIMS

### A. Introduction

The district court denied qualified immunity on four of Brent's Fourth Amendment

claims. Specifically, the court found that Brent raised triable issues as to whether:

> (1) Mia Wenk went beyond the scope of the limited consent that had been given
> to her to enter the living room area of [Brent's] home and question RAB to ensure
> that he had no medical problems arising from his exposure to the cold weather
> (January 20th visit); (2) Wenk demanded to be permitted to question RAB outside
> the presence of either parent (January 20th visit); (3) Wenk, Heather Decormier-
> McFarland, and Monica Sampson gained entry to his home by misrepresenting
> the purpose and intent of their visit (January 21st visit); (4) while Wenk kept the
> Brent parents preoccupied, and despite Brent's expressed objections, Sampson
> and Decormier-McFarland went throughout the home and photographed the
> interior of his home (January 21st visit).

In essence, Brent argues that Wenk, Decormier-McFarland, and Sampson violated his Fourth

Amendment rights by exceeding the limited consent to search that he had given them.

The social workers do not appear to contest that Brent has raised a triable issue as to

whether he suffered a violation of his Fourth Amendment rights. They instead contend that this

court had not clearly established as of January 2010 that Brent had a right to be free from

unreasonable searches and seizures performed by social workers. In support, they cite *Andrews*,

700 F.3d at 859, which held that the Fourth Amendment's prohibition on unreasonable searches

does apply to social workers, but that such law was not clearly established as of 2008 when the

relevant events in *Andrews* took place.

**B. Legal standard**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." "[P]hysical

entry of the home is the chief evil against which the wording of the Fourth Amendment is

directed." *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972). "[A] warrantless

search or seizure inside a home by a law enforcement officer violates the Fourth Amendment

unless an exception to the warrant requirement applies." *Andrews*, 700 F.3d at 854.

**C. Analysis**

Wenk, Sampson, and Decormier-McFarland raise a close question as to whether the

Fourth Amendment applied to their conduct in January 2010. As the social workers argue,

*Andrews* and *Jordan v. Murphy*, 145 F. App'x 513 (6th Cir. 2005), on which *Andrews* relied,

suggest that until *Andrews*, this court had not yet clearly established that the Fourth Amendment

applies to the activities of social workers. On the other hand, since *Andrews*, this court has held

that the clearly established law in this circuit determined as early as 2002 that the Fourth

Amendment applies to the seizure of children by social workers. *See Kovacic v. Cuyahoga Cnty.*

*Dep't of Children & Family Servs.*, 724 F.3d 687, 699 (6th Cir. 2013) (holding that this circuit

had clearly established in 2002 that the warrantless seizure of children by social workers violates

the Fourth Amendment). And in doing so, this court reasoned that, presumptively, the Fourth

Amendment applies to all searches and seizures performed under color of law. *See id.* We must

now decide whether *Andrews* or *Kovacic* governs the search of a home in 2010. Because Brent's Fourth Amendment allegations relate to the search of his home, and not to the seizure of his children, we hold that *Andrews* controls.

*Andrews* concerned the search of the plaintiff's home following a complaint to a state agency responsible for the welfare of children. The plaintiff in *Andrews* claimed that police officers arrived at his home with employees of the State Department of Children's Services in tow. Andrews testified that when he walked into his home, he "was immediately followed into [his] house by an officer, closely followed by the three [Department of Children's Services] employees, and then another officer, creating a 'whoosh of presence' and 'flooding' into the home." *Andrews*, 700 F.3d at 850. He also claimed that he was coerced into consenting to the interview of his children outside his presence and acquiescing in a walk-through of his home, both performed by the Children's Services employees. *Id.* at 851.

Andrews sued, alleging, among other things, that the state employees violated his Fourth Amendment rights by entering his home without a warrant or his consent, interviewing his children without his consent, and walking through his home without his consent. The social workers claimed absolute and qualified immunity, but the district court held that they were not entitled to immunity. On appeal, this court reversed. The court first explained that,

> [i]f their implication is that social workers are not state actors for the purposes of the Fourth Amendment, the Supreme Court has established that the Fourth Amendment's restrictions on unreasonable searches and seizures extend well beyond the police:
>
>> [T]he Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action"—that is, "upon the activities of sovereign authority." Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities. . . . Because the individual's interest in privacy and personal security "suffers whether the government's motivation is to investigate violations of criminal laws or breaches

> of other statutory or regulatory standards," it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.

*New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (internal citations omitted). Thus, the presumption appears to be that any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply.

*Id.* at 858–59. The *Andrews* court concluded, based on this presumption, that the Fourth Amendment applied to the Children's Services employees. *Id.* at 859.

Nonetheless, the *Andrews* court noted that this circuit had no clearly established law indicating that social workers were subject to the restrictions of the Fourth Amendment in the performance of their duties; that is, it determined that, as of 2008, this court had not yet clearly established that social-worker activities are subject to the Fourth Amendment. The court explained that this court's unpublished decision in *Jordan*, 145 F. App'x 513, "is the only case from our court that bears on the issue of whether the reasonable social worker, facing the situation in the instant case, would have known that her conduct violated clearly established law. Yet, *Jordan* fails to give clear guidance to the social worker faced with the decision to enter the Andrews home." *Andrews*, 700 F.3d at 861. Thus, although the court concluded that "social workers in entering a home are governed by the Fourth Amendment, and . . . that no social worker exception applies in such situations," it said that clearly established law did not compel such a conclusion in 2008 when the search occurred. *Id.* at 863.

In *Kovacic v. Cuyahoga County Department of Children and Family Services*, 724 F.3d 687, 699 (6th Cir. 2013), this court also considered whether a warrantless search and seizure by child welfare officials violated the Fourth Amendment. As in *Andrews*, *Kovacic* relied on the premise that state actors are presumptively subject to the Fourth Amendment. *Id.* at 698 (citing

*Camara v. Municipal Ct.*, 387 U.S. 523, 530–31 (1967)). But contrary to *Andrews*, *Kovacic*

reached the following conclusion:

> In sum, there is an absence of pre–2002 case law specifically mentioning social workers, which under our binding precedent is insufficient to upset the presumption that all government searches and seizures are subject to the strictures of the Fourth Amendment. We thus agree with the district court that at the time of the social workers' actions, it was clearly established that Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers.

*Kovacic*, 724 F.3d at 699. The *Kovacic* court drew this conclusion after considering *Andrews*.

Collectively, *Andrews* and *Kovacic* indicate that before this court decided *Andrews* in

2012, a social worker entering a home without a warrant did not violate clearly established law,

but a social worker removing a child without a warrant did. Brent does not allege that his

children were removed in violation of the Fourth Amendment; he instead challenges the

warrantless entry into his home. *Andrews* therefore controls this case, meaning that the social

workers are entitled to qualified immunity on Brent's Fourth Amendment claim.

Brent does not challenge this interpretation of *Andrews*, but instead argues that *Andrews*

was wrongly decided. He relies on decisions of district courts within this circuit and the

decisions of other circuits to establish that there has never been a social-worker exemption to the

Fourth Amendment.

Brent's argument is without merit. First, *Andrews* belies Brent's argument by holding

that there was no clearly established law regarding a social worker exemption in 2008, when the

events in *Andrews* took place. And Brent cites no case that would indicate a change in this

circuit's law between 2008 and 2010, when the events of this case took place. Second, and

relatedly, "[w]hen determining whether a constitutional right is clearly established, we look first

to decisions of the Supreme Court, then to our own decisions and those of other courts within the

circuit, and then to decisions of other Courts of Appeal." *Andrews*, 700 F.3d at 853. Brent's

reliance on district court cases within this circuit and on the law of other circuits is therefore

unavailing. Because our circuit in *Andrews* held that there was no clearly established law

regarding the Fourth Amendment's applicability to social workers in 2008, that determination

controls this case. We therefore reverse the judgment of the district court and grant the social

workers qualified immunity on Brent's Fourth Amendment claims.

## IV. FOURTEENTH AMENDMENT CLAIMS

### A. Background

The district court also denied qualified immunity to the defendants on several of Brent's

Fourteenth Amendment claims. It interpreted Brent's claims as violations of both his

"procedural due process interest in parenting" and his "substantive fundamental right to raise

[his] child[ren]." *Quoting Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Analyzing both

bases for Brent's claims, the district court determined that "[t]o the extent that Brent's claim is

based upon the removal of the children from his home, the State Defendants are correct that they

cannot be held liable for any such deprivation because the family court—not the State

Defendants—bore the ultimate responsibility for this decision." Nonetheless, the district court

determined that Brent did raise triable issues regarding whether the social workers made

decisions regarding the removed children's care without consulting him. The court specifically

identified the following five actions:

> (1) various examinations and interventions that were conducted without his
> knowledge or consent and in the absence of any court order; (2) the refusal of
> several Defendants to seek or permit his input in decisions regarding his
> children's medical, educational, residential, and other needs; (3) the failure to
> advise him of decisions that had been made with respect to his children;
> (4) certain Defendants' insistence that—notwithstanding their conclusion that the
> home conditions were adequate and safe—they would recommend the children's
> return only if he would waive his right to a jury trial and give up all post-return

decision-making authority with respect to their education, medical care, and extracurricular activities; and (5) the creation of a document that purported to appoint the Chinavares as the temporary guardians of the male children without parental consent or a court order.

(internal citation omitted).

On appeal, the defendants contend that both absolute and qualified immunity shield them from these claims. They first argue that they are entitled to absolute immunity for all of their actions leading up to the Family Court's removal order because the Family Court mandated the only constitutionally cognizable deprivation that Brent suffered—the removal of his children from his custody. Second, the defendants contend that Brent retained no protected liberty interest in the parenting of his children after the Family Court placed them in foster care. They accordingly argue that their failure to consult Brent regarding his children did not violate his due process rights under the Fourteenth Amendment.

## B. Legal standard

The Fourteenth Amendment's Due Process Clause guarantees that no "State [shall] deprive any person of life, liberty, or property, without due process of law." Supreme Court precedent holds that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). A state may extinguish parental rights only by proving that "clear and convincing evidence" so warrants. *Id.* at 769. Yet beyond a liberty interest in the future custody of one's child, the Supreme Court has not delineated the rights of parents temporarily deprived of the custody of their children. And neither party points us to any precedents from this circuit that illuminate the meaning of the right to raise one's child.

We particularly note that

> not every disregard of its regulations by a public agency . . . gives rise to a cause of action for violation of constitutional rights. Rather, it is only when the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions.

*Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir. 1976). Brent must therefore show not only that the state violated its own procedures, but that such violation resulted in a procedure that violated constitutional due process. That is, he must show that the resulting procedure contravenes clearly established federal law.

## C. Analysis

The social workers first argue that the district court misinterpreted this court's decision in *Pittman v. Cuyahoga County Department of Children and Family Services*, 640 F.3d 716, 722 (6th Cir. 2011), and that properly understood, the case indicates that absolute immunity shields them from all of Brent's claims. In *Pittman*, the plaintiff claimed that an agent of the county's child welfare agency

> unconstitutionally deprived him of his fundamental liberty interest in maintaining a parental relationship with [his child] by regularly, repeatedly and on an ongoing basis misrepresenting his status, his whereabouts and his attitude towards parenting [his child] to the Juvenile Court; by misrepresenting his status [and] his attitude toward parenting when participating in agency decisions regarding the placement and custody of [his child]; and by completely cut[ting] him out of the [placement and custody] process.

*Id.* at 723–24 (third, fifth, and sixth alterations in original) (internal quotation marks omitted). Pittman also claimed that the defendants misled him to believe that he would be next in line for custody of his child if they determined the child's mother to be an unfit parent. *Id.* at 724.

The *Pittman* court first held that absolute social-worker immunity protects against liability for the filing of a complaint and affidavit in support of removal of a child. *Id.* Specifically, the court noted that "[w]hether [the social worker] made intentional

misrepresentations to the juvenile court in the complaint and affidavits does not affect the conclusion that she is entitled to absolute immunity." *Id.* at 725. The *Pittman* court drew on *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc), which analogized social-worker immunity in such contexts to prosecutorial immunity.

In the present case, the district court properly applied *Pittman*. It held that "[t]o the extent that Brent's claim is based upon the removal of the children from his home, the State Defendants are correct that they cannot be held liable for any such deprivation because the family court—not the State Defendants—bore the ultimate responsibility for this decision." The district court found triable issues only with regard to whether the social workers failed to properly consult with Brent after the children's removal. Accordingly, *Pittman*, standing alone, does not contradict the district court's analysis.

The social workers nonetheless argue that Brent's remaining claims should be dismissed based on absolute immunity under *Holloway* because they were acting in their capacity as legal advocates. Alternatively, they contend that the rights that the district court identified were not clearly established and, therefore, qualified immunity shields them. On a claim of absolute immunity, "[t]he official seeking absolute immunity bears the burden of showing that immunity is justified in light of the function she was performing." *Holloway*, 220 F.3d at 774. But on a claim of qualified immunity, "[t]he plaintiff has the burden of establishing that the law was clearly established at the time of the challenged conduct." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012). We will now consider each of Brent's Fourteenth Amendment claims in turn.

### 1. Social worker action 1: interrogation of Brent's children without his consent

Brent alleges that Wenk, Sampson, and Decormier-McFarland interrogated his children in violation of his constitutional rights. In particular, he asserts that Wenk interviewed all of his children without his consent when she visited his home on January 20, 2010. He also claims that Sampson and Decormier-McFarland seized RAB by forcing him to show them around Brent's residence on January 21, 2010.

Brent cites two cases to suggest that the actions of Wenk, Sampson, and Decormier-McFarland were a violation of his clearly established Fourteenth Amendment rights, but neither is persuasive. First, he cites *Myers v. Potter*, 422 F.3d 347 (6th Cir. 2005), which held that police officers violated Myers's Fourth Amendment rights when they interrogated Myers, who was then a child, for three hours beyond the one hour to which his mother had consented. Brent's claim differs in two critical respects. First, Brent asserts his claim under the Fourteenth Amendment, but *Myers* clearly established the law only under the Fourth Amendment.

The second critical difference between this case and *Myers* is that Brent asserts the claim on his own behalf, not on behalf of his children. *Myers* reaffirmed the unremarkable proposition that a party interrogated without valid consent suffers a constitutional violation. It provides no authority to suggest that a father personally suffers a constitutional violation when social workers interrogate his children without his consent. Accordingly, *Myers* provides no authority regarding Brent's Fourteenth Amendment rights.

The other case that Brent cites, the Seventh Circuit decision in *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), is also distinguishable. *Doe* held that

> because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his parents and by targeting the plaintiff parents as child abusers.

*Id.* at 524.

But *Doe* alone does not clearly establish the law in the Sixth Circuit. As this court clearly

explained in *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042–43 (6th Cir. 1992):

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

This reasoning severely limits *Doe*'s import as an out-of-circuit case. Moreover, the

holding in *Doe* does not point "unmistakably to the unconstitutionality of the conduct

complained of here," *see id.* at 1043, because RAB's under-dressed mid-January arrival at a

police station in fact gave rise to a reasonable suspicion of child abuse. Finally, *Doe* actually

granted qualified immunity to the caseworkers on the basis that they would have believed that

state law gave them authority to conduct such an interview. Brent has therefore cited no

authority supporting the conclusion that the interrogation of his children violated a constitutional

right.

We also note that *Kovacic v. Cuyahoga County Department of Children and Family

Services*, 724 F.3d 687 (2013), is not to the contrary. *Kovacic* determined that this circuit had

"clearly established [as of 2002] that Fourth Amendment warrant requirements, including the

exigent-circumstances exception, apply to the removal of children from their homes by social

workers." *Id.* at 699. The case held that a parent may sue social workers for such constitutional

violations. But *Kovacic* did not address whether a temporary seizure within the home (i.e., to

interrogate the children) violated the Fourth Amendment. Neither do the parties' submissions to

this court. Absent any further discussion on this point, Brent has failed to carry his burden of showing that the actions of Wenk, Sampson, and Decormier-McFarland violated clearly established law. Qualified immunity is therefore appropriate on these claims.

### 2. *Social worker actions 2 and 3: failure to seek Brent's input in decisions regarding the children and failure to advise Brent of the decisions*

Brent fails to carry his burden of showing that any of these alleged actions violated clearly established law. His principal contention is that *Santosky* guaranteed him the right to be consulted regarding his children's care while they were not in his custody. But *Santosky*'s holding is considerably more limited. *Santosky* considered the interest parents retain in the permanent custody of their children when the state temporarily removes the children from their parents' care. *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982). It did not consider the parents' right to participate in other decisions concerning the children's welfare while they are temporarily in the state's custody. Accordingly, Brent has not identified any clearly established law that the defendants allegedly violated.

Brent next argues that MCL §§ 712A.13a(10)(c) and 722.124a gave him certain rights, and that the state's failure to honor its state-law obligations itself violates due process. Michigan Compiled Law § 712A.13a(10) provides that "[i]f the court orders placement of the juvenile outside the juvenile's home, the court shall inform the parties . . . [t]hat participation in an initial services plan is voluntary without a court order." And MCL § 722.124a gives social workers the right to consent to routine medical treatment for children in their care. Brent cites three cases in support of his claim that the defendants' purported violations of MCL §§ 712A.13a(10) and 722.124a constitute a federal due process violation: *Wolff v. McDonnell*, 418 U.S. 539 (1974); *Goss v. Lopez*, 419 U.S. 565 (1975); and *Perry v. Sniderman*, 408 U.S. 593 (1972).

We find none of these cases on point. In *Wolff*, the Supreme Court confronted "important questions concerning the administration of a state prison," namely whether "disciplinary proceedings did not comply with the Due Process Clause." 418 U.S. at 542–43. The case before us, in contrast, concerns child-neglect proceedings, and Brent does not challenge the adequacy of the proceedings, but only the social workers' alleged failure to comply with state law.

*Goss* is similarly not on point. That case concerned a class of high-school students' suspensions from school. The Supreme Court held that the Due process Clause "requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. Brent is not asserting that his children were suspended from school, so *Goss* is of no relevance to the present circumstances.

Finally, Brent cites *Perry*. The Supreme Court in *Perry* held that the government cannot deny a governmental benefit to a recipient because of the recipient's exercise of a constitutional right. *See* 408 U.S. at 597–98. Although *Perry* might bear on Brent's retaliation claim, discussed in the next subsection, it has no relevance to the provisions at issue in this subsection.

All three cases cited by Brent are therefore distinguishable. On the other hand, this court's recent decision in *Jasinski v. Tyler*, 729 F.3d 531 (6th Cir. 2013), although cited by neither side, is directly on point. The key holding in *Jasinski*, a case involving a different provision of Michigan's child-protection laws, is as follows:

> To establish a procedural due process claim, a plaintiff must show "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the . . . interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). A liberty interest may be created by state law when a state places "substantive limitations on official discretion." *Tony*

L. and Joey L. v. Childers, 71 F.3d 1182, 1185 (6th Cir. 1995) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). A state may create such limitations by "establishing 'substantive predicates' to govern official decision-making . . . and further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)). The state statute "must use 'explicitly mandatory language' requiring a particular outcome if the articulated substantive predicates are present." *Id.* (citing *Thompson*, 490 U.S. at 463).

*Id.* at 541. Michigan Compiled Laws § 712a.13a(10)(c) appears to qualify as such a substantive limitation on official discretion because the statute specifies that "[i]f the court orders placement of the juvenile outside the juvenile's home, the court *shall* inform the parties . . . [t]hat participation in an initial services plan is voluntary without a court order." (emphasis added).

But Brent does not rely on *Jasinski*, and we are therefore loathe to address the constitutional dimensions of MCL § 712a.13a(10)(c) here. This is particularly so because we have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In the present case, we have concluded that Brent has not carried his burden of showing that the law applicable to his case was clearly established. *Jasinski* supports this reasoning because *Jasinksi* itself held that "we cannot say that a reasonable [Child Protective Services] official would understand that the failure to file a petition under § 722.638 would constitute a denial of procedural due process. No decision has yet found a procedural due process right in a similar context." *Jasinksi*, 729 F.3d at 544. Likewise, the parties here have pointed us to no case suggesting a constitutional dimension to MCL § 712a.13a(10)(c). The social workers are therefore entitled to qualified immunity on these procedural due process claims.

### 3. *Social worker action 4: alleged insistence that Brent waive his right to a jury trial in order to obtain the social workers' approval of the children's return to his custody*

The district court also denied qualified immunity on Brent's claim that certain defendants insisted that—notwithstanding their conclusion that the home conditions were adequate and safe—they would recommend the children's return only if he would waive his right to a jury trial and give up all post-return decision-making authority with respect to their education, medical care, and extracurricular activities. On appeal, the social workers argue that this conduct was intimately connected to their role as advocates and, in any event, only the Family Court could have ordered the children's return. We agree.

Under this court's decision in *Pittman v. Cuyahoga County Department of Children and Family Services*, 640 F.3d 716, 725 (6th Cir. 2011), the removal of the children from parental custody was one entrusted to the Family Court. Accordingly, the Family Court affected the deprivation, not the social workers, whatever their conduct in so advocating. The decision to return the children, and the advocacy associated therewith, is entitled to the same immunity. Indeed this court has so held. Considering Tennessee's child welfare statute, this court explained that

> Tennessee law entrusts the decision whether to return a neglected child to the home from which he was removed to the Juvenile Court. The Department [of Children's Services] acts in an advisory role to the Juvenile Court in recommending that the child is ready to return home. In performing that role, social workers in the Department act in much the same fashion as probation officers who make sentencing recommendations to criminal courts for which they are entitled to absolute immunity. . . . Social workers involved in the investigation or recommendation are, therefore, entitled to absolute immunity with respect to claims arising from such recommendations and investigations.

*Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 422–23 (6th Cir. 2001) (internal citations omitted). The same logic applies here. Advocacy and decisions concerning the return of removed children are entitled to the same immunity as advocacy and decisions concerning their initial removal.

Moreover, *Perry v. Sniderman*, 408 U.S. 593 (1972), offers no help to Brent. A claim for retaliation under *Perry* must allege that the government denied the plaintiff a benefit because the plaintiff exercised a constitutional right. *See* 408 U.S. 597 ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . ."). Here, Brent appears to claim that he had the right to have the social workers recommend the return of his children (the purported benefit), and that they denied him this benefit because he chose to exercise his right to a jury trial in the Family Court (the purported constitutional right).

Brent is wrong twice over. First, a recommendation from the social workers is not a benefit within the meaning of *Perry* but is, as we have just explained, an action committed to the absolute discretion of the social workers. Second, although Brent may have been entitled to a jury trial in the Family Court under Michigan law, Brent provides no authority holding that the Fourteenth Amendment requires such a procedure, so he cannot claim that he exercised a constitutional right at all. We therefore find *Perry* inapposite to the present case.

In sum, the defendants are entitled to absolute immunity on this claim. We therefore reverse the district court's judgment to the contrary.

### 4. Social worker action 5: creation of a document that purported to appoint the Chinavares family as the temporary guardians of the male children

Finally, the district court determined that Brent raised triable issues regarding the creation of a document that purported to appoint the Chinavares family as the temporary guardians of the male children without parental consent or a court order. The document, issued on the Department of Human Services' stationery states that "Noel and Michael Chinavare does [sic] have temporary guardianship of [AB, RB, and JB]."

As earlier discussed, the only case that Brent cites in support of his parental rights, *Santosky v. Kramer*, 455 U.S. 745 (1982), held that a state may "may sever *completely and*

*irrevocably* the rights of parents" only by proving that "clear and convincing evidence" so warrants. *Id.* at 747–48 (emphasis added). Brent cites no authority supporting the proposition that the document declaring that the Chinavares had *temporary guardianship* of Brent's three boys violated his right to due process. Indeed this claim also fails under qualified immunity's first prong—that the defendants violated Brent's constitutional rights at all—because Brent has not alleged, much less proffered evidence, that the document actually deprived him of the custody of his children. Absent some authority suggesting that clearly established law prohibited the social workers' actions, Brent has failed to carry his burden of establishing that a reasonable juror could find to the contrary. Qualified immunity is therefore appropriate on this claim.

### 5. *Alleged discovery violation*

The social workers also appeal the district court's decision regarding "[i]mmunity as to the alleged failure to produce documents." In its opinion, the district court considered this claim "as falling within [Brent's] parental rights claim." Brent argues that MCL § 722.627(2)(f) gives him the right to access DHS records regarding his children.

The language of the statute reads as follows:

Unless made public as specified information released under section 7d, a written report, document, or photograph filed with the department as provided in this act is a confidential record available only to 1 or more of the following . . .

(f) A person named in the report or record as a perpetrator or alleged perpetrator of the child abuse or neglect or a victim who is an adult at the time of the request, if the identity of the reporting person is protected as provided in section 5.

As we explained with regard to MCL § 712a.13a(10)(c), MCL § 722.627(2)(f) appears to "place[] substantive limitations on official discretion" that would render any violation of MCL § 722.627(2)(f) an additional violation of Brent's procedural due process rights. *See Jasinski v. Tyler*, 729 F.3d 531, 541 (6th Cir. 2013) (internal quotation marks omitted). Brent, however,

does not so argue. Nor does he cite any authority suggesting that "a reasonable [Child Protective Services] official would understand that the failure to [comply with MCL § 722.627(2)(f)] would constitute a denial of procedural due process. No decision has yet found a procedural due process right in a similar context." *See Jasinksi*, 729 F.3d at 544. The burden on this issue is Brent's—a burden to show the violation of clearly established federal law. *See Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) ("The plaintiff has the burden of establishing that the law was clearly established at the time of the challenged conduct."). This is a burden that Brent has failed to meet.

We also note some difficulty in discerning the factual basis for Brent's claim. Brent appears to have requested the entire case file on his children. But Brent does not clarify in his briefing which of these documents he was allegedly denied. As the defendants point out, Brent's complaint acknowledges that the defendants did deliver some documents to Brent's attorney "during the hearing on March 30, 2010." The record does not reveal whether these March 30, 2010 documents are the entire basis for this claim or only some portion of it. And Brent has not established that this timing violated his due process rights. He has, therefore, failed to carry his burden against the defendants' assertions of qualified immunity with regard to the documents in question. For these reasons, we grant qualified immunity to the defendants on this claim.

## V. STATE-LAW CLAIMS

### A. Background

The district court also denied governmental immunity on several of Brent's state-law claims. Specifically, the district court denied state-law immunity on Brent's IIED and gross-negligence claims against Wenk, Sampson, Trice, McGehee, and Lamar, as well as his claim under MCL § 722.633(1) against Trice. We will consider each claim in turn.

## B. Legal standard

The Michigan Supreme Court has

[p]rovide[d] these steps to follow when a defendant raises the affirmative defense of individual governmental immunity. The court must do the following:

> (1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).
>
> (2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.
>
> (3) If the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether:
>
> > (a) the individual was acting or reasonably believed that he was acting within the scope of his authority,
> >
> > (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and
> >
> > (c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.
>
> (4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross* test by showing the following:
>
> > (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> >
> > (b) the acts were undertaken in good faith, or were not undertaken with malice, and

> (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). Contrary to who bears the burden of proof in the federal context, "the burden . . . fall[s] on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense." *Id.* at 227–28.

## C. Analysis

### 1. *IIED claims*

Brent alleges that the social workers intentionally inflicted emotional distress upon him in myriad ways. The district court dismissed several of Brent's IIED claims, but identified many more as remaining for trial. As the district court explained,

> [t]he essence of these allegations is that the State Defendants, despite having no actual belief that the Brent children were exposed to any harm in the home, nevertheless undertook a campaign to discover—or even fabricate—damaging evidence so as to get the children removed, and then, having accomplished that purpose, used the return of the children as collateral to coerce Brent to relinquish his parental authority. For example, Brent alleges that (1) Wenk, with Sampson's approval, continued her investigation of the Brent family, notwithstanding their conclusion that the initial complaint was unsubstantiated, (2) Wenk and Sampson conducted this investigation having already predetermined the outcome and falsified various reports to support this outcome; (3) Wenk, Trice, McGehee, Lamar, and Sampson refused to explain what services were being offered to the Brent family or what harm, if any, the children faced in the absence of those services; (4) Wenk, Trice, McGehee and Sampson withheld information from Brent and refused to permit him to have any input regarding what was best for the family; (5) Wenk abused her authority to force her will upon the parents upon threat of the children not returning or being removed again after their return; (6) Wenk, Sampson, and Lamar refused to advise Brent what he needed to do to facilitate the return of his children; (7) Wenk coerced Brent into turning over all post-return decision-making authority with respect to the children's education, medical care, and extracurricular activities by threatening that the children would otherwise not be permitted to return; (8) Sampson and Lamar refused to respond to or investigate Brent's claims regarding constitutional, statutory, and policy violations; (9) despite having determined that the home was suitable for the children's return, Trice, Lamar, and McGehee held the children hostage to coerce the Brents to forfeit their right to trial and falsified various documents to justify not returning the children; (10) Trice refused to provide services to reunify the

family, notwithstanding the review board's conclusions that the medical and educational needs of the children were not being met during their removal and that they should be returned to the Brent home. Brent also alleges that these actions were taken with reckless disregard for their effect on him, and caused him extreme emotional distress.

The social workers argue on appeal that they had no reason to know that any of these purported actions were unlawful, and that because the Family Court jury determined that Brent had neglected his children, their investigation cannot have been conducted with malice. They further contend that if this court finds no federal constitutional violations, then they must have been acting within the scope of their authority. Brent responds that because Michigan law requires the state employees to be trained in their legal duties, they cannot plausibly claim that they were mistaken as to those duties. He also contends that the defendants have offered no evidence suggesting that they were acting in good faith.

We find Brent's arguments the more persuasive at this stage of the case. First, the defendants cite no cases, orders of the Family Court, or Michigan statutes authorizing the ten actions that the district court identified as remaining for trial. Second, the defendants cite no authority for the proposition that simply because their actions did not violate the U.S. Constitution, they could reasonably believe that they were within the scope of their state-law authority. The defendants also fail to cite any compelling authority to support their claim that because the Family Court jury determined that Brent had neglected his children, none of their actions could have been taken with malice. Although they rely on the opinion of the Michigan Court of Appeals in *Latits v. Phillips*, 826 N.W.2d 190 (Mich. Ct. App. 2012), for the proposition that a finding of probable cause defeats a claim for false arrest, they offer no authority to suggest that Michigan law applies this holding to the actions of social workers in the context of child-neglect proceedings. Accordingly, we affirm the district court's decision that, at

this stage, the defendants have failed to negate the absence of a genuine dispute regarding Brent's IIED claims, but we note that they may reassert their state-law immunity defense upon the completion of discovery.

### 2. *Gross-negligence claims*

For similar reasons, we deny the defendants' claims of governmental immunity on Brent's gross-negligence claims. The parties' briefing and the district court's opinion leaves some doubt as to what the factual bases are for these claims. Nonetheless, as with Brent's IIED claims, the burden is on the government official asserting immunity to prove that she or he is so entitled, *see Odom v. Wayne Cnty.*, 760 N.W.2d 217, 227–28 (Mich. 2008), which includes proving that he or she "was acting or reasonably believed that he was acting within the scope of his authority." *Id.* at 228. As with Brent's IIED claims, the defendants have failed to cite the authority that allegedly authorized their actions. Absent such authority, we cannot conclude as a matter of law that the defendants reasonably believed that Michigan law authorized their actions. State-law immunity is therefore inappropriate at this stage of the case.

### 3. *Michigan Compiled Laws § 722.633(1) claim*

Finally, we consider Brent's claim that "Trice is liable to Plaintiff under MCL 722.633(1) for the damages caused from her failure to report the medical neglect of Plaintiff's son, including but not limited to medical expenses and emotional distress suffered by Plaintiff as a result of her failure." Michigan Compiled Laws § 722.633(1) provides that "[a] person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure." The district court considered this claim and explained that "[a]lthough the State Defendants request a dismissal and/or a summary judgment with respect to Brent's entire amended complaint, Trice has not made any argument

specifically regarding this claim. Therefore, and in the absence of any argument or briefing by the parties, this claim will proceed."

On appeal, Trice does not dispute that she failed to specifically address this claim before the district court, but instead argues that Brent lacks standing to bring this claim himself and that it should instead have been brought by RAB. She adds that even if RAB had brought this claim, the neglectful party rather than Trice herself would be the proximate cause of any injuries. Brent counters that both whether he was injured by the failure to report (and therefore has standing to bring this claim) as well as the proximate cause of any injury are factual issues that are not before us on appeal.

On this claim the law favors Trice. "Even if no party to this appeal has raised the issue of standing, this court can and must address the issue on its own motion." *Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1092 (6th Cir. 1985). Here, the Michigan Supreme Court has explained that "the Legislature intended that liability under [MCL § 722.633(1)] be limited to claims for damages *by the identified abused child* about whom no report was made." *Murdock v. Higgins*, 559 N.W.2d 639, 646 (Mich. 1997) (emphasis added) (quoting *Marcelletti v. Bathani*, 500 N.W.2d 124, 127 (Mich. Ct. App. 1993)). Brent brings this claim in his own name, not RAB's. Accordingly, his claim must be dismissed for lack of standing.

## VI. CONCLUSION

For all of the reasons set forth above, the judgment of the district court is **AFFIRMED** with regard to Brett's state-law claims of IIED and gross negligence. Its judgment with regard to the remainder of Brett's claims is **REVERSED** because the social workers are entitled to either absolute or qualified immunity. We **REMAND** the case to the district court for further proceedings consistent with this opinion.

# APPENDIX

# 2

home or should have a search warrant or court order. In practice, law enforcement assistance is essential in executing a search warrant or a court order to keep peace, prevent physical injury to all involved and prevent the destruction of evidence.

A federal court in *O'Donnell v. Brown* reaffirmed that the Fourth Amendment restricts unlawful entry by social workers into a private home.[57] The *O'Donnell* case arose from the entry of police officers and CPS caseworkers into and the temporary removal of children from a private family home while their parents were out of town, following a 911 call alleging child neglect. In *O'Donnell*, the authorities visited the house more than once during a span of eight hours before deciding to remove the children. When the police officers and CPS finally entered the home, they did not have a valid, written order giving them authority to enter the home.

In holding that the CPS caseworkers violated the Fourth Amendment, the *O'Donnell* Court held that the Fourth Amendment protects against unreasonable searches and seizures. Government entry into a private home is considered a search implicating the Fourth Amendment. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, except pursuant to a few specifically established exceptions, such as consent or exigent (emergency) circumstances. The police and CPS, in *O'Donnell* did not have consent to enter the home and remove the children. Given this, the *O'Donnell* Court concluded that only emergency circumstances would justify the warrantless entry into the home. "Exigent circumstances" occur where a real immediate and serious consequences would occur were a police officer to postpone action to get a warrant. There must be a need to protect or preserve life or avoid serious injury. The *O'Donnell* Court made clear: mere possibility of danger is not enough. The bottom line of this case is constitutional rights should not be lightly disregarded. If CPS are unsure whether a situation presents emergency circumstances then it likely does not.

To avoid the Fourth Amendment legal issues in *O'Donnell*, the Michigan Court Rules *specifically* addresses under what circumstances CPS and law enforcement can enter a private home and take a child into custody (1) without a court order [*See*, MCR 3.963 (A)] and (2) with a court order [See, MCR 3.963 (B)].

> MCR 3.963(A) **Taking Custody Without Court Order.** An *officer* may without court order remove a child from the child's surroundings and take the child into protective custody if, after investigation, the officer has reasonable grounds to conclude that the *health, safety*, or *welfare* of the child is endangered.

---

[57]. *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 2004 U.S. Dist. LEXIS 18976 (W.D. Mich. 2004)

The language in MCR 3.963(A) is consistent with the language found in MCL 712A.14. The *O'Donnell* Court briefly addressed MCR 3.963 and MCL 712A.14, indicating that they may authorize the seizure of a child, but they do not give law enforcement the authority to enter a home to effect the seizure. The entry itself must satisfy the Fourth Amendment, which generally requires a warrant (*aka*, an order authorizing entry into a specified premises) unless there are emergency circumstances, which would be the case in situations falling under MCR 3.963(A). Cases falling under MCR 3.963(A) are those cases where law enforcement reasonably concluded that they need to immediately enter and remove a child out of the home because that child was in real, immediate and serious danger.

Law enforcement's entry into a private home is supported by MCR 3.963(A) only in situations where there is no time to spare to get a signed, written order by the court authorizing law enforcement to enter the home to remove the child. Otherwise, the Fourth Amendment applies to law enforcement, social workers, as it does to all other officers and agents of the State whose requests to enter, however benign or well-intentioned, are met by a closed door. There is no social worker exception to the strictures of the Fourth Amendment. In circumstances, such as *O'Donnell*, where it is not an emergency to remove the child from the home, law enforcement and CPS must obtain a signed, written order to both enter the home and to take the children into custody. *See* MCR 3.963 (B) below.

> MCR 3.963(B) **Court-Ordered Custody.** (1) The court may issue a written order authorizing a child protective services worker, an officer or other person deemed suitable by the court to immediately take a child into protective custody when, upon presentment of proofs as required by the court, the judge or referee has reasonable grounds to believe that conditions or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child and that remaining in the home would be contrary to the welfare of the child. At the time it issues the order or as provided in MCR 3.965(D), the court shall make a judicial determination that reasonable efforts to prevent removal of the child have been made or are not required. The court may include in such an order authorization to enter specified premises to remove the child. *See* JCO5b.

Had the police officers and CPS obtained a signed, written order authorizing them to enter the O'Donnell home and remove and place the children into protective custody, they may very well have avoided the Fourth Amendment violations. *See* JC05b. State statutes and regulations cannot be construed to displace the protections of the United State Constitution even when the State acts to protect the welfare of children.

## 2.10.    PHYSICAL EVIDENCE AND PHOTOGRAPHS

# APPENDIX

# 3

Services Manual provides guidance to the caseworker for the initial fact-finding and discretionary preliminary investigation. The DHS does not assign every case for field investigation but evaluates them according to established intake criteria.

### 2.3.2. *Field Investigation*

Once a complaint is accepted, it is assigned for field investigation within 24 hours, although the alleged seriousness of the risk to the children may dictate a more immediate response.[30] A full description of the protective services investigation and assessment process is not necessary here. *See* the MDHS Services Manual. The major elements include: 1) a face-to-face contact with the parents, guardian or caretaker and the child to determine the presence or degree of danger; 2) an effort to visually assess the part of the child's body which is alleged to have sustained injury; and 3) a determination of the sources of danger and risk to the child based on an assessment of risk, including an assessment of the parents and significant other persons associated with the family, the children, and the general situation. The investigation and evaluation of all complaints assigned for field investigation must be completed within 30 calendar days from the date the Department received the complaint.[31]

Protective services are to be provided as long as the child needs protection. Cases that have an intensive or high score on the abuse/neglect scale must be kept open until the risk level is moderate or low.[32]

## 2.4. CONTACTING THE CHILD

### 2.4.1. *Generally*

In the course of the investigation, the worker is expected to make a face-to-face contact with the child.[33] Where parents have challenged protective services for contacting children as part of the initial investigation, courts have, up to now, found no constitutional violation. Parents have no clearly established statutory or constitutional rights to prohibit workers from talking to their child if the worker can gain access to the child outside of the home. Parental consent is not required to interview a child at school, a neighbor or relative's home, a medical facility, a day care

---

[30]. MCL 722.628(1)
[31]. MDHS CPS Manual, Item 712
[32]. *Id.*
[33]. MCL 722.628(2); MDHS CPS Manual, Item 712

home or center.[34] No court has determined that talking with a child as part of a protective services investigation without parental permission is constitutionally prohibited.

### 2.4.2.   *At Home*

The sanctity of the home is constitutionally protected and parents may legally refuse a caseworker admittance to the home and refuse access to the child.  In such a case the worker might seek a court order to assist the investigation or contact the child at some other location.  Current law does not require the workers to apprise parents of their right to refuse entry.  Even silence may constitute implied consent as long as the parent makes no physical gesture such as barring the door, which indicates lack of consent.

### 2.4.3.   *At School*

Schools and other institutions are required to cooperate with the department in child protection investigations, including allowing access to the child for interview without the parent's consent.

> A school or other institution shall cooperate with the department during an investigation of a report of child abuse or neglect. Cooperation includes allowing access to the child without parental consent if access is necessary to complete the investigation or to prevent abuse or neglect of the child... .[35]

In an opinion of September 6, 1995, Michigan's Attorney General supported the investigative powers of the DHS in relation to the schools. The Attorney General, interpreting the Child Protection Law, concluded that a school administration:

- may not deny access to a child protective services worker who wishes to interview a child at school;
- may not require a child protective services worker to establish in writing the need to interview a child;
- does not have the right to have a school official at the interview; and
- may not prevent the interview with a child until the child's parents have been notified.[36]

---

[34]. *See Fitzgerald v. Williamson*, 787 F.2d 403 (8th Cir. 1986); *Doe "A" v Special School District of St. Louis County*, 637 F.Supp. 1138 (E.D. Mo 1986); *Achterhof v. Selvaggio*, 886 F.2d 826 (6th Cir 1989) No. 88-2231
[35]. MCL 722.628(8)
[36]. Op.Atty.Gen. 1995, No. 6869

# APPENDIX

# 4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

DWAYNE B., by his next friend, John Stempfle;
*et al.,*

                      Case No. 2:06-CV-13548

                      Hon. Nancy G. Edmunds

    Plaintiffs,

v.

                      **Class Action**

JENNIFER GRANHOLM, in her official capacity
as Governor of the State of Michigan, *et al.,*

    Defendants.

---

## ORDER ENTERING CONSENT DECREE

Pursuant to this Court's Order granting the parties' Joint Motion for Final

Approval of Class Action Settlement Agreement, and its Memorandum Opinion

granting the motion, both entered on this date, the Settlement Agreement attached

to this Order is hereby entered as a consent decree and Order of this Court.

Dated: October 24, 2008

                s/Nancy G. Edmunds
                Nancy G. Edmunds
                United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| DWAYNE B., by his next friend, John Stempfle; CARMELA B., by her next friend, William Ladd; LISA J., by her next friend, Teresa Kibby; and JULIA, SIMON, and COURTNEY G., by their next friend, William Ladd; for themselves and others similarly situated, | ) ) ) ) ) ) ) | No. 2:06-cv-13548 Hon. Nancy G. Edmunds Hon. Mag. Donald A. Scheer |
| | ) | Class Action |
| Plaintiffs, | ) ) | **SETTLEMENT AGREEMENT** |
| v. | ) ) | |
| JENNIFER GRANHOLM, et. al., | ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

Attorneys for Plaintiffs:

Marcia Robinson Lowry
Susan Lambiase
Sara M. Bartosz
Elissa Hendler
Gena Wiltsek
Children's Rights
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: 212.683.2210

Edward P. Leibensperger
Kevin M. Bolan
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Phone: 617.535.4046

Elizabeth Phelps Hardy
Noel D. Massie
Jay C. Boger
Kienbaum Opperwall Hardy & Pelton, P.L.C.
280 North Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
Phone: 248.645.0000

Attorneys for Defendants:

Michael G. Frezza (P46949)
Assistant Attorney General
Cadillac Place, Su 10-200
Detroit, MI 48202
Phone: 313.456.0040

B. Jay Yelton
Brad Sysol
P. Rivka Schochet
Miller, Canfield, Paddock, and Stone
444 West Michigan Ave.
Kalamazoo, MI 49007
Phone: 269.381.7030

_____/

## I.   <u>PREAMBLE</u>

A.   The provisions of this Agreement resolve the existing disputes and issues in the case of *Dwayne B. v. Granholm*, Civil Action Number 2:06-cv-13548, and satisfy and resolve the claims of the Named Plaintiffs and the Plaintiff class for injunctive and declaratory relief in the above-entitled case as of the date of this Agreement.

B.   This Court has subject matter jurisdiction and personal jurisdiction over this action and therefore the authority to enter this Agreement.

C.   This Court shall have continuing jurisdiction over this action to ensure compliance with the terms of this Agreement for as long as the Agreement remains in effect.

D.   Any state agency responsible for the care, protection, and/or supervision of Plaintiff class members shall be bound by the provisions of this Agreement.  For as long as this Agreement remains in effect, all provisions of this Agreement referring to the "Department of Human Services," "the Department," or "DHS," upon any subsequent changes to the current governmental organizational structure of the Michigan Department of Human Services concerning the children in the Plaintiff class as defined in this Agreement, shall apply with full force and effect to the state of Michigan and to any subsequent agency or agencies with any of the responsibilities that apply to the current Michigan Department of Human Services under this Agreement as of the date of this Agreement.

E.   The term "DHS" as used in this Agreement refers to all Defendants in the case of *Dwayne B. v. Granholm*, Civil Action Number 2:06-cv-13548, including but not limited to Jennifer Granholm, in her official capacity as Governor of the state of Michigan; Ismael Ahmed, in his official capacity as Director of DHS; and Stanley Stewart, in his official capacity as Chief Deputy Director of DHS.

1

F.  The term "Plaintiffs" as used in this Agreement refers to all members of the class certified by Judge Nancy G. Edmunds on February 15, 2007 in the case of *Dwayne B. v. Granholm*, Civil Action Number 2:06-cv-13548.

G.  This Agreement, along with any of its provisions, is not, and shall not be construed to be, an admission of any liability on the part of DHS concerning any of the claims and allegations in the complaint in this litigation.

H.  Defendants do not speak for the Michigan Legislature, which has the power under Michigan law to determine the appropriations for the State's child welfare programs. However, at least annually after Court approval of this Agreement, and consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this Agreement in connection with any budget, funding, or allocation request to the executive or legislative branches of State government. To the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal fund sources, Defendants shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular budgetary needs assessments.

I.  Such budgetary requests, which shall be provided to the Monitor, shall, among other things, identify for the executive and legislative branches of State government, with sufficient particularity, the known and anticipated costs to the State for the timely implementation of the reforms and outcome measures provided for herein. Defendants shall maximize available federal funding opportunities. Nothing in this paragraph limits Defendants' obligations under this Agreement.

J.  The parties acknowledge that this Agreement shall be controlled by and implemented in accordance with the United States Constitution and federal law and subject to federal court supervision and enforcement. The parties further acknowledge that this Agreement will be implemented consistent with the Michigan Constitution and state

2

law insofar as the provisions of the Michigan Constitution and state law do not conflict with controlling federal law.

## II.   **PRINCIPLES**

Interpretation of the provisions of this Agreement will be guided by the following principles:

A.   Safety:  The first priority of the Department of Human Services ("DHS") child welfare system is to keep children safe.

B.   Children's Needs:  Whenever possible, children must have a voice in decisions that affect them, and DHS must consider the specific needs of each child as decisions are made on his or her behalf.

C.   Families and Communities:  Families must be treated with dignity and respect, and, whenever possible, included in decisions that affect them and their children.  DHS must actively partner with communities to protect children and support families when determining the intervention plan for a child.

D.   Placement:  The ideal place for children is in their own home with their own family. When DHS cannot ensure their safety in the family home, it must place children in the most family-like and least restrictive setting required to meet their unique needs and must place siblings together whenever possible.  DHS must strive to make the first placement the best and only placement.

E.   Reunification and Permanency:  DHS must reunify children with their siblings and families as soon as is safely possible.  When reunification is not possible, DHS must provide children with a permanent home and/or permanent connection with caring, supportive adults as soon as possible.  DHS must also ensure that children in its care are connected with the resources necessary for physical and mental health, education,

financial literacy, and employment and that they acquire the life skills necessary to become successful adults.

F. <u>Services</u>: When DHS intervenes on behalf of children it must strive to leave children and families better off than if there had been no intervention. DHS must tailor services to meet the unique needs of each family member and provide those services in a manner that is respectful of the child and the family. Services should be outcome-based, data-driven, and continuously evaluated.

## III. <u>OUTCOMES</u>

A. <u>Reporting Periods</u>: Except in relation to the outcome measures set forth in subsection III.D below, reporting on all other outcome measures set forth in this section shall begin in Reporting Period Three, as defined in Section XVII.H below.

B. <u>Changes in Federal Indicators</u>: The indicators set forth in the remainder of this section were developed by the United States Department of Health and Human Services ("HHS") as part of the Child and Family Services Review ("CFSR") process. In the event that, during the term of this Agreement, HHS modifies these indicators, the parties and the Monitor will meet to determine whether to make corresponding changes in DHS's responsibilities under the Agreement.

C. <u>Content of Reports and Compliance Expectations</u>: DHS shall report on aggregate performance for the outcome indicators identified in paragraphs D and E below in each Reporting Period, as defined in Section XVII.H below, and shall comply with the identified interim measures. By October 2013, DHS shall meet or exceed the federal indicators for each outcome. Additionally, DHS shall report in each Reporting Period on its performance with regard to each of the component elements of the Permanency outcomes set forth in Section III.E below, as such components are defined by HHS. Effective October 2013 and thereafter, DHS's performance shall

4

exceed the median performance of all states with regard to each such component element.

D. <u>Safety</u>:

   1.   *Recurrence of Maltreatment within Six Months (%)*: By the end of Reporting Period Four, the percentage of children without a recurrence of maltreatment within six months following their exit from foster care will be 94.6% or higher. This percentage is the national indicator. Michigan will commit to maintaining or exceeding this percentage over the duration of the Agreement.

   2.   *Maltreatment in Foster Care (%)*: By the end of Reporting Period Two, the percentage of children not maltreated while in foster care will be 99.68% or higher. This percentage is the national indicator. DHS will commit to maintaining or exceeding this percentage over the duration of the Agreement.

E. <u>Permanency</u>:

   1.   *Composite One: Timeliness and Permanency of Reunification*: By Reporting Period Ten, DHS shall achieve, and shall thereafter maintain, a score of 122.6 or greater on this composite. DHS shall meet interim targets as follows: by Reporting Period Two, a score of 99; by Reporting Period Four, a score of 100; by Reporting Period Six, a score of 105; by Reporting Period Eight, a score of 113. DHS shall report the following individual component measures for Composite One:

      a.  Of all children who were discharged from foster care to reunification in the target 12-month period, and who had been in foster care for 8 days or longer, what percent were reunified in less than 12 months from the date of the latest removal from home?

      b.  Of all children who were discharged from foster care to reunification in the 12-month target period, and who had been in foster care for 8 days or longer, what was the median length of stay in months from the date of the latest removal from home until the date of discharge to reunification?

5

c.  Of all children who entered foster care for the first time in the 6-month period immediately prior to the target 12-month period, and who remained in foster care for 8 days or longer, what percent were discharged from foster care to reunification in less than 12 months from the date of the latest removal from home?

d.  Of all children who were discharged from foster care to reunification in the 12-month period immediately prior to the target 12-month period, what percent re-entered foster care in less than 12 months from the date of discharge?

2.  *Composite Two: Timeliness to Adoption*:  By Reporting Period Ten, DHS shall achieve, and shall thereafter maintain, a score of 106.4 or greater on this composite.  DHS shall meet interim targets as follows: by Reporting Period Two, a score of 93; by Reporting Period Four, a score of 96; by Reporting Period Six, a score of 100; by Reporting Period Eight, a score of 103.  DHS shall report the following individual component measures for Composite Two:

a.  Of all children who were discharged from foster care to a finalized adoption during the 12-month target period, what percent were discharged in less than 24 months from the date of the latest removal from home?

b.  Of all children who were discharged from foster care to a finalized adoption during the 12-month target period, what was the median length of stay in foster care, in months, from the date of the latest removal from home to the date of discharge to adoption?

c.  Of all children in foster care on the first day of the 12-month target period who were in foster care for 17 continuous months or longer, what percent were discharged from foster care to a finalized adoption by the last day of the 12-month target period?

d.  Of all children in foster care on the first day of the 12-month target period who were in foster care for 17 continuous months or longer, and who were not legally free for adoption prior to that day, what percent became legally free for adoption during the first 6 months of the 12-month target period?

e.  Of all children who became legally free for adoption during the 12 months prior to the target 12-month period, what percent were discharged from foster care to a finalized adoption in less than 12 months from the date of becoming legally free?

3.  *Composite Three: Achieving Permanency for Children in Foster Care for Long Periods of Time:*  By Reporting Period Ten, DHS shall achieve, and shall thereafter maintain, a score of 121.7 or higher on this composite.  DHS shall meet interim targets as follows: by Reporting Period Two, a score of 118; by Reporting Period Four, a score of 119; by Reporting Period Six, a score of 120; by Reporting Period Eight, a score of 121.  DHS shall report the following individual component measures for Composite Three:

a.  Of all children who were discharged from foster care during the 12-month target period, and who were legally free for adoption (i.e., there was a termination of parental rights for both parents) at the time of discharge, what percent were discharged to a permanent home prior to their 18th birthday?

b.  Of all children who were in foster care for 24 months or longer on the first day of the 12-month target period, what percent were discharged to a permanent home by the last day of the 12-month period and prior to their 18th birthday?

c.  Of all children who either (1) were, prior to age 18, discharged from foster care during the 12-month target period with a discharge reason of emancipation, or (2) reached their 18th birthday while in foster care but had not yet been discharged from foster care, what percent were in foster care for three years or longer?

4.  *Composite Four: Placement Stability While in Foster Care:*  For all Reporting Periods, DHS will maintain a score of 101.5 or higher on this composite. DHS shall report the following individual component measures for Composite Four:

a. Of all children in foster care during the 12-month target period, and who were in foster care for at least 8 days but less than 12 months, what percent had two or fewer placement settings?

b. Of all children in foster care during the 12-month target period, and who were in foster care for at least 12 months but less than 24 months, what percent had two or fewer placement settings?

c. Of all children in foster care during the 12-month target period, and who were in foster care for at least 24 months, what percent had two or fewer placement settings?

In reporting on placement stability, DHS shall provide information separately stating scores for each stability measure for children placed in relative foster homes; children placed in non-relative foster homes; and children placed in residential care.

## IV.   ORGANIZATIONAL STRUCTURE

A. The DHS organizational structure shall be modified as follows:

1. There shall be established within DHS a Children's Services Administration, headed by a Director of Children's Services Administration, who shall be at the rank of Deputy Director of the Department of Human Services or higher.

2. Within the Children's Services Administration, and reporting directly to the Director of Children's Services Administration, there shall be: (a) a person responsible for all children's services policy, program development, and support functions ("Director of Bureau of Child Welfare"); (b) a person responsible for child welfare improvement (" Director of Child Welfare Improvement Bureau"); and (c) a person responsible for children's services field operations in Designated Counties ("Director of Bureau of Children's Field Services Operations") as further described in paragraph 3, below.

8

3.      In, at minimum, Wayne, Genesee, Kent, Macomb, and Oakland Counties (identified as "Designated Counties"), DHS offices providing children's services shall be distinct from those providing other services, and there shall be a county-level Administrator of Children's Services in each of the Designated Counties who reports directly to the Director of Bureau of Children's Field Services Operations as described in paragraph 2, above.

4.      The Children's Services Administration shall include units containing a sufficient number of qualified staff to exercise their functions effectively and shall be responsible for data collection and analysis, quality improvement, federal compliance, and training.

5.      The Children's Services Administration shall hold responsibility for evaluating the performance of private providers of children's services, including, but not limited to, private Child Placing Agencies ("CPAs"). These duties include, but are not limited to, requiring and approving corrective action plans when necessary and making recommendations to the Director of DHS concerning contract renewal, modification, and termination.

6.      Individuals within the Children's Services Administration, including but not limited to caseworkers, supervisors, and managers, shall be assigned full-time to children's services, and shall not hold responsibility for any of DHS's other functions, such as cash assistance, Medicaid, and adult services.

7.      Within the Field Operations Administration of DHS, there shall be established the position of Children's Services Field Manager. This position shall be responsible for ensuring that policies and practices established in the Children's Services Administration are followed in all parts of the state other than the Designated Counties, and that the needs of these other counties are taken into account by the Children's Services Administration as it formulates policies and practices. The Children's Services Field Manager shall report

9

directly to the Deputy Director for Field Operations, and shall consult regularly with the Director of Children's Services Administration.

8.  DHS shall establish a Children's Services Cabinet, which shall be headed by the Director of Children's Services Administration and shall include the persons described in subsections IV.A.2 and IV.A.7 above. The Cabinet shall meet regularly as determined by the Director of Children's Services Administration for the purposes of uniformly and efficiently administering all child welfare programs, policies, and practices.

9.  The changes enumerated in this section shall be phased in, beginning with the establishment of separate Children's Services offices in Wayne County, and shall be completed by March 31, 2009.

B.  On or before January 31, 2009, DHS, Plaintiffs, and the Monitor shall meet to review the progress of implementation of the organizational changes enumerated above. On or before June 30, 2009, the parties shall meet to further review the implementation of the organizational changes and to consider whether structural changes similar to those implemented with respect to the Designated Counties identified in Section IV.A.3 above should be implemented, with whatever modifications may be appropriate, in any remaining non-designated counties. Should either party recommend that these terms be modified, the parties will engage in good faith negotiations with the assistance of the Monitor. Nothing in this section shall be construed to preclude the parties from holding earlier and/or additional meetings to review and consider changes to the organizational structure.

## V.  RESPONDING TO REPORTS OF CHILD ABUSE AND NEGLECT

A.  DHS shall ensure that its system for receiving, screening, and investigating reports of child abuse and neglect is adequately staffed and that investigations of all reports are initiated and completed within the time periods required by state law.

10

B. DHS shall establish a statewide centralized hotline, to be operated 24 hours per day. It shall be adequately staffed and supported by adequate telecommunications equipment and information technology, for the receipt, screening, and assignment for investigation of reports of abuse and neglect, as follows:

1. A Wayne County pilot, by October 2009;

2. A statewide centralized hotline, by October 2011.

C. DHS shall, by April 2009, establish and implement a quality assurance process to ensure that reports of abuse and neglect are competently investigated and that, in cases in which abuse and/or neglect is indicated, actions are taken and services are provided appropriate to the circumstances.

D. DHS shall establish separate units to investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHS, whether directly supervised by DHS or privately supervised by one of its private CPAs or child caring institution ("CCI") providers. Such units shall be established within each of the Designated Counties. There shall be no more than three additional units responsible for other areas of the state and each of these additional units shall report to a person within the Children's Services Administration at the level of Deputy Director or higher. DHS shall also establish a mechanism to ensure accountability in those cases in which the abuse or neglect is substantiated, including appropriate follow-up on corrective action plans. These units shall be established according to the following schedule:

1. For the Designated Counties as defined in Section IV.A.3 above, by October 2009;

2. For the remainder of the state, by April 2010.

E. The scope of the Needs Assessment provided for in Section IX of this Agreement shall include consideration of services required to prevent abuse and neglect and to

11

keep children who have been the subject of abuse or neglect investigations safe in their own homes.

## VI.   STAFF QUALIFICATIONS, TRAINING, CASELOADS, AND SUPERVISION

A.   Caseworker Qualifications and Training:

1.    Entry level caseworkers for positions in Child Protective Services ("CPS"), foster care, and adoption, who are responsible for cases of Plaintiff class members either directly or as Purchase of Service ("POS") monitors, shall have a bachelor's degree in social work or a related human services field.

2.    All such caseworkers shall complete an eight week pre-service training that includes a total of 270 hours of competence-based classroom and field training. Beginning April 2009, and continuing thereafter, each trainee will receive a competence-based performance evaluation, which shall include a written examination. As part of pre-service training, a trainee may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced worker and may, under appropriate supervision, be assigned responsibility for a "training caseload" not to exceed three cases. Prior to assuming any other casework responsibilities, including the assumption of a caseload other than a training caseload, the worker must demonstrate an appropriate level of knowledge and ability to meet the case practice expectations of this Agreement by passing the performance evaluation.

3.    All caseworkers shall receive a minimum number of hours of in-service training annually, as follows:

a. CPS workers: for the state fiscal year beginning October 1, 2008 ("SFY 2009"), at least 16 hours; for the state fiscal year beginning October 1, 2009 ("SFY 2010"), at least 24 hours; for the state fiscal year beginning October 1, 2010 ("SFY 2011"), at least 32 hours; for state fiscal

12

years beginning October 1, 2011 ("SFY 2012") and thereafter, at least 40 hours.

b.  Foster Care and Adoption workers:  for SFY 2009, at least 24 hours; for SFY 2010 and thereafter, at least 40 hours.

4.  Private CPA and CCI caseworkers whose activities and responsibilities are comparable to those of DHS caseworkers shall be required to meet the same qualifications, pre-service and in-service training, and competency-based performance evaluation requirements as DHS workers.  Such private CPA workers shall receive a minimum of 24 hours of in-service training for SFY 2010, and a minimum of 40 hours of in-service training for SFY 2011 and thereafter.

B.  Supervisor Qualifications and Training:

1.  By April 2009, DHS shall develop and implement a competency-based Supervisory Training Program for all DHS, CPS, foster care, adoption, and POS supervisors ("Supervisors" or "Supervisory Positions") that is both consistent with the Principles set forth in Section II of this Agreement and designed to serve the overall goals and purposes of this Agreement.  This competency-based training shall address the work management skills, conceptual skills, interpersonal skills, self-management skills, and technical knowledge recognized among child welfare professionals as fundamental requirements for an effective public agency supervisor.  The Supervisory Training Program shall consist of at least 40 class hours.

2.  Beginning in April 2009 and continuing thereafter, all staff either promoted from within DHS or hired from outside DHS to a Supervisory Position shall complete the supervisory training program and pass a competency-based performance evaluation based on that training within three months of assuming the Supervisory Position.  The competency-based performance evaluation shall include a written examination.  Failure to achieve a passing grade on the competency-based performance examination as a whole,

13

including a passing grade on its written portion, within two sittings shall require the subject individual to complete an additional training before becoming eligible to sit for the performance evaluation again, said training to occur within an additional 45 days. The failure to pass the performance evaluation in the third sitting shall render the subject individual ineligible for further service as a DHS supervisor with responsibility for supervision of CPS, foster care, and adoption cases.

3.    All DHS Supervisors who were promoted or hired to Supervisory Positions before April 2009, and who have not previously received supervisory training, shall receive the competency-based supervisory training, as described above for new promotions and hires, and pass the associated competency-based performance evaluation, which shall include a written examination, by July 2010. Failure to achieve a passing grade on the performance evaluation as a whole, including a passing grade on its written portion, within two sittings shall require the subject individual to complete additional training before becoming eligible to sit for the evaluation again, said training to occur within an additional 45 days. The failure to pass the performance evaluation in the third sitting shall render the subject individual ineligible for further service as a Supervisor with responsibility for supervision of CPS, foster care, and adoption cases.

4.    *Supervisor Qualifications*: Except as set forth below, all staff hired from outside DHS or promoted from within DHS after January 2009 to fill positions including responsibility to supervise child welfare casework shall have earned a master's in social work from an accredited school of social work or a master's or higher degree in a comparable/equivalent field as a condition for such hiring or promotion. All current DHS Supervisors with either (1) less than 18 months of experience as a DHS Supervisor or (2) less than 18 months of combined experience as a DHS Supervisor and as a similarly situated supervisor in another public child welfare system, or duly licensed CPA or CCI, shall be required to earn a master's in social work from

an accredited school of social work or a master's degree in a comparable/equivalent field within four years following the date of entry of this Agreement as a condition of continued employment as a supervisor of CPS, foster care, or adoption cases. Exceptions to the requirement of a master's degree can be made for persons who have demonstrated the knowledge, skills, and abilities necessary to be an effective supervisor; however, such exceptions can only be made with the approval of the DHS Director and the Director must set forth in the approval the factual basis for the Director's conclusion that the person has demonstrated the competencies necessary to provide high quality supervision. The Monitor shall report on the percentage of supervisors who are granted such exceptions. In the event that such exceptions are granted to more than 10% of DHS supervisors, the Monitor shall conduct a review and report on whether (a) DHS has followed appropriate practices in proposing and granting exceptions, and (b) the individuals granted such exceptions are in fact qualified to perform supervisory duties.

5. *Development of University-Based Training Opportunities*: DHS shall encourage its child welfare staff, and the staff of private CPAs, to pursue master's-level work under a tuition reimbursement program (Title IV-E funded or other appropriate funding source as available) with accredited schools of social work. DHS shall develop relationships, joint programs, and such other programs as are deemed worthwhile with the accredited schools of social work to enhance and improve existing opportunities for the training and education of DHS and private CPA and CCI caseworker and supervisory staff.

6. Private CPA or CCI supervisors whose activities and responsibilities are comparable to those of DHS Supervisors shall be required to meet the same training and performance evaluation requirements as DHS Supervisors within the timeframes set forth in Sections VI.B.2 and VI.B.3 above. Private CPA supervisors whose activities and responsibilities are comparable to those of

15

DHS supervisors shall be required to meet the qualifications set forth in Sections VI.B.3 and VI.B.4 above by April 2011.

C. <u>Licensing Worker Qualifications and Training:</u>

By December 15, 2008, DHS shall develop and provide to the Monitor and Plaintiffs a plan identifying the type and amount of training to be provided to all staff responsible for conducting home studies, licensing inspections, annual evaluations, and other activities related to the licensing or monitoring of foster homes or residential care facilities, whether employed by DHS or by a private provider. The plan shall include timetables for implementation. Upon the Monitor's approval of the plan as submitted or modified, DHS shall implement the plan.

D. <u>Oversight of Training Requirements:</u>

There shall be a designated individual within the DHS central office who is solely responsible for overseeing and ensuring compliance with all training requirements for both DHS and private CPA and CCI workers and supervisors. DHS county offices and private CPAs shall be required to submit to this individual records attesting to the completion of pre-service training requirements and satisfactory performance on competency-based performance evaluations.

E. <u>Caseload Standards:</u>

1. DHS shall achieve the caseload standards set forth in this section. These standards will apply equally to both DHS worker caseloads and caseloads of private CPA caseworkers with comparable case responsibilities.

2. *Supervisors*: Each Foster Care, Adoption, CPS, Licensing, and POS monitoring Supervisor will be responsible for the supervision of no more than five caseworkers. DHS will achieve this standard as follows:

   a. By January 2010, 50% of Foster Care, Adoption, and CPS Supervisors will supervise no more than five caseworkers;

16

  b. By January 2011, 95% of Foster Care, Adoption, and CPS Supervisors will supervise no more than five caseworkers;

  c. By January 2011, 50% of Licensing and POS monitoring Supervisors will supervise no more than five caseworkers; and

  d. By January 2012, 95% of Licensing and POS monitoring Supervisors will supervise no more than five caseworkers.

3. *Foster Care Workers*: Each Foster Care worker will have a caseload of no more than 15 children. DHS will achieve this standard as follows:

  a. By November 15, 2008, 95% of Foster Care workers will have caseloads of no more than 30 children and 60% of Foster Care workers will have caseloads of no more than 25 children;

  b. By October 2009, 70% of Foster Care workers will have caseloads of no more than 22 children;

  c. By October 2010, 80% of Foster Care workers will have caseloads of no more than 20 children; and

  d. By October 2011, 95% of Foster Care workers will have caseloads of no more than 15 children.

4. *Adoption Workers*: Each Adoption worker will have a caseload of no more than 15 children. DHS will achieve this standard as follows:

  a. By February 2009, 60% of Adoption workers will have caseloads of no more than 25 children;

  b. By April 2009, 95% of Adoption workers will have caseloads of no more than 30 children;

  c. By October 2009, 70% of Adoption workers will have caseloads of no more than 22 children;

  d. By October 2010, 80% of Adoption workers will have caseloads of no more than 20 children; and

  e. By October 2011, 95% of Adoption workers will have caseloads of no more than 15 children.

5.   *Investigation/Assessment Workers*:

    a.   Each CPS worker assigned to investigate or assess allegations of abuse or neglect will have a caseload of no more than 12 open cases. DHS will achieve this standard as follows:

       i.   By April 2009, 95% of investigation/assessment staff will have no more than 16 open cases;

       ii.   By October 2009, 60% of investigation/assessment staff will have no more than 14 open cases;

       iii.   By October 2010, 80% of investigation/assessment staff will have no more than 13 open cases; and

       iv.   By October 2011, 95% of investigation/assessment staff will have no more than 12 open cases.

    b.   Each CPS worker assigned to provide ongoing services will have a caseload of no more than 17 families. DHS will achieve this standard as follows:

       i.   By April 2009, at least 95% of CPS ongoing services workers will have no more than 30 families;

       ii.   By October 2009, 60% of CPS ongoing services workers will have caseloads of no more than 25 families;

       iii.   By October 2010, 80% of CPS ongoing services workers will have caseloads of no more than 20 families; and

       iv.   By October 2011, 95% of CPS ongoing services workers will have caseloads of no more than 17 families.

6.   *POS Monitoring Workers*: Each POS monitoring worker will have a caseload of no more than 45 cases. DHS will achieve this standard as follows:

    a.   By October 2009, 60% of POS monitoring workers will have a caseload of no more than 55 cases;

b. By October 2010, 75% of POS monitoring workers will have a caseload of no more than 50 cases; and

c. By October 2011, 95% of POS monitoring workers will have a caseload of no more than 45 cases.

7. *Licensing Workers*: Each licensing worker will have a caseload of no more than 30 cases. DHS will achieve this standard as follows:

a. By October 2009, 60% of licensing workers will have a caseload of no more than 36 cases;

b. By October 2010, 75% of licensing workers will have a caseload of no more than 33 cases; and

c. By October 2011, 95% of licensing workers will have a caseload of no more than 30 cases.

8. *Mixed Caseloads*: With respect to mixed caseloads, DHS, in consultation with Plaintiffs and subject to the approval of the Monitor, shall establish caseload maximums and timeframes by which they will be achieved, based upon an appropriate weighting formula.

9. *Caseload Tracking and Reporting*: Beginning on a date to be established by the Monitor after consultation with the parties, DHS will provide regular reporting, at least quarterly, on the percentage of supervisors and workers in each of the categories above whose workloads meet the standards set forth in this section.

## VII. ASSESSMENT, CASE PLANNING, AND PROVISION OF SERVICES

A. Assessments and Service Plans:

DHS shall complete a written assessment of the child(ren)'s and family's strengths and needs, designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care, and shall update the

assessment at least quarterly thereafter. Assessments shall be of sufficient breadth and quality to usefully inform case planning.

DHS shall complete an Initial Service Plan within 30 days of placement, and an Updated Service Plan at least quarterly thereafter. The written service plan shall accord with the requirements of 42 U.S.C. § 675(1), and shall indicate:

1.      The assigned permanency goal;

2.      How DHS, other service providers (including the private CPA, where applicable), parents, and foster parents will work together to confront the difficulties that led to the child's placement in foster care and achieve the permanency goal;

3.      The services to be provided to the child(ren), parent(s), and foster parent(s);

4.      Who is to provide those services and by when they are to be initiated; and

5.      The actions to be taken by the caseworker to help the child(ren), parent(s), and foster parent(s) connect to, engage with, and make good use of services.

The service plan shall contain attainable, measurable objectives with expected timeframes, and shall identify the party or parties responsible for each task.

Service plans shall be signed by the caseworker, the caseworker's supervisor, the parent(s), and the child(ren), if of age to participate. If the parent(s) and/or child(ren) are not available or decline to sign the plan, the service plan shall include an explanation of the steps taken to involve them and shall identify any follow-up actions to be taken to secure their participation in services.

When a child is placed with a private CPA or CCI, the private CPA or CCI shall complete the assessment and the service plan in accordance with the provisions above. DHS shall review and approve assessments and service plans prepared by a private CPA or CCI. In the event that the parties agree to a different form of oversight of private CPA performance, pursuant to the review set forth in Section XII.G below, this paragraph shall no longer apply.

20

B. <u>Supervisory Oversight of Assessments and Service Plans</u>:

Prior to being finalized, each assessment and service plan shall be reviewed and approved by a supervisor only after a face-to-face meeting with the worker. Supervisors shall meet at least monthly with each assigned worker to provide consultation on their cases.

C. <u>Team Decision-Making</u>:

A Team Decision-Making meeting ("TDM") shall be held to make or recommend critical case decisions. TDMs shall be led by a trained facilitator, and shall include the parent(s) from whom the child has been or may be removed; foster parent(s); child(ren) if of age to participate; family, friends, or other supports identified by the parent(s) and child(ren); other service providers as appropriate; and the caseworker, with supervisory participation when necessary. For children placed with a private CPA, the private CPA caseworker, and the private CPA supervisor when necessary, shall also be present. A TDM shall be held:

1. Prior to placement, or by the next working day after an emergency placement;

2. Prior to the transfer of a child in foster care to a different placement setting, or by the next working day after an emergency transfer;

3. Prior to reunification;

4. Prior to a change in the permanency goal;

5. When a child returns from Absent Without Legal Permission ("AWOLP") status;

6. When a child has been in care for 9 months with a goal of reunification, and sufficient progress has not been achieved to ensure reunification within 12 months;

7. When a child has been legally free for adoption for three months but does not have a permanent placement identified.

At the conclusion of each TDM, the facilitator shall prepare a written report detailing the decisions and recommendations emerging from the meeting. The report shall be

21

provided to the worker and the worker's supervisor, and shall include a section identifying areas in which supervisory follow-up is needed.

D. Provision of Services:

DHS will ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family, and will monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. DHS is responsible for helping the parent(s) from whom the child has been or may be removed, the child(ren), and the foster parent(s) identify appropriate, accessible, and individually compatible services; assisting with transportation when necessary; helping to identify and resolve any barriers that may impede parent(s), child(ren), and foster parent(s) from making effective use of services; and intervening to review and amend the service plan when services are not provided or do not appear to be effective.

E. Implementation Schedule:

Assessments, service plans, and TDMs shall be implemented by the dates set forth in the following tables.

Wayne, Oakland, Macomb, Kent, and Genesee Counties:

|  | DHS | CPA |
|---|---|---|
| Initial assessment and initial service plan | Oct., 2009 | Oct., 2009 |
| Quarterly re-assessment and updated service plan | Oct., 2009 | Oct., 2009 |
| Placement TDM | Oct., 2009 | N/A |
| Change of placement TDM | Oct., 2009 | Oct., 2009 |
| Return from AWOLP TDM | Oct., 2009 | Oct., 2009 |
| TDM for children awaiting reunification more than 9 months | Oct., 2009 | Oct., 2009 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2009 | Oct., 2009 |
| Reunification TDM | Oct., 2009 | Oct., 2009 |
| Change of permanency goal TDM | Oct., 2009 | Oct., 2009 |

22

Berrien, Calhoun, Ingham, Jackson, Kalamazoo, Muskegon, Saginaw, St. Clair, and
Washtenaw Counties:

|  | DHS | CPA |
|---|---|---|
| Initial assessment and service plan | Oct., 2009 | Oct., 2009 |
| Quarterly re-assessment and updated service plan | Oct., 2009 | Oct., 2009 |
| Placement TDM | Oct., 2009 | N/A |
| Change of placement TDM | Oct., 2010 | Oct., 2010 |
| Return from AWOLP TDM | Oct., 2010 | Oct., 2010 |
| TDM for children awaiting reunification more than 9 months | Oct., 2011 | Oct., 2011 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2011 | Oct., 2011 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2011 | Oct., 2011 |
| Reunification TDM | Oct., 2010 | Oct., 2010 |
| Change of permanency goal TDM | Oct., 2010 | Oct., 2010 |

Remainder of State:

|  | DHS | CPA |
|---|---|---|
| Initial assessment | Oct., 2009 | Oct., 2009 |
| Quarterly re-assessment | Oct., 2009 | Oct., 2009 |
| Placement TDM | Oct., 2010 | N/A |
| Change of placement TDM | Oct., 2011 | Oct., 2011 |
| Return from AWOLP TDM | Oct., 2011 | Oct., 2011 |
| TDM for children awaiting reunification more than 9 months | Oct., 2011 | Oct., 2011 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2011 | Oct., 2011 |
| Reunification TDM | Oct., 2011 | Oct., 2011 |
| Change of permanency goal TDM | Oct., 2011 | Oct., 2011 |

23

F. <u>Additional Provisions Regarding Certain Permanency Planning Goals:</u>

A child shall be assigned only one permanency goal at any time and this goal shall be a federally recognized permanency goal. Where appropriate, a child shall also be assigned a concurrent goal in conformity with federal regulations and subsection VII.F.2 below.

1. *Maintaining a Permanency Goal of Reunification beyond 12 Months*: For any child who has a permanency goal of return home for more than 12 months, the child's worker, with written approval from the supervisor, shall include in the record a written explanation justifying the continuation of the goal, and identifying the additional services necessary or circumstances which must occur in order to accomplish the goal. No child shall have a permanency goal of return home for more than 15 months unless there are documented in the record and approved by the child's worker's supervisor compelling reasons to believe that the child can be returned home within a specified and reasonable time period.

2. *Concurrent Planning*: Strategic planning and preparation for possible adoptive placement of a child shall occur concurrently with the delivery of reunification services to the child's birth parent(s), unless clearly inappropriate for case specific reasons that are documented in the child's record. The adoption planning process shall begin immediately for all children for whom a diligent search has failed to locate the whereabouts of both parents and for whom no appropriate family member is available to assume custody.

3. *Change of Goal to Adoption*: In the event that a child's permanency goal is changed to adoption, DHS, and the assigned contract agency where applicable, shall within 30 days of the goal change:

   a. Assign a worker with adoption expertise to the case;

b. Determine whether the child's foster parent(s) or relative(s) are prepared to adopt the child and, if so, take appropriate steps to secure their consent to adoption;

c. If no adoptive resource has been identified, register the child on national, regional, and local adoption exchanges; and

d. If no adoptive resource has been identified, develop and implement a child-specific plan to recruit an adoptive family for the child.

The child-specific recruitment plan shall be reviewed at least quarterly until the child is placed in the home of a family that plans to care for the child through the age of majority as follows: (a) in the first six months following the child's goal becoming adoption or guardianship, in a face-to-face meeting between the Adoption worker and the Adoption Supervisor; (b) in cases where a permanent home has not been identified within six months of the child's permanency goal becoming adoption or guardianship, in a face-to-face meeting attended by the Adoption worker, the Adoption Supervisor and a person designated by the central office, not previously involved in the case, who is specially trained in permanency and adoption processes and planning, and (c) in cases where a permanent home has not been identified within one year of the child's permanency goal becoming adoption or guardianship, in a face-to-face meeting attended by the Adoption worker, the Adoption supervisor, and an outside expert engaged by DHS with expertise in permanency and adoption processes and planning.

Beginning November 15, 2008, DHS in consultation with the Monitor shall develop a process that will identify barriers to adoption and guardianship in cases in which a permanent home has not been identified within six months of the child's permanency goal becoming adoption or guardianship.

4. *Preparation and Filing of Petition for Termination of Parental Rights*: The process of freeing a child for adoption and seeking and securing an adoptive

placement shall begin as soon as the child's permanency goal becomes adoption, but in no event later than as required by federal law. A petition to terminate the parental rights of any parent whose rights must be terminated in order for the child to achieve permanency shall be filed within two weeks of the date on which the goal is changed to adoption, whether the goal change results from DHS's decision or from a court order.

5.     *Placement with a Fit and Willing Relative*: DHS, and the assigned contract agency where applicable, shall not assign a permanency goal of placement with a fit and willing relative to a child for whom it has not made adoption efforts unless:

    a.   An appropriate relative has been identified and has cleared all background checks required for placement of a child in the home;

    b.   The relative is willing to assume long-term responsibility for the child but has legitimate reasons for not adopting the child or pursuing permanent legal guardianship;

    c.   It is in the child's best interests to remain in the home of the relative rather than be considered for adoption by another person; and

    d.   The permanency goal receives the documented approval of the Director of the Bureau of Child Welfare or a higher-ranking official.

In such circumstances, DHS and the relative shall execute an agreement that ensures the permanency and stability of this placement.

With respect to any child assigned the goal of placement with a fit and willing relative as of the effective date of this Agreement, DHS shall ensure that, as part of the next regularly scheduled permanency plan review process, the goal is reviewed and changed, or there is documentation established in the case record that the conditions of this subsection of the Agreement have been met.

6.    *Another Planned Permanent Living Arrangement*: DHS, and the assigned contract agency where applicable, shall not assign the permanency goal of Another Planned Permanent Living Arrangement ("APPLA") unless:

    a.   The child is at least 14 years old;

    b.   Every reasonable effort has been made, and documented in the record, to return the child home, to place the child with appropriate family members, or to place the child for adoption;

    c.   The foster parent(s) caring for the child have agreed in writing to continue to do so until the child is emancipated; and

    d.   The permanency goal receives the documented approval of the Director of the Bureau of Child Welfare, or a higher-ranking official.

With respect to any child assigned the goal of APPLA as of the effective date of this Agreement, DHS shall ensure that, as part of the next regularly scheduled permanency plan review process, the goal is reviewed and changed, or there is documentation established in the case record that the conditions of this subsection of the Agreement have been met.

7.    *Independent Living and Emancipation*: DHS, and the assigned contract agency where applicable, shall not assign a permanency goal of independent living or emancipation to any child. No child below the age of 16 may be placed in an independent living placement.

With respect to any child assigned the goal of independent living or emancipation as of the effective date of this Agreement, DHS shall ensure that, as part of the regularly scheduled permanency plan review process, the goal is reviewed and changed.

8.    *Adoption Subsidies*: Upon identification of an adoptive family for a child legally freed for adoption, DHS shall within 14 days provide the putative adoptive family with an adoption subsidy application and explanatory

27

materials regarding the adoption subsidy program in Michigan and related federal Title IV-E regulations and HHS policies. DHS shall include a written record of delivery of such materials in the child's file.

9. *Disrupted Pre-Adoptive Placements*: DHS shall maintain a list, which shall be made available to the Monitor, of all Michigan Children's Institute ("MCI") wards and permanent court wards whose pre-adoptive placements disrupt prior to finalization. This list shall include:

   a. The name of the child;

   b. The name and address of the child's putative adoptive parents;

   c. The date of and reason for the placement disruption; and

   d. The current placement of the child.

G. Special Reviews for Backlogged Children:

1. *Backlog Cohorts*: The provisions of this section shall apply to all children in DHS foster care custody, including those children placed through private CPAs, who, at any time from the date of execution of this Agreement until January 1, 2009 (a) have had the parental rights of their parents terminated and have been legally free for adoption for more than 365 days or (b) have a goal of reunification and have been in care for more than 365 days.

2. *Actions to Be Taken During SFY 2008*: Upon execution of this Agreement and throughout the remainder of SFY 2008, DHS will develop and implement the policies, procedures, and organizational structures required to achieve legal permanency for children whose cases are part of the Backlog Cohorts. DHS shall:

   a. Establish the position of Permanency Planning Coordinator, with overall responsibility for implementing this section. The Permanency Planning Coordinator shall ensure the development of position descriptions and qualification requirements for the Permanency Planning Specialists described below, develop statements of work for any such positions to be filled by

28

contract providers, and develop policies and procedures for implementing the other steps required by this section.

b. Create at least 200 positions for Permanency Planning Specialists, including related supervisory and support staff. These shall be limited-term, specialized assignment positions responsible for reviewing cases of and pursuing legal permanency for children in the Backlog Cohorts. If DHS decides to fill some or all of these positions by contract, the statement of work developed for the contracting process will be provided to Plaintiffs and to the Monitor for review and comment prior to issuance. DHS shall fill 108 of these positions during SFY 2008, and the balance during SFY 2009.

c. Develop policies and procedures for permanent legal guardianship, subsidized guardianship, concurrent planning, post-adoption services, post-permanency guardianship services, community services, and youth permanency services that will facilitate the effort to achieve timely permanency for children for whom parental rights are terminated.

d. Undertake a gap analysis study to identify the services and supports required, but not currently available, to adequately address the needs of children in the Backlog Cohorts.
e. Develop and submit to the Michigan Legislature for legislative action Permanent Legal Subsidized Guardianship legislation.

f. Hire sufficient training staff to develop curriculum for training, and train Permanency Planning Specialists.

g. Begin reporting on the number, characteristics, and progress of children in the Backlog Cohorts, sorted by county, worker, and private CPA.

h.  Continue to assign the Permanency Planning Coordinator to manage the Backlog Project and monitor and report on progress.

3.  *Actions to be Taken During SFY 2009*:  In SFY 2009, DHS shall:

a.  Hire and/or contract for and train an additional 92 Permanency Planning Specialists, including related supervisory and support staff, to review and pursue legal permanency for Backlog Cohort cases.

b.  Continue to assign the Permanency Planning Coordinator to manage the Backlog Project and monitor and report on progress.

c.  By September 30, 2009, achieve legal permanency for at least 50% of the children in each of the two backlog groups identified in Section VII.G.1 above.

4.  *Actions to Be Taken During SFY 2010 and SFY 2011*:  During SFY 2010 and 2011, DHS shall:

a.  Continue to employ and/or contract for sufficient Permanency Planning Specialists, as required, to pursue legal permanency for all Backlog Cohort cases not already in permanency status in the manner described above.

b.  Continue to assign the Permanency Planning Coordinator to manage the Backlog Project and monitor and report on progress.

c.  By the conclusion of SFY 2010 (September 30, 2010), achieve legal permanency for 85% of the children in each of the two Backlog Cohorts identified in Section VII.G.1 above.

30

d. By the conclusion of SFY 2011 (September 30, 2011), achieve legal permanency for 100% of the children in each of the two Backlog Cohorts identified in Section VII.G.1 above.

H. <u>Caseworker Contacts and Visits:</u>

1. *Worker-Child Contacts*:  By October 2011, each child in foster care shall be visited by the assigned foster care case manager at least two times during the child's first month of placement, and at least one time per month thereafter. At least one visit each month shall take place at the child's placement location and shall include a private meeting between the child and the case manager. By October 2012, the requirement of two visits per month shall apply for the first three months following an initial placement or a placement move.

2. *Worker-Parent Visits*:  By October 2009, for each child in foster care with a permanency goal of reunification, the child's caseworker will have face-to-face contacts with the child's parent(s) as follows:  (a) for the first month the child is in care, two face-to-face contacts with each parent, at least one of which must occur in the home, and two phone contacts with each parent, if the parent has a phone; (b) for each subsequent month, at least one face-to-face contact with each parent and phone contact as needed, with at least one contact in each three-month period occurring in the parent's place of residence.

3. *Parent-Child Visits*:  By October 2009, DHS shall take all reasonable steps to assure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents.  Reasonable exceptions to this requirement shall include cases in which: (1) a court orders less frequent visits; (2) the parents are not attending visits despite DHS's having taken adequate steps to ensure the parents' ability to visit; (3) one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration; or (4) the child is above the age of 16 and refuses such visits.

All exceptions, and all reasonable steps to assure that visits take place, shall be documented in the case file. If such exceptions exist, DHS shall review the appropriateness of the child's permanency goal.

4.      *Sibling Visits*: By October 2009, DHS shall take all reasonable steps to assure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHS foster care custody. Reasonable exceptions to this requirement shall include cases in which: (1) the visit may be harmful to one or more of the siblings; (2) the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children; (3) the distance between the children's placements is more than 50 miles and the child is placed with a relative; or (4) one of the siblings is above the age of 16 and refuses such visits. All exceptions, and all reasonable steps taken to assure that visits take place, shall be documented in the case file.

## VIII. SERVICES AND PLACEMENT RESOURCES DEVELOPMENT AND UTILIZATION

A. Provision of Services:

DHS shall ensure that children in foster care have access to appropriate services sufficient in range and quantity to meet their service and placement needs, including medical and dental care, mental health services, and appropriate educational services. Consistent with the provisions of Section VII.D, DHS shall ensure that appropriate action is taken in each case to assist the child(ren), parent(s), and foster parent(s) in connecting to, engaging with, and making use of these services.

DHS shall be responsible for helping the parent(s), child(ren), and foster parent(s) identify appropriate, accessible, and individually compatible services; assisting with transportation when necessary; helping to identify and resolve any barriers that may impede parent(s), child(ren), and foster parent(s) from making effective use of

32

services; and intervening to review and amend the service plan when services are not provided or do not appear to be effective.

DHS will monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect.

1.  *Provision of Medical, Dental, and Mental Health Services*: DHS shall, by October 2009, take all necessary and appropriate steps to ensure that each child entering foster care receives:
    a.  Any needed emergency medical, dental, and mental health care;
    b.  A full medical examination within 30 days of the child's entry into care;

2.  *Health Services Plan*: By June 2009, DHS shall provide to the Monitor and Plaintiff a detailed Health Services Plan, which shall set forth the specific action steps DHS will implement in order to ensure that each child entering foster care receives:
    a.  A screening for potential mental health issues utilizing a valid and reliable tool within 30 days of entry into foster care, and a referral for a prompt further assessment by an appropriate mental health professional for any child with identified mental health needs as indicated by the screening tool;
    b.  All required immunizations, as defined by the American Pediatric Association, at the appropriate age;
    c.  Periodic medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Pediatric Association; and
    d.  Any needed follow-up medical, dental, and mental health care as identified.

The Health Services Plan shall be subject to the approval of the Monitor in consultation with the parties. The Monitor shall establish timeframes for

33

implementation of subsections VIII.A.2.a-d above in consultation with the parties.

DHS shall maintain an up-to-date medical file for each child in care, including medical history information reasonably available to DHS. DHS shall ensure that, at the time a child is placed in a foster home or residential care facility, the foster care provider receives specific written information about the child's present health status and any present medical needs or health concerns, as well as any medical history of which DHS is aware, that is reasonably necessary for the foster care provider to responsibly care for the child.

In maintaining medical records, DHS shall ensure that it is in compliance with MCL 722.954c(2) by preparing, updating, and providing medical passports to caregivers. In addition, DHS shall ensure that the medical passport, or some other DHS document inserted in each child's file, includes a complete and regularly updated statement of all medications prescribed to and given to the child. All such information shall be provided to all medical and mental health professionals to whom the child is referred and accepted for treatment, as well each foster care provider with whom a child is placed.

By November 15, 2008 and thereafter, each child entering care shall be assigned a Medicaid number and the foster parent or other placement provider shall receive a Medicaid card, or an alternative verification of the child's Medicaid status and number, within 30 days of the child's entry into care. For any subsequent placement during the same episode of care, the foster parent or other placement provider shall receive the child's Medicaid card or alternative verification of Medicaid status and number upon the child's placement.

3. *Reconfiguration of Mental Health Services Spending*: Beginning October 2008, DHS shall redirect at least $3 million to fund mental health services. In

34

order to help ensure that children in foster care in each county have access to the range of mental and behavioral health services and supports necessary to address their needs, including behavior management training and supports for caregivers working with children with behavioral problems, DHS will gather and analyze data on the way in which DHS funds are utilized to provide mental health services. DHS shall determine whether the allocation of these funds matches the priority needs of the children served, and if not, shall implement a plan to reallocate those funds to support the development and provision of services to meet the priority needs. New contracts for reconfiguration of Mental Health Services Spending will be implemented as follows:

a. By October 2009, in Wayne, Kent, Oakland, Genesee, and Macomb Counties;

b. By October 2010, in Berrien, Calhoun, Ingham, Jackson, Kalamazoo, Muskegon, Saginaw, St. Clair, and Washtenaw Counties; and

c. By October 2011, in all remaining counties.

This paragraph is not intended to limit any other obligations under this Agreement.

4. *Supports for Children Transitioning to Adulthood*:

a. DHS will ensure that children age 14 and older in foster care and youth transitioning from foster care to adulthood have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood, including but not limited to independent living services eligible for federal reimbursement under the Chafee program, and shall maintain sufficient resources to deliver independent living services to all children in the Plaintiff class who qualify for them.

b. DHS also shall develop and implement the following policies, services, and programs focused on meeting the needs of foster children who are 14 years and older with a permanency goal other than a goal of reunification:

35

i. Beginning November 15, 2008 and thereafter, DHS shall refer all children age 14 and older in foster care and youth transitioning from foster care to adulthood to Michigan Works! Agencies for participation in youth programs and services administered under the Workforce Investment Act, 29 U.S.C. 2801 et seq., designed to assist youth in developing job skills and career opportunities, and shall refer suitably qualified children for summer training, mentorship, and enrichment opportunities;

ii. By November 15, 2008, DHS shall have developed and implemented a policy and the necessary resources to extend all foster youths' eligibility for child foster care custody until age 20 and to make available independent living services through the age of 21;

iii. By November 15, 2008, DHS shall develop and implement a policy and process by which all children emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid managed care coverage so that their coverage continues without interruption at the time of emancipation;

iv. Beginning November 15, 2008, DHS shall refer all children without an identified housing situation at the time of emancipation from the foster care system at age 18 or beyond to the Michigan State Housing Development Authority for rental assistance and services under the Homeless Youth Initiative; and

v. By October 2009, DHS shall hire 14 regional Education Planners who shall provide consultation and support to youth age 14 and older in accessing educational services and in developing individualized education plans, including identifying all available financial aid resources.

5. *Provision of Educational Services*:
   a. DHS shall ensure that each child is screened for general and educational needs within 30 days of his/her entry into foster care.

    b.  DHS shall take reasonable steps to ensure that school-aged foster children are registered for and attending school within 5 days of initial placement or any placement change, including while placed in congregate care or emergency placements. No child shall be schooled pursuant to MCL Section 380.1561(3)(f).

    c.  DHS shall make reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

6.    *Improved Utilization of Existing Sources of Funding for Child/Family-Specific Goods and Services*: In order to ensure that the range of funds, including "flexible funds" (referred to in Section IX.B), available to meet individualized needs of families and children can be readily accessed by case managers working with those families and children, DHS shall implement a system that designates appropriate and knowledgeable administrative staff, rather than the case managers, as the staff responsible for determining the specific funding source to be drawn upon for the provision of goods and services identified as needed by the case manager/TDM team and for coding and processing the necessary paperwork. This system shall be implemented statewide by October 2009.

B. Foster and Adoptive Home Recruitment, Retention, and Support

1.    DHS shall:

    a.  Ensure that each county has a sufficient number and adequate array of foster homes capable of serving the needs of those children coming into care for whom foster home placement is appropriate;

    b.  Ensure that relatives of children in foster care and non-relatives with whom a child has a family-like connection are identified and considered as potential foster home placements for children; where a relative or non-relative with whom the child has a family-like connection is an

37

appropriate foster home placement for a child, DHS shall ensure that appropriate steps are taken to license the relative or non-relative as a licensed foster home as set forth in Section VIII.B.7 below; and

c. Develop a placement process in each county that ensures that a child entering foster care for whom a suitable relative foster home placement is not available is placed in the foster home that is the best available match for that child, irrespective of whether that foster home is a DHS- or private CPA-operated foster home.

2. *Immediate Recruitment of Placement Resources for Adolescents, Sibling Groups, and Children with Disabilities*: By December 15, 2008, DHS shall develop and provide to the Monitor and Plaintiffs a recruitment plan to increase the number of available placements for adolescents, sibling groups, and children with disabilities. The recruitment plan shall include, for each category of placements, the number of placements to be developed; the strategies to be followed in developing such placements; and specific timetables with interim targets. Within 30 days of receiving the proposed plan, the Monitor shall, in consultation with the parties, either approve the plan or, if the Monitor determines that the plan is not appropriate, convene the parties for the purpose of revising the plan so that the plan can be approved within an additional 30 days. DHS shall implement the approved recruitment plan consistent with the timetable and interim targets set forth therein.

3. *Development of Treatment Foster Homes*: DHS shall develop treatment foster homes, a category of foster homes designed to serve children with higher levels of need.

a. By November 15, 2008, DHS will have 50 treatment foster home beds available;

b. By October 2009, DHS will have 100 treatment foster home beds available; and

38

c.  By October 2010, DHS will have 200 treatment foster home beds available.

4.  *Assessment of Adequacy of Foster Home and Adoptive Home Capacity*:  As part of the Needs Assessment set forth in Section IX of this Agreement, DHS shall gather, analyze, and report relevant data and identify the extent to which its present array of available foster and adoptive homes is appropriate to the characteristics and needs of the foster care population.  This review shall focus on issues relating to both recruitment and retention of foster and adoptive homes.

DHS will develop and implement, for each county, a foster and adoptive home recruitment and retention plan reasonably designed to ensure adequate foster and adoptive home capacity.  Consistent with the Needs Assessment, DHS will ensure that resources are available to support the development and implementation of individualized adoption recruitment plans for children who are free for adoption and whose goal is adoption but for whom no adoptive family has been identified.

The assessments of foster and adoptive home capacity shall be completed as follows:
a.  By March 2009, for the following counties:  Wayne, Oakland, Macomb, Kent and Genesee;
b.  By October 2009, for the balance of the state.
Foster and adoptive home recruitment and retention plans shall be developed, and implementation initiated, within three months of the completion of the assessments.

5.  *State Oversight of Foster Home Recruitment*:  A designated unit or person within the central office shall be responsible for monitoring the development and implementation of the foster and adoptive home recruitment and retention

39

plans by county offices; providing or arranging for technical assistance to the county offices concerning recruitment and retention; and reporting to the Children's Services Cabinet on progress and problems in achieving the goals set forth in the recruitment and retention plans.

6. *Adequacy of Foster Home Board Payments and Specialized Rate Determinations*: In order to ensure that payments to foster parents are sufficient to meet the needs of the children in foster care, DHS shall ensure that the Determination of Care ("DOC") process is applied consistently and appropriately across all counties and offices. DHS shall identify, after consultation with the Monitor and Plaintiffs, a state office responsible for ensuring that Determinations of Care and decisions regarding payment of a specialized administrative rate to contract providers are made uniformly across the state and in accordance with DHS policy. DHS shall also establish procedures by which a foster parent or CPA may obtain review by a designated official in the central office of a Determination of Care or administrative rate (general or specialized) decision.

7. *Licensing of Relative Foster Homes*:
   a. Subject to the timeframes for implementation set forth in subsections (k) through (o) below, other than in some exceptional circumstances, as defined in subsection (e) below, all foster parents (relatives and non-relatives) shall be licensed.

   b. When placing a child with a relative who has not been previously licensed as a foster parent, DHS shall:
      i. Prior to placement, visit the relative's home to determine that it is safe;
      ii. Within 72 hours following placement, check law enforcement and child abuse registry records for all adults residing in the home; and

40

       iii. Within 30 days, complete a home study determining whether the relative should, upon completion of training and submission of any other required documents, be licensed as a foster parent.

c. All licensed relative foster care providers shall receive the same foster care maintenance rates paid by DHS to similarly situated unrelated foster care providers, including the ability to qualify for enhanced Determination of Care rates.

d. All permanent wards living with relative caregivers shall be provided foster care maintenance payments equal to the payments provided to licensed foster caregivers.

e. If the foster care provider is related to the child, and exceptional circumstances exist such that it is in the child's best interest to be placed with the relative despite the relative's desire to forego licensing, such exceptional circumstances for foregoing licensing must be documented in the child's record, and must be approved by:
    i. In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services;
    ii. In any other county, the Children's Services Field Manager.

In such instances, the relative caregiver and the other adult household members must meet the same safety standards as non-relative providers; the relative caregiver must be fully informed of the benefits, including the exact amount of monetary benefits, of licensure; and the relative caregiver must sign a waiver stating understanding that he or she is foregoing the benefits, including the exact amount of monetary benefits of licensure. The Monitor shall report on the percentage of relative caregivers who elect to waive licensing. In the event that more than 10% of unlicensed relative caregivers decline to be licensed, the Monitor shall conduct a review and

41

report on whether DHS has adequately instituted and followed the procedures set forth in this section.

f.   DHS shall submit for pre-approval to Plaintiffs the form waiver letter to be used consistent with the requirements of this section.  This waiver must be re-signed by the relative caregiver annually and a copy must be placed in the child's record.  The relative caregiver may change his or her mind and choose to undergo licensing at any time, and when this occurs, DHS must allow the relative caregiver to undergo the licensing process.

g.   DHS shall prepare and make public the procedures on obtaining variances from standard foster care licensing requirements for purposes of licensing relative homes.  DHS shall not waive any licensing standards that are essential for the safety and well-being of the child.

h.   Other than pursuant to the exception for unlicensed relative foster homes set forth in subsection (e) above, no child shall be placed in an unlicensed foster home unless there is an order of the juvenile court that the child be so placed.

i.   By November 15, 2008, DHS shall produce and begin the implementation of a written plan, as set forth below, to ensure the speedy licensing of all current unlicensed relative caregivers in a phased-in time period, beginning immediately and to be completed no later than September 30, 2010.

j.   The plan shall include:
     i.   The requirement that pre-service and in-service foster parent training be provided to relative caregivers pursuing licensure and that the content of the training include those parts of the general

42

foster parent training curriculum that are relevant to relative caregivers;

ii. The designation of sufficient licensing staff to review all current unlicensed foster homes, and to complete the licensing process for each family within 90 days;

iii. The designation of sufficient training staff to ensure that all mandatory training is provided to newly licensed relative care foster parents;

iv. A process for the re-placement of any child currently in a relative foster home that does not meet the licensing standards, unless exceptional circumstances have been documented and approved, as outlined above; and

v. Identification of any categories of relative caregivers whose licensure is to be prioritized.

k. With regard to all children entering DHS foster care custody on or after October 1, 2008, relatives providing foster care for children in DHS foster care custody shall be licensed unless exceptional circumstances have been documented and approved, as outlined above.

l. With regard to all children who, prior to October 1, 2008, are placed in an unlicensed relative foster home (as temporary wards, permanent wards, or state MCI wards), referred to as the "Relative Caregiver Backlog Cohort," actions are to be taken as set forth in subsections m, n, and o below.

m. *Actions to be Taken During SFY 2008*: Upon execution of this Agreement and throughout the remainder of SFY 2008, DHS will develop and implement the policies, procedures, and organizational structures required to license all currently unlicensed relative caregivers. Included within this effort, DHS shall do at least the following:

43

i.   Establish and fill the position of Relative Licensing Coordinator with overall responsibility for implementing this section. The Coordinator shall ensure the development of position descriptions, qualification requirements, and work processes for the Relative Licensing positions described below, and/or develop statements of work for any such positions to be filled by contract providers, and shall develop policies and procedures for implementing the Backlog Reviews required in this section and to oversee implementation of these reviews;

ii.  Create and fill, or provide sufficient funds to contract providers for such providers to fill, 40 Relative Licensing positions. These are to be limited-term, specialized assignment positions dedicated to the Relative Caregiver Backlog Cohort whose responsibilities shall include reviewing cases of unlicensed relative caregivers and implementing licensing processes to determine whether to license these homes and, if so, to get them licensed. Responsibilities shall also include the identification of those homes with the most immediate needs for licensure. The development of necessary forms, agreements, promotional/informational materials, and services manuals will be completed by the Children's Services Administration;

iii. Establish a unit within the Children's Services Administration charged with maximizing Title IV-E reimbursements from the federal government;

iv.  Develop a combined/coordinated Family Home Assessment for relative providers, family foster care, and adoption;

v.   Begin reporting on the number and characteristics of unlicensed relative homes and the children in those homes, and on progress in licensing the homes, broken down by county and private CPA, where applicable; and

44

     vi.  Have available adequate training staff to develop curriculum and training for and to train Relative Licensing staff.

n. *Actions to be Taken During SFY 2009*:  In SFY 2009, DHS shall:

     i.  Continue to employ or contract for Relative Licensing staff as necessary and to maintain Licensing Teams, as required, to address all remaining cases within the Relative Caregiver Backlog Cohort; and

     ii.  Continue to assign the Relative Licensing Coordinator to oversee implementation of this Backlog Review; and to monitor and report on progress.

By September 30, 2009, review of at least 50% of the Relative Caregiver Backlog Cohort shall have been completed, and all homes reviewed shall have been duly licensed as foster care providers, or specially waived from licensure pursuant to the provisions of this section, or, if not licensed or waived, any children placed in such homes shall have been re-placed within 30 days of the decision not to license the home or waive licensure.

o. *Actions to be Taken During SFY 2010*:  In SFY 2010, DHS shall:

     i.  Continue to employ or contract for Relative Licensing staff as necessary and to maintain Licensing Teams, as required, to address all remaining cases within the Relative Caregiver Backlog Cohort; and

     ii.  Continue to assign the Relative Licensing Coordinator to oversee implementation of this Backlog Review; and to monitor and report on progress.

By September 30, 2010, review of 100% of the Relative Caregiver Backlog Cohort shall have been completed, and all homes reviewed shall have been duly licensed as foster care providers, or specially waived from licensure pursuant to the provisions of this section. If the home is not deemed appropriate for licensure or waiver, pursuant to the provisions of this section, all foster children placed in the home shall be re-placed within 30 days of the decision not to license the home or waive licensure.

8.  *Implementation of an Adequate Child Placement Process*: DHS shall implement an adequate child placement process in each county or region. Prior to implementing the process, DHS shall conduct a review and analysis of the Child Placement Network ("CPN") process presently in place in Wayne County, and submit to the Monitor a report indicating the results achieved by the CPN pilot in Wayne County, the strengths and weaknesses of that process, and DHS's conclusions with respect to the appropriateness and effectiveness of a potential rollout of that process in other counties.

DHS shall submit for review and approval by the Monitor plans for implementation of adequate placement processes in the remainder of the state, along with any modifications of the CPN process in Wayne County. Full implementation of an adequate placement process will be implemented according to the following schedule:

a.  By October 2009, in Oakland, Genesee, Kent, and Macomb counties;

b.  By October 2010, in Berrien, Calhoun, Ingham, Jackson, Kalamazoo, Muskegon, Saginaw, St. Clair, and Washtenaw Counties; and

c.  By October 2011, in the remainder of the state.

9.  *Provision of Post-Adoption Services*: DHS shall develop and implement a full range of post-adoption services to assist all eligible special needs children adopted from state foster care and their permanent families (including, but not limited to, physical therapy, counseling, and other services required to address the developmental and/or physical disabilities of an adopted child) and shall

46

maintain sufficient resources to deliver such post-adoption services to all children in the Plaintiff class who qualify for these services along with their permanent families.

## IX. NEEDS ASSESSMENT

A. No later than November 15, 2008, DHS shall begin an Assessment of the need for additional services and placements, including the need for family preservation services, foster and adoptive placements (including placements for children with disabilities or other behavioral needs), wraparound services, reunification services, and medical, dental, and mental health services, for children in foster care throughout the state.

B. The Assessment shall also include a review of and recommendations regarding the use and availability of "flexible funds" – funds that are available to allow caseworkers to arrange for special cash assistance and/or the purchase of specific goods and services in addition to those normally available through DHS's regular contacting processes – in order to meet identified needs of children or families and/or remove barriers to reunification or permanency.

C. A second Needs Assessment shall be conducted two years after the conclusion of the first Needs Assessment. The second Needs Assessment will include, in addition to the scope outlined in Sections IX.A and IX.B above, a specific review and recommendation as to whether the additional treatment foster home beds provided pursuant to Section VIII.B.3 are sufficient to meet the needs of children in foster care.

D. Each Needs Assessment shall be conducted in consultation with and subject to the approval of the Monitor, and shall make use of independent experts to the extent that the Monitor reasonably deems necessary. The first Needs Assessment shall be forwarded to the Monitor and the parties by May 15, 2009, and the Monitor, after receiving comments from Plaintiffs, shall issue a final report containing his or her

47

findings within 60 days thereafter. The report shall set forth the findings and recommendations with respect to additional services and placements to be developed and a timeline for development of those additional services and placements. A similar process shall apply to the second Needs Assessment.

E. DHS shall make available additional funds of at least $4 million to develop the additional services and placements identified by the first Needs Assessment, and further additional funds of at least $4 million to develop the additional services and placements identified by the second Needs Assessment. If the costs for implementing the recommendations from the Needs Assessments exceed the additional funds made available pursuant to this subsection, DHS will consult with Plaintiffs and the Monitor to determine how to prioritize the use of the additional funds. If DHS believes that it can create the new services and placements identified by the Needs Assessment, in whole or in part, by re-programming existing funds rather than expending new funds, DHS, in consultation with Plaintiffs and the Monitor, and with the approval of the Monitor, may utilize such reprogramming of existing funds to support the implementation of the Needs Assessment recommendations.

F. In order to fund the additional POS monitoring positions needed to meet the caseload standards set forth in Section VI.E.6 of this Agreement, the State has allocated $2 million of additional state funds. In the event that the review of the POS monitoring function set forth in Section XII.G of this Agreement leads to a revised staffing plan that allows some or all of this $2 million in additional funding to be saved, such savings shall be re-allocated to funding the items and services identified in the Needs Assessment, supplementing the amount of funding provided pursuant to Section IX.E above.

## X. PLACEMENT STANDARDS AND LIMITATIONS

A. General Standards:

DHS shall place children according to the following standards:

1. All children shall be placed in accordance with their individual needs, taking into account a child's need to be placed as close to home and community as possible, the need to place siblings together, and the need to place children in the least restrictive, most home-like setting.

2. Children for whom the permanency goal is adoption should, whenever possible, be placed with a family in which adoption is a possibility.

3. Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family. DHS shall not contract and shall immediately cease contracting with any program or private CPA that gives preference in its placement practices by race, ethnicity, or religion.

4. Children in the foster care custody of DHS shall be placed only in a licensed foster home, a licensed facility, or, subject to the requirements of Section VIII.B.7 of this Agreement, an unlicensed relative home.

B. Placement Limitations:

1. *Limitations on Out-of-County Placements*: DHS shall place all children within their own county or within a 75 mile radius of the home from which the child entered custody (whichever is greater), unless:

   a. The child's needs are so exceptional that they cannot be met by a family or facility within the county or 75 mile radius;

   b. The child needs re-placement and the child's permanency goal is to be returned to his/her parents who at that time reside out of the county or 75 mile radius;

49

    c.  The child is to be placed with a relative out of the county or 75 mile radius; or,

    d.  The child is to be placed in an appropriate pre-adoptive or adoptive home that is out of the county or 75 mile radius.

If placement outside the county or 75 mile radius is made:

    a.  In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services shall be specifically required to certify the circumstances supporting the placement in writing, based on his or her own examination of the circumstances and the child's needs and best interests;

    b.  In any other county, the Children's Services Field Manager shall be specifically required to certify the circumstances supporting the placement in writing, based on his or her own examination of the circumstances and the child's needs and best interests.

2.    *Limitations on Separation of Siblings*: Siblings who enter placement at or near the same time shall be placed together, unless doing so is harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at any time, except for reasons set forth above, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file and shall be reassessed on a quarterly basis.

3.    *Limitations on Number of Children in Foster Home*: Beginning March 2009, for children entering the foster care system, no child shall be placed in a foster home if that placement will result in more than three foster children in that foster home, or a total of six children, including the foster family's natural

50

and/or adopted children.  No placement will result in more than three children under the age of three residing in a foster home.  Exceptions to these limitations may be made, on an individual basis, documented in the case file, when in the best interest of the child(ren) being placed, as follows:

a.  In a "Designated County," as defined in Section IV.A.3 of this Agreement, by the county Administrator of Children's Services;

b.  In any other county, by the Children's Services Field Manager.

4.  *Limitations on Use of Emergency or Temporary Facilities*:

a.  *Time limit for placement in emergency or temporary facility*:  Beginning October 2009, children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days.

b.  *Number of placements in an emergency or temporary facility*:  Beginning October 2009, children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period.  An exception to this limitation shall be made for:

i.  Children who are AWOLP;

ii.  Children facing a direct threat to their safety, or who are a threat to the safety of others such that immediate removal is necessary; or

iii.  Children whose behavior has changed so significantly that the county director or his/her manager designee has certified that a temporary placement for the purposes of assessment is critical for the determination of an appropriate foster placement.

Children experiencing a second emergency or temporary-facility placement within one year shall not remain in an emergency or temporary facility for more than seven days.

51

Replacements under this section shall take place in accordance with the determinations made at a TDM held pursuant to the provisions in Section VII.C of this Agreement.

For the period of time between the entry of the Agreement by the Court and the time table for implementation of the TDM process as set forth in Sections VII.C and VII.E of this Agreement, whenever the re-placement of a child is under consideration as a result of any one of the three circumstances set forth in this section, DHS shall conduct a special placement review by the caseworker, which will include talking with the supervisor, the child, and either the most recent foster care provider or the child's therapist. The special placement meeting shall be for the purpose of examining the circumstances surrounding the potential placement disruption and making a placement decision that is in the child's best interest. The review shall result in a written determination setting forth the placement decision and its basis.

5. *Limitations on Placement in Jail, Correctional, or Detention Facility*: No child in DHS foster care custody shall be placed, by DHS or with knowledge of DHS, in a jail, correctional, or detention facility unless such child is being placed pursuant to a delinquency charge. Within 90 days of the signing of this Agreement, DHS shall notify the State Court Administrative Office and the Michigan State Police of this prohibition, and provide written instructions to immediately notify the local DHS office of any child in DHS foster care custody who has been placed in a jail, correctional, or detention facility.

If it comes to the attention of DHS that a child in DHS foster care custody has been placed in a jail, correctional, or detention facility, and such placement is not pursuant to a delinquency charge, DHS shall ensure the child is moved to a DHS foster care placement as soon as practicable, and in all events within five days, unless the court orders otherwise over DHS objection.

52

If a child in DHS foster care custody is placed in a jail, correctional, or detention facility pursuant to a delinquency charge, and the disposition of such a charge is for the child to return to a foster care placement, then DHS shall return the child to a DHS placement as soon as practicable but in no event longer than five days from disposition, unless the court orders otherwise over DHS objection.

6.   *Limitations on Placement of High Risk Youth*:  DHS shall not place any child determined by a DHS assessment to be at high risk for perpetrating violence or sexual assault in any foster care placement with foster children not so determined.

7.   *Limitations on Residential Care Placements*:   No child shall be placed in a residential treatment center or any other group care setting with a capacity in excess of eight children (campus-wide) without express written approval by:
   a.  In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services;
   b.  In any other county, the Children's Services Field Manager.

Such approval shall be based on certification and specific findings, documented in the child's case file, that: (1) the child's needs cannot be met in any other type of placement; (2) the child's needs can be met in the specific facility requested; and (3) the facility is the least restrictive placement to meet the child's needs.  A description of the services available in the facility to address the individual child's needs must also be documented in the case file.

The need for a residential placement shall be reassessed every 90 days.  Children may not be placed in a residential placement for more than six months without the express authorization, documented in the foster care file, of:
   a.  In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services;
   b.  In any other county, the Children's Services Field Manager.

53

No child may be placed in a residential placement for more than 12 months without the express authorization, documented in the foster care file, of the Director of Children's Services Administration or a higher-ranking official.

## XI.   USE OF PSYCHOTROPIC MEDICATIONS, PHYSICAL RESTRAINTS, AND SECLUSION

A. Psychotropic Medications:

1.   Psychotropic medication shall not be used as a method of discipline or control for any child.

2.   Within six months of the signing of this Agreement, DHS shall undertake a review of the policies and procedures surrounding the use of psychotropic medications. This evaluation will be designed in close collaboration with the Monitor and any additional experts on the use of psychotropic medication for children it deems appropriate. The Monitor shall make recommendations, which shall include timetables for implementation, promptly upon reviewing the results of the evaluation, which DHS shall implement. The Monitor shall consult with Plaintiffs in designing the evaluation and issuing recommendations.

3.   By November 15, 2008, DHS shall create and as soon as possible thereafter hire or contract for the services of a full-time Medical Director, with appropriate qualifications, who shall, among other things, be responsible for overseeing the implementation of policies and procedures concerning the use of psychotropic medications for all children in DHS foster care custody, and who shall have the authority to issue and impose corrective actions. The Medical Director shall report directly to the Director of Children's Services Administration.

4.     When possible, parents shall consent to the use of medically necessary psychotropic medication. In the event that a parent is not available to provide consent for psychotropic medication, DHS shall, pursuant to applicable sections of state law, apply to the court for consent.

5.     By January 15, 2009, DHS shall establish and implement processes to ensure documentation of psychotropic medication approvals, documentation by contract agencies of all uses of psychotropic medication, and review of such documentation by appropriate DHS staff, including the Medical Director, on an ongoing basis.

B.   Use of Physical Restraint and Seclusion/Isolation:

1.     DHS shall prohibit the use of Positive Peer Culture, peer-on-peer restraint, and any other forms of physical discipline in all foster care placements. All uses of physical restraint for children in any placements, and all uses of seclusion/isolation in group, residential, or institutional placements, shall be reported to the Quality Assurance ("QA") unit. Such reports shall be made available to the licensing unit and the Medical Director for appropriate action.

2.     Within six months of the signing of this Agreement, DHS shall undertake a review of the policies and procedures surrounding all forms and use of physical restraint and seclusion/isolation of children in foster care. This evaluation will be designed in close collaboration with the Monitor and any additional experts on the use of physical restraint and seclusion/isolation of children as it deems appropriate. The Monitor shall make recommendations, which shall include timetables for implementation, promptly upon reviewing the results of the evaluation, which DHS shall implement.

3.     The QA unit, in consultation with the Medical Director, shall be responsible for monitoring the implementation of policies and procedures surrounding all

55

forms and use of physical restraint and seclusion/isolation of children in DHS foster care custody, and shall issue and impose corrective actions.

## XII. DHS SUPERVISION OF CONTRACT AGENCIES

A. All CCIs and private CPAs that provide placements and child welfare services to Plaintiff class members shall be bound by all applicable terms of this Agreement, including, but not limited to, the caseload limits and supervisor-to-caseworker ratio limits set forth in Section VI.E, the supervisory staff training and qualifications set forth in Section VI.B, and the caseworker training and qualifications requirements set forth in Section VI.A.

B. By November 15, 2008, all DHS contracts with CCIs or private CPAs that provide placements and child welfare services to Plaintiff class members shall be performance-based contracts that require an annual review of the CPAs' and CCIs' performance. By October 2009, DHS shall incorporate all applicable performance outcome goals set forth in Section III of this Agreement and process requirements of this Agreement into the performance-based contracts, but will do so without limiting the ability of DHS to independently monitor and enforce these contracts. Further, DHS shall develop a set of enforcement measures to be imposed in the event that a contract agency fails to comply with material terms or requirements of the performance-based contract. DHS shall specify in any such contract: (1) that any reports of suspected abuse or neglect of any Plaintiff class member while receiving such contracted placements or services shall be reported to DHS for investigation; (2) that all placement providers for foster children in DHS foster care custody are prohibited from using or authorizing the use of corporal punishment for children under the care and supervision of DHS or the private CPA; and (3) that any reports of suspected corporal punishment while in that provider's care shall be reported to DHS for investigation, as necessary.

56

C. DHS shall give due consideration to any and all substantiated incidents of abuse, neglect, and/or corporal punishment occurring in the placements licensed and supervised by a contract agency at the time of processing its application for licensure renewal. The failure of a contract agency to report suspected abuse or neglect of a child to DHS shall result in an immediate investigation to determine the appropriate corrective action up to and including termination of the contract or placement of the provider on provisional licensing status, and a repeated failure within one year shall result in termination of the contract.

D. By March 2009, DHS shall ensure that all CCIs or private CPAs that provide placements and child welfare services to Plaintiff class members report to DHS accurate data on at least a six-month basis in relation to the requirements of this Agreement.

E. Beginning October 2009, DHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiff class members, to ensure, among other things, the safety and well-being of Plaintiff class members and to ensure that the contract agency is complying with the applicable terms of this Agreement. At least once each year, DHS shall inspect each private CPA to review all relevant aspects of the agency's operations; shall conduct an unannounced inspection of each residential care facility; and shall visit a random sample of each agency's foster homes, including the greater of 5% of the total number of homes supervised by the agency or 10 homes. Visits to foster homes shall assess the safety of children placed in the home and the extent to which children and foster parents are receiving appropriate supports from the CPA. DHS shall prepare written reports of its inspections and visits, detailing findings. DHS shall require corrective actions and require providers to report to DHS on the implementation of these corrective action plans, and shall conduct follow-up visits when necessary. Such reports will routinely be furnished to the Monitor.

F. DHS shall maintain sufficient resources to permit its staff to undertake timely and

57

competent contract enforcement activities as set forth in this section. As necessary based upon workload, DHS shall expand its staff to allow for increased monitoring and oversight responsibilities.

G. By April 2009, DHS will, in coordination with the Monitor, review the effectiveness of the DHS POS monitoring function in providing case-level oversight of private CPAs.

## XIII. MANAGEMENT INFORMATION SYSTEM

A. By October 2009, DHS shall generate from an automated system accurate and timely data reports regarding each of the requirements and outcome measures set forth in this Agreement and regarding those other requirements of this Agreement for which automated reporting is reasonable and appropriate, as determined by the Monitor in consultation with the parties. Extensions to this date, allowing additional time during which DHS may supply particular reports based upon manual counts, may be granted by the Monitor after consultation with Plaintiffs.

By October 2012, DHS shall have an automated statewide child welfare information system ("SACWIS") compliant with applicable federal regulations governing functionality, data integrity, and QA measures.

B. By January 2009, in consultation with the Monitor and in coordination with Children's Services Administration, Field Operations Administration, private CPA representatives, and Local/Regional DHS office representatives, DHS shall design a permanency tracking system and associated reports. The system shall, at a minimum, be capable of reporting pertinent status information sorted by individual child, DHS worker/CPA, and county, for all children in foster care. By April 2009, DHS shall issue accurate data from the permanency tracking system to the Monitor and Plaintiffs.

58

C. Both leading up to and subsequent to the full implementation of a SACWIS, DHS shall at all times satisfy all federal reporting requirements and shall maintain data integrity and accuracy on a continuous basis.

## XIV. QUALITY ASSURANCE

A. DHS shall, in consultation with and subject to the approval of the Monitor, develop and implement a statewide QA program that will be directed by a QA unit established within the DHS central office. In administering the QA program, the QA unit shall develop an internal DHS capacity to undertake data collection, data verification, data assessment, case record or qualitative service review and other such oversight and reporting functions that, in coordination with the Monitor and any external data review processes undertaken by the Monitor, will facilitate ongoing assessment of DHS child welfare performance in relation to the performance requirements and goals contained in this Agreement. The QA unit will support the DHS Director and DHS management in identifying areas of systemic strengths and weaknesses and in formulating strategies to improve in areas of substandard performance. The QA unit shall provide ongoing critical evaluation and oversight of the strategies designed and undertaken to improve substandard services and outcomes.

B. The QA unit shall become a permanent unit of the Child Welfare Improvement Bureau within the DHS central office. It shall continue to perform the functions described in this section after full implementation of this Agreement and DHS exit from Court jurisdiction.

C. The DHS Director shall appoint a director to administer the QA unit who possesses the necessary qualifications and experience to conduct competent data collection, evaluation, as well as the management skills necessary to manage a staff tasked to perform QA functions encompassing DHS state, regional, and county offices. The director of the QA unit shall report directly to a member of the Children's Services

59

Cabinet.  The QA unit shall be adequately staffed, and its staff shall receive specialized training to fulfill all unit responsibilities.

D. All reports provided by the QA unit shall become public record so long as any individually identifying information in relation to the temporary or permanent wards in DHS foster care custody is redacted from such report consistent with applicable state and federal confidentiality laws.

E. Reporting on DHS Performance:  The QA unit shall, within 60 days following the end of each Reporting Period as defined in Section XVII.H of this Agreement, compile and provide, in consultation with the Monitor, all pertinent data regarding statewide performance in relation to the requirements and outcome measures contained in this Agreement.  This data shall be furnished to the Monitor and Plaintiffs.

F. Special Reviews for Higher Risk Cases:

   1. By November 15, 2008, DHS shall designate the membership of a special review team, reporting to the Director of Children's Services Administration, charged with conducting reviews designed to assess and meet the needs of children in the following higher risk categories:

      a. Children who have been the subject of an allegation of abuse or neglect in a residential care setting or a foster home, whether licensed or unlicensed, between June 2007 and September 2008, and who remain in the facility or home in which the maltreatment is alleged to have occurred;

      b. Children, not subject to the provisions of Section XIV.F.1.a above, who have been the subject of three or more reports alleging abuse or neglect in a foster home, the most recent of which reports was filed during or after July 2007, and who remain in the foster home in which maltreatment is alleged to have occurred;

      c. Children who, at the time of review, have been in three or more placements, excluding return home, within the previous 12 months;

60

    d.  Children who, at the time of review, have been in residential care for one year or longer; and

    e.  Children who, at the time of review, are in an unrelated caregiver placement, defined as an unlicensed home in which the caregiver is not a relative of the child but has been approved as a placement resource because of prior ties to the child and/or the child's family.

2.    By November 15, 2008, DHS shall develop, subject to the approval of the Monitor and in consultation with Plaintiffs, a plan setting forth:

    a.  The dates and processes by which DHS shall have compiled an accurate list of children subject to review because they meet one or more of the criteria set forth above;

    b.  The number and type of special reviews DHS proposes to undertake in the upcoming 90-day period, and the rationale for these choices; and

    c.  The data to be reported at the conclusion of the 90-day period.

3.    At the conclusion of the initial 90-day period, DHS shall report to the Monitor and Plaintiffs the results of the reviews conducted during the period, and shall develop and implement a corrective action plan, as appropriate, to address the findings.

4.    The review process set forth in Sections XIV.F.1 and XIV.F.2 above shall be repeated every 90 days until all special reviews are completed. The Monitor may, upon DHS's request and after consultation with Plaintiffs, terminate the requirement for completing any or all categories of special reviews, upon finding that either (a) DHS has developed sufficient, generally useful information as a result of these reviews, and further special review of individual cases is unlikely to provide significant benefit, or (b) because of DHS's implementation of other relevant sections of this Agreement, such reviews are no longer necessary.

G. <u>Fatality Reviews</u>: DHS shall ensure that a review, conducted by qualified and competent individuals and independent of the county in which the fatality occurred, has been conducted, and the findings and recommendations of that review conveyed to the Monitor and Plaintiffs, of each child who died while in the foster care custody of DHS, as follows:

1. For such children who died during the three-year period ending March 31, 2008, no later than November 15, 2008;

2. For child fatalities occurring after March 31, 2008, within six months of the date of death.

Findings and recommendations of these reviews will be incorporated into all relevant QA activities, program improvement, contract agency oversight, and other related policies and practices.

## XV. <u>IMPLEMENTATION PLAN</u>

No later than December 15, 2008, DHS will develop a detailed implementation plan, approved by Plaintiffs and the Monitor, that will become part of this Agreement and fully enforceable. The implementation plan will set forth the steps, timetables, and persons responsible by which DHS will achieve compliance with the terms of this Agreement. The parties will review this implementation plan on an annual basis to determine whether modifications are necessary to ensure that DHS achieve compliance in the manner and within the time periods contained in this Agreement.

## XVI. <u>NAMED PLAINTIFFS</u>

A. DHS will provide Plaintiffs' counsel with regular quarterly updates of the individual Named Plaintiffs' case records until such time as the Named Plaintiffs are no longer in DHS foster care custody. Within 30 days of the Court's approval of this Agreement, and each quarter thereafter, the parties will meet and confer in good faith regarding the Named Plaintiffs' case plans and the placements and services provided to the Named Plaintiffs, and attempt to agree on necessary services and plans. In the

62

event the parties cannot agree on such services and plans, the issue shall be referred to the Monitor for resolution.

B. In addition to the case record updates described above, DHS will provide Plaintiffs' counsel with prior notification, if possible, and if not possible, with notification as soon as practicable, of any significant events or developments concerning the Named Plaintiffs, including but not limited to any change in placement, services, permanency goal, or permanency plans; and any allegations of abuse or neglect involving any of the Named Plaintiffs or occurring in their placement(s). Plaintiffs may meet and confer in good faith with DHS regarding these events and developments. In the event the parties cannot agree on the actions to be taken with respect to such events or developments, the issue shall be referred to the Monitor for resolution. If there is no monitor for any reason, the issue will be referred to the Court.

C. Nothing in this section shall be read to waive or preclude any and all individual damages claims by Plaintiff class members, including the Named Plaintiffs.

## XVII. MONITORING

A. The parties agree that Kevin M. Ryan shall be the Monitor of DHS's compliance with the terms of this Agreement.

B. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. The retention of the Monitor shall be conducted solely pursuant to the procedures set forth in this Agreement and will not be governed by any formal or legal procurement requirements. The Monitor shall hire such staff as the Monitor deems necessary to discharge his or her responsibilities under this Agreement.

C. The Monitor shall have free and complete access to records maintained by DHS, its divisions and any successor agencies or divisions, and by its contract providers. The

63

Monitor shall also have free and complete access to the staff of DHS; its divisions and any successor agencies or divisions; persons within the executive branch; contract providers; children in the care of DHS and of contract providers; and other individuals that the Monitor deems relevant to his or her work. DHS shall direct all employees and contract providers to cooperate fully with the Monitor and shall assist the Monitor in gaining free access to other stakeholders in the child welfare system. All non-public information obtained by the Monitor shall be maintained in a confidential manner. In providing the public reports described in Sections XVII.H XVII.I and below, and consistent with applicable state and federal confidentiality requirements, the Monitor shall not identify public or private staff or agencies, except to the extent that such information about public or private staff and agencies has already been made public. Plaintiffs shall have access, through the Monitor, to all information made available to the Monitor, subject to the existing protective order in effect in this case.

D. The Monitor shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitor reasonably deems necessary. In order to avoid duplication and build capacity within the agency, DHS shall provide the Monitor with copies of all state-issued data reports regarding topics covered by this Agreement. Notwithstanding the existence of state data, data analysis or reports, the Monitor shall have the authority to prepare new reports on outcome measures and all other terms of this Agreement to the extent the Monitor deems necessary.

E. The Monitor and Plaintiffs shall receive, and the Monitor shall review (and, for data, verify the accuracy of) all written processes, programs, procedures, statements of work, formal analyses, system designs, and data reports developed pursuant to this Agreement. The Monitor shall take into account the timeliness, appropriateness, and quality of these work products in reporting on the State's compliance with the terms of this Agreement.

F. In addition to the requirements set forth in paragraph E above, the Monitor's duties shall be to: confirm independently the data reports and statistics provided pursuant to this Agreement; conduct independent case record or other qualitative reviews or audits; review and approve all plans, documents, and data reports agreed to be developed and produced by DHS pursuant to this Agreement; and report on DHS's progress in implementing the terms of this Agreement and the achievement of the outcomes set forth herein. The Monitor shall specifically review and approve, prior to implementation, the following specific products required by this Agreement:

1. The plan for training staff responsible for home studies and licensing, as set forth in Section VI.C;

2. The assessment and case planning process (to ensure that the processes provide the information necessary in high quality case planning) set forth in Section VII.A;

3. The process by which information from the TDM is provided to and utilized by the supervisors (to ensure that this process results in appropriate follow-up, effective on-going case supervision, and timely supervisory oversight of case plan implementation), set forth in Section VII.C;

4. Procedures by which a foster parent or CPA shall seek review of a Determination of Care or administrative rate decision, set forth in Section VIII.B.6;

5. The Needs Assessments set forth in Section IX;

6. The policies and procedures for use of psychotropic medications, set forth in Section XI.A;

7. Data reports for each of the outcome measures in this Agreement and for those other requirements of this Agreement for which the Monitor determines that automated reporting is reasonable and appropriate (in consultation with the parties);

8. The design of a permanency tracking system and associated reports, set forth in Section XIII.B;

9. The development and implementation of a statewide QA program, set forth in Section XIV;

65

    10.    The special review plans set forth in Section XIV.F; and

    11.    The Health Services Plan required to be developed pursuant to Section VIII.A.2.

G.  During Reporting Period Two, unless another timeframe is agreed upon by the parties, the Monitor shall provide the parties with a written monitoring plan setting forth the methodologies by which the Monitor will measure DHS's progress in implementing the terms of this Agreement and achieving the outcomes set forth herein. Specifically, the Monitor's methodologies may include, but are not limited to, analyses of information collected: (a) by DHS's management and information systems if and when available and accurate; (b) from a review of relevant case records; (d) from the production of data aggregated by the Monitor or third parties; and (d) from interviews with DHS staff, resource families, class members or prior class members and their families, contract agency staff, service providers, and other Michigan child welfare stakeholders. The Monitor shall make best efforts to specify the methods he or she will utilize to perform his or her duties as to each and every section of this Agreement. The plan may be periodically revised by the Monitor, after consultation with the parties, particularly if and when DHS data becomes more available and accurate and when a QA unit becomes functional. Nothing in this paragraph is intended to in any way limit the scope of the Monitor's access to information and individuals as otherwise set forth herein.

H.  For each Reporting Period, the Monitor will issue a report setting forth the measurable progress made by DHS in relation to each of the performance (process and outcome) requirements contained in this Agreement. Reporting Period One will begin on October 1, 2008, and end on March 31, 2009. Each subsequent Reporting Period (to be identified as "Reporting Period Two," "Reporting Period Three," and so forth in consecutive number sequence) shall be the six-month period of time beginning on the day following completion of the previous Reporting Period. The end of each Reporting Period will coincide with the end of a federal reporting period.

I.  The Monitor's reports, which shall be public documents, shall set forth DHS's levels of compliance with the outcome measures and processes set forth in this Agreement. The reports shall also set forth the steps taken by DHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects. Such reports shall be issued every six months, unless the parties agree otherwise. The reports shall be provided to the parties in draft form for comment at least two weeks prior to formal issuance.

J.  The intent of the parties is that the Monitor shall develop a plan to transfer the primary monitoring function to DHS's QA unit upon the termination of this Agreement, or at such earlier time as the parties may agree. The Monitor shall work in collaboration with DHS in building its QA capacity.

K.  The parties may request that the Monitor review and issue recommendations regarding the provision of services to the Named Plaintiffs in this case.

L.  The Monitor shall not express any conclusions as to whether DHS has reached legal compliance on any item or items.

M.  If at any time the Monitor can no longer serve, the parties shall agree on another Monitor, with input and recommendations from the outgoing Monitor.

N.  DHS shall enter into a contract to secure the services of the Monitor. The Monitor shall have a budget and staff sufficient to allow the Monitor to carry out the responsibilities described in this Agreement, and may contract with such experts or consultants as he or she may deem appropriate, in consultation with the parties. Experts or consultants hired by the Monitor may initiate and receive *ex parte* communications with the parties.

67

O. Other than as expressly provided in this Agreement, this Agreement shall not be deemed a waiver of any privilege or right DHS may assert, including those recognized at common law and created by statute, rule, or regulation against any other person or entity with respect to the disclosure of any information.

P. The Monitor shall be permitted to engage in *ex parte* communications with all parties. The Monitor may periodically meet privately with the Court concerning issues related to this case, provided the parties are made aware of the occurrence of such a meeting.

Q. Unless such conflict is waived by the parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the state of Michigan or its departments, officers, agents, or employees.

R. The Monitor is not a state or local agency or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection. Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit, or demand arising out of the Monitor's good-faith performance pursuant to this Agreement. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

## XVIII.  ENFORCEMENT, DISPUTE RESOLUTION, AND TERMINATION

A. This Agreement shall constitute the entire integrated Agreement of the parties. No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this matter or in any other proceeding.

B. In the event that Plaintiffs identify an area in which they believe DHS is not in substantial compliance with an enforceable provision of this Agreement:

1. Plaintiffs shall, prior to seeking judicial relief, notify DHS and the Monitor, in writing, of the compliance issue.

2. Within 15 calendar days of Plaintiffs' notification, DHS shall respond in writing to Plaintiffs and the Monitor as to what actions, if any, it proposes to take with regard to the issue of alleged non-compliance.

3. Regardless of whether DHS agrees with Plaintiffs' assertion of non-compliance, the parties shall meet with the Monitor within 15 calendar days of Plaintiffs' notice, unless otherwise agreed by the parties. The purpose of this meeting shall be for the parties to engage in good faith discussions facilitated by the Monitor to determine whether additional actions are necessary to address Plaintiffs' assertion of non-compliance. The parties shall engage in these facilitated dispute resolution discussions for a period not to exceed 30 calendar days, unless extended by mutual agreement of the parties.

4. If at the end of the 30-day period, or the period as extended by mutual agreement of the parties, Plaintiffs determine that judicial action is necessary, Plaintiffs may seek further relief from the Court.

5. To the extent that any non-compliance by DHS is in whole or in part attributable to DHS's organizational structure, changes in organizational structure shall be considered as among the elements of the corrective actions needed to correct the non-compliance.

6. If Plaintiffs believe that DHS has violated this Agreement and, as a result, have caused or are likely to cause immediate and irreparable harm to a child(ren) in DHS's foster care custody, they may seek emergency judicial relief. Before taking such action, however, Plaintiffs must give DHS written notice with respect to any such harm, including with such notice any documentation that Plaintiffs believe supports their decision to invoke the provisions of this paragraph. DHS will respond to this notice in writing

69

within three business days.  The parties must then invoke the provisions in Sections XVIII.B.1-5 above, provided that the entire process shall be completed within 10 business days of DHS's response to Plaintiffs' notice, unless extended by mutual agreement of the parties.

C.  This Agreement shall terminate upon the finding by the Court that DHS has achieved compliance with all terms of the Agreement and has remained in compliance with those terms for a period of 18 months.  The burden shall be on DHS to demonstrate compliance.

D.  DHS shall maintain sufficient records to document its compliance with all of the requirements of this Agreement.  During the period of this Agreement, DHS shall maintain any and all records required by or developed under this Agreement.

E.  The parties agree to defend the provisions of this Agreement.  The parties shall notify each other of any court challenge to this Agreement.  In the event any provision of this Agreement is challenged in any local or state court, the party(ies) affected shall remove the matter to a Michigan federal court and seek consolidation with the present action.

F.  In the event that legislation currently known as the "Federal Consent Decree Fairness Act" is enacted into law, DHS agrees that it will not invoke their right under that Act to modify or vacate the consent decree resulting from this Agreement.  Nothing in this section limits DHS's ability to seek to modify or vacate the provisions of this Agreement under other law.

G.  This Agreement shall be binding on all successors, assignees, employees, agents and all those working for or on behalf of Plaintiffs and DHS.

70

## XIX. ATTORNEYS' FEES

For purposes of this Agreement, the parties acknowledge that Plaintiffs, as prevailing parties in this lawsuit, are entitled to recover and reserve the right to seek expenses of litigation, including reasonable attorneys' fees and nontaxable costs, pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 23(h).

**AGREED TO AND APPROVED FOR ENTRY BY:**

**FOR PLAINTIFFS:**

Marcia Robinson Lowry
Susan Lambiase
Sara M. Bartosz
Elissa Hendler
Gena E. Wiltsek
CHILDREN'S RIGHTS
330 Seventh Ave., Fourth Floor
New York, NY 10001
T: (212) 683-2210

Edward P. Leibensperger
Kevin M. Bolan
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109
T: (617) 535-4000

Elizabeth Phelps Hardy
Noel D. Massie
Jay C. Boger
KIENBAUM OPPERWALL HARDY & PELTON, P.L.C.
280 North Old Woodward Avenue, Suite 400
Birmingham, MI 48009
T: (248) 645-0000

71

FOR DEFENDANTS:

_____
Jennifer M. Granholm, in her official capacity as
Governor of the State of Michigan


_____
Ismael Ahmed, in his official capacity as
Director of the Michigan Department of Human Services


_____
Michael G. Frezza, Assistant Attorney General
Michigan Department of Attorney General
3030 W. Grand Blvd. Suite 10-200
Detroit, MI 48202




SO ORDERED AND ADJUDGED, this the _____ day of _____, 2008.


                                    _____
                                    DISTRICT JUDGE




72

07/03/2008 15:08 FAX 519 439 9672          HILTON LONDON                              ☑002

Jul. 3. 2008  2:28PM    LICENSING & REGULATION                      No. 6427.  P. 3

FOR DEFENDANTS:


_____
Jennifer M. Granholm, in her official capacity as
Governor of the State of Michigan


_____
Ismael Ahmed, in his official capacity as
Director of the Michigan Department of Human Services



_____
Michael G. Frezza, Assistant Attorney General
Michigan Department of Attorney General
3030 W. Grand Blvd. Suite 10-200
Detroit, MI 48202



SO ORDERED AND ADJUDGED, this the ____ day of _____, 2008.


                                        _____
                                        DISTRICT JUDGE

# APPENDIX

# 5

- Describe any changes in the family since the child(ren) entered care.

- Record all referrals made for the family since placement including any services provided by the agency at the time of placement in the Service Referral Table of the Parent-Agency Treatment Plan and Service Agreement.

**V. Recommendations to the Court**

(Complete for each child).

A.  **Should child(ren) Remain in Out of Home Placement?**

For each child under court jurisdiction, for the period covered by this report, identify case action as continued placement, return home and monitoring or closure.

If the child(ren) should remain in out of home placement, describe why it is not in the child(ren)'s best interest to be returned home, place for adoption or placed within the relative/kinship network.

B.  **Mandatory Petition for Termination of Parental Rights**

If a mandatory petition has been filed requesting termination of parental rights at the dispositional hearing, the recommendations should contain either:

1.  A statement that the supervising agency believes it is in the child(ren)'s best interest to terminate the parent's' rights to the child(ren) and the reasons why; or

2.  Documentation regarding the compelling reasons why termination of parental rights is not in the child(ren)'s best interest. (see FOM 722-7, Compelling Reasons for more information.)

If the mandatory petition section is the same for all children, check yes and the appropriate recommendation below. If this section is different for one or more children in the family, check no. Then click in the child name section and follow directions to add a section for each child.

Check boxes: Check only one box (1-3) and as many a-i as necessary if box 3 is checked.

1.  A mandatory petition is not required. If #1 is checked, a petition for termination of parental rights has not been filed. Write NA in the space below.

2.  A petition for termination of parental rights has been filed and it is in the child(ren)'s best interest to proceed: If #2 has been

# APPENDIX

# 6

# CHAPTER 15

# GUARDIANSHIP

# CHAPTER 15

# GUARDIANSHIP

## 15.1. INTRODUCTION

Guardianships, power of attorney and emancipation provide legal options for workers trying to achieve safe and permanent plans for children. Guardianship, however, should not be seen as a cure-all, nor can it be equated with termination of parental rights and adoption in terms of the legal security it offers. In some circumstances, some form of legal guardianship may offer a suitable plan for a child.[1] The legal requirements for guardianship, power of attorney and emancipation are outlined below. This is not an exhaustive discussion of the law but is meant to provide an overview, a primer, on these legal statuses, particularly for nonlawyer caseworkers. Should one decide to pursue guardianship or emancipation, legal advice is recommended.

## 15.2. POWER OF ATTORNEY

Parents or legal guardians can delegate their parental responsibilities to another for a limited time period, without court action, by means of a power of attorney.

> By a properly executed power of attorney, a parent or guardian of a minor or a guardian of a legally incapacitated individual may delegate to another person, for a period not exceeding 6 months, any of the parent's or guardian's powers regarding care, custody, or property of the minor child or ward, except the power to consent to marriage or adoption of a minor ward or to release of a minor ward for adoption. ... If a guardian for a minor or legally incapacitated individual delegate any power under this section, the guardian shall notify the court within 7 days after execution of the power of attorney, and provide the court the name, address, and telephone number of the attorney-in-fact.[2]

A properly executed power of attorney form (*See* Fig. 15.1) need not be filed with a court (unless there is an existing guardianship order). The power of attorney expires automatically after six months, though it may be repeatedly renewed by execution of another document.

---

[1]. MCR 3.976(A)(3)
[2]. MCL 700.5103

**Fig. 15.1.: Power of Attorney**

## POWER OF ATTORNEY

I, _____ , mother (father) of minor child(ren)

_____ appoint _____

of _____ ,true and lawful attorney for me, and give to "him/her/them" any and all of my legal authority and power regarding the care, custody, or property of this (these) minor child(ren), except the power to consent to marriage or adoption or to release the child(ren) for adoption, for a period not to exceed six (6) months from this date as provided for in MCL 700.5103.

I grant to this attorney full power and authority to perform every act necessary for the proper care of the minor child(ren), their property and affairs, including medical care, except as specifically limited above, as fully as I could do myself if personally present.

DATED: _____ X

_____

In The Presence Of:
[Witnesses]

W/_____ W/_____

Revised: 9/1/2007

## 15.3. GUARDIANSHIPS

### 15.3.1. *Three types available under Michigan law*

Protection of a child through the use of guardianship may be particularly appropriate where the parent or parents will be temporarily absent from the child's life and thereby unable to provide care, for reasons such as incarceration, extended in-patient mental health or substance abuse treatment, or hospitalization. Guardianship may also be a valuable alternative to termination of parental rights where there are important family ties, both psychological and legal, that one wishes to preserve and yet the biological parent is unable to properly care for the child in the foreseeable future.

Three types of guardianships are available under Michigan law: general guardianship, limited guardianship, and temporary guardianship. If a petition to terminate an existing guardianship is filed, the court may also order a permanent guardianship. The parent of an unmarried minor may appoint a guardian for the minor by will or by another writing signed by the parent and attested by at least two witnesses.[3] "A professional guardian may be appointed."[4]

## 15.4. GENERAL GUARDIANSHIP (MCL 700.5204)

### 15.4.1. *Petitioner*

"General," "permanent," "regular," "ordinary," or "full" guardianship, as it is variously known, does not require parental consent. The statute requires[5]:

> (1) A person interested in the welfare of a minor, or a minor if 14 years of age or older, may petition for the appointment of a guardian of the minor. The court may order the Department of Human Services or a court employee or agent of the court to conduct an investigation of the proposed guardianship and file a written report of the investigation.

Note that nearly anyone, i.e. a "person interested in the welfare of a minor," may petition for the appointment of a guardian. Parents, relatives, friends and Department of Human Services (DHS) caseworkers are among those who may wish to initiate such proceedings.

### 15.4.2. *Grounds*

---

[3]. *See* testamentary appointment of guardian, MCL 700.5202

[4]. MCL 700.5212

[5]. MCL 700.5204(1)

The court may appoint a guardian for an unmarried minor if any of the following circumstances exist[6]:

(a)    The parental rights of both parents or of the surviving parent have been terminated or suspended by prior court order, by judgment of divorce or separate maintenance, by death, by judicial determination of mental incompetency, disappearance, or by confinement in a place of detention.[7]

(b)    The parent or parents do permit the minor to reside with another person and do not provide the other person with legal authority for the minor's care and maintenance, and the minor is not residing with his or her parent or parents when the petition is filed.

(c)    All of the following:

   (i)    The minor's biological parents have never been married to one another.

   (ii)    The minor's parent who has custody of the minor dies or is missing and the other parent has not been granted legal custody under court order.

   (iii)    The person whom the petition asks to be appointed guardian is related to the minor within the fifth degree by marriage, blood, or adoption.

### 15.4.3. *Child Support and Parenting Time*

(5)  For the minor ward's welfare, the court may at any time, order the minor ward's parents to pay reasonable support and order reasonable parenting time and contact of the minor ward with his or her parents.[8]

## 15.5.  LIMITED GUARDIANSHIP (MCL 700.5205)

### 15.5.1. *Voluntary; Requires Parental Consent; Grounds*

Limited guardianship requires voluntary consent of the parent or parents with legal custody of the child.[9]  It is really a court-sanctioned consent arrangement.

(1) The court may appoint a limited guardian for an unmarried minor upon the petition of the minor's parent or parents if all of the following requirements are met[10]:

---

[6]. MCL 700.5204(2)

[7]. "Prior court order" does not include an order appointing a limited guardian; MCL 700.5204(2)(a)

[8]. MCL 700.5204(5)

[9]. MCL 700.5205(1)

[10]. MCL 700.5205(1)

(a)     The parents with custody of the minor consent or, in the case of only 1 parent having custody of the minor, the sole parent consents to the appointment of a limited guardian.

(b)     The parent or parents voluntarily consent to the suspension of their parental rights.

(c)     The court approves a limited guardianship placement plan agreed to by both of the following parties:

(i) The parents with custody of the minor or, in the case of only 1 parent having custody of the minor, the sole parent who has custody of the minor.

(ii) The person or persons whom the court will appoint as the minor's limited guardian.

## 15.5.2. *Placement Plan Required*

In addition to finding parental consent, the court must approve a limited guardianship placement plan agreed to by the parties.

(2) A minor's parent or parents who desire to have the court appoint a limited guardian for that minor and the person or persons who desire to be appointed limited guardian for that minor must develop a limited guardianship placement plan. The parties must use a limited guardianship placement plan form prescribed by the state court administrator. A limited guardianship placement plan form must include a notice that informs a parent who is a party to the plan that substantial failure to comply with the plan without good cause may result in the termination of the parent's parental rights under chapter XIIA of 1939 PA 288, MCL 712A.1 to 712A.32. The proposed limited guardianship placement plan shall be attached to the petition requesting the court to appoint a limited guardian. The limited guardianship placement plan shall include provisions concerning all of the following[11]:

(a)     The reason the parent or parents are requesting the court to appoint a limited guardian for the minor.

(b)     Parenting time and contact with the minor by his or her parent or parents sufficient to maintain a parent and child relationship.

(c)     The duration of the limited guardianship.

(d)     Financial support for the minor.

(e)     Any other provisions that the parties agree to include in the plan.

---

[11]. MCL 700.5025(2)

The court shall review the placement plan and approve, disapprove or modify the plan if the parties agree to the modified plan.[12] A limited guardianship placement plan that has been approved by the court may be modified upon agreement of the parties and approval of the court. A modified limited guardianship plan shall be filed with the court.[13]

## 15.6. TEMPORARY GUARDIANSHIP (MCL 700.5213)

If necessary to protect the child, the probate court may appoint a temporary guardian for six months. Such an appointment may be necessary where immediate decisions affecting the child's health or welfare is required (e.g. regarding necessary medical treatment) or where the child's placement must be secured pending a full hearing on a guardianship petition. The temporary guardian has all the powers and duties of a limited guardian, except that the appointment expires after six months.[14] A temporary guardian may be appointed only in the course of a proceeding for permanent guardianship.[15] The court rules require that the court hold a hearing and take testimony before appointing a temporary guardian, but the court may shorten the period for notice of hearing or dispense with notice altogether.[16] A petitioner should inform the court clerk if a temporary guardian is necessary, and be prepared to proceed immediately to an emergency hearing.

## 15.7. POWERS AND DUTIES

### 15.7.1. *Powers and Duties of the General Guardian*

The powers and duties of a guardian of a minor are set forth in the statute:
A minor's guardian has the powers and responsibilities of a parent who is not deprived of custody of the parent's minor and unemancipated child, *except that a guardian is not legally obligated to provide for the ward from the guardian's own money* and is not liable to third persons by reason of the parental relationship for the ward's acts. [The statute then specifies some of the powers and duties of the guardian.][17]

### 15.7.2. *Powers and Duties of Limited Guardian*

[12]. MCL 700.5206(1)
[13]. MCL 700.5206(1)(c). *See also* MCL 700.5206(2)
[14]. MCL 700.5213(3) (If necessary, the court may appoint a temporary guardian with the status of an ordinary guardian of a minor but the authority of a temporary guardian shall not exceed 6 months.)
[15]. MCR 5.403(A)
[16]. MCR 5.403(B)
[17]. MCL 700.5215

A limited guardian appointed under this section has all of the powers and duties enumerated in section 5215 except that a minor's limited guardian shall not consent to marriage or adoption of the minor ward or to the release of the minor ward for adoption.[18]

## 15.8. PROCEDURE

### 15.8.1. *Procedure*

(1) The petitioner shall give notice of the time and place of hearing of a petition for the appointment of a minor's guardian to each of the following[19]:
a. The minor, if 14 years of age or older.
b. The person who had the principal care and custody of the minor during the 63 days preceding the date of the petition.
c. Each living parent of the minor or, if neither of them is living, the adult nearest of kin to the minor.

(2) Upon hearing, if the court finds that a qualified person seeks appointment, venue is proper, the required notices have been given, the requirements of section 5204 or of sections 5205 and 5206 are satisfied, and the minor's welfare will be served by the requested appointment, the court shall make the appointment. In other cases, the court may dismiss the proceeding or make another disposition of the matter that will serve the minor's welfare.[20]

### 15.8.2. *Lawyer-Guardian ad litem for the Minor*

When a guardian is nominated for a minor and at the point a petition for removal or resignation of the guardian is sought, the court, at any time in the proceedings, may appoint a lawyer-guardian ad litem to represent the minor if the court determines that the interests of the minor are or may be inadequately represented. The lawyer-guardian ad litem is to give due consideration to the preference of the minor if the minor is 14 years of age or older.[21]

## 15.9. COURT REVIEW OF GUARDIANSHIPS

---

[18]. MCL 700.5206(4)
[19]. MCL 700.5213(1)
[20]. MCL 700.5213(2)
[21]. MCL 700.5213(4)

### 15.9.1. *Court Review Factors*

The court may review a guardianship for a minor as it considers necessary and shall review a guardianship annually if the minor is under 6 years of age. [Distinction: The guardian has duties that include filing an annual report/letters with the court until the child reaches the age of majority. The guardian's duties are not to be confused with the court's duties.] In conducting the review, the court shall consider all of the following factors[22]:

(a) The parent's and guardian's compliance with either of the following, as applicable:
    (i)   A limited guardianship placement plan.
    (ii)   A court-structured plan under subsection (3)(b)(ii)(B) or section 5209(2)(b)(ii).

(b) Whether the guardian has adequately provided for the minor's welfare.

(c) The necessity of continuing the guardianship.

(d) The guardian's willingness and ability to continue to provide for the minor's welfare.

(e) The effect upon the minor's welfare if the guardianship is continued.

(f) Any other factor that the court considers relevant to the minor's welfare.

The court may order the DHS or a court employee or agent to conduct an investigation and file a written report of the investigation regarding the above factors.[23]

Upon completion of a guardianship review, the court may either continue the guardianship or schedule and conduct a hearing on the status of the guardianship. At the conclusion of such a hearing, the court may continue the limited guardianship, order the parties to modify the limited guardianship, terminate the guardianship or appoint an attorney to represent the minor.[24]

## 15.10. TERMINATION OF GUARDIANSHIP

---

[22]. MCL 700.5207(1)

[23]. MCL 700.5207(2)

[24]. MCL 700.5207(3)

## 15.10.1. *Authority Continues Until Termination of Guardianship*

The guardian's authority continues until terminated with the death, resignation with court approval, or removal of the guardian by the court or upon the minor's death, adoption, marriage, or attainment of majority.[25] A guardianship may terminate without order of the court upon the child's death, adoption, marriage, or attainment of majority.

## 15.10.2. *Petition to Terminate Guardianship*

(1) After notice and hearing on a petition under section 5208 to terminate a limited guardianship, the court shall terminate the limited guardianship if it determines that the minor's parent or parents have substantially complied with the limited guardianship placement plan. The court may enter orders to facilitate the minor's reintegration into the home of the parent or parents for a period of up to 6 months before the termination.[26]

(2) For a petition to terminate a guardianship in which subsection (1) does not apply, after notice and hearing, the court may do any of the following[27]:

    (a) Terminate the guardianship if the court determines that it is in the best interests of the minor, and do any of the following:

        (i) Enter orders to facilitate the minor's reintegration into the parent's home for a period of up to 6 months before the termination

        (ii) Order the Department of Human Services to supervise the transition period when the minor is being reintegrated into his or her parent's home.

        (iii) Order the Department of Human Services to provide services to facilitate the minor's reintegration into his or her parent's home.

    (b) Continue the guardianship for not more than 1 year after the hearing date if the court determines that it is in the best interests of the minor, and do any of the following:

        (i) If the guardianship is a limited guardianship, order the parent or parents to comply with 1 of the following:
        (A) The limited guardianship placement plan.
        (B) A court-modified limited guardianship placement plan.

        (C) If the limited guardianship was established before December 20, 1990, a court-structured plan that enables the minor to return to the home of his or her parent or parents.

---

[25]. MCL 700.5217

[26]. MCL 700.5209(1)

[27]. MCL 700.5209(2)

(i)    If the guardianship is ordered under section 5204, order the parent or parents to follow a court-structured plan that enables the minor to return to the home of his or her parent or parents.

(ii)    If a guardianship is continued under subparagraph (i) or

(iii)    Schedule and conduct a hearing to review the guardianship before the expiration of the period of time that the guardianship is continued and either terminate the guardianship or limited guardianship or proceed under subdivision (c) or (d).

15.10.3.    *Lawyer-Guardian ad litem for the Minor; Referral to the Department of Human Services; Child Protection Petition in Family Court*

When considering a petition to terminate a guardianship, the court may appoint an attorney (lawyer-guardian ad litem) to represent the minor or refer the matter to the DHS. The attorney or the DHS may file a complaint on behalf of the minor requesting the Family Division of the Circuit Court to take jurisdiction of the minor under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2.[28] *See* 15.9, Failed Guardianship as a Basis for Child Protection Jurisdiction.

15.10.4.    *Termination of Guardianship Upon Disposition of Child Custody Action*

Upon receipt of a copy of a judgment or an order of disposition in a child custody action regarding a minor that is sent to the court as provided in section 6b of the child custody act of 1970, 1970 PA 91, MCL 722.26b, the court shall terminate the guardianship or limited guardianship for that minor.[29]

## 15.11. PERMANENT GUARDIANSHIP

(c) If the minor resides with the guardian or limited guardian for not less than 1 year and if the court finds that the minor's parent or parents have

---

28. MCL 700.5209(2)(d)
29. MCL 700.5210

failed to provide the minor with parental care, love, guidance, and attention appropriate to the child's age and individual needs resulting in a substantial disruption of the parent-child relationship, the court can continue the guardianship if it is established by clear and convincing evidence that the continuation would serve the best interests of the minor.[30]

## 15.12. BEST INTERESTS APPLIED TO GUARDIANSHIPS

As used in the court reviews and terminations of either general or limited guardianships, "best interests of the minor" means the sum total of the following factors to be considered, evaluated and determined by the court[31]:

(i)     The love, affection, and other emotional ties existing between the parties involved and the child.

(ii)    The capacity and disposition of the parties involved to give the child love, affection, and guidance and continuation of the educating and raising of the child in its religion or creed, if any.

(iii)   The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(iv)    The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(v)     The permanence, as a family unit, of the existing or proposed custodial home.

(vi)    The moral fitness of the parties involved.

(vii)   The mental and physical health of the parties involved.

(viii)  The home, school, and community record of the child.

(ix)    The reasonable preference of the child if the court considers the child to be of sufficient age to express preference.

(x)     The willingness and ability of the guardian to facilitate and encourage a close and continuing parent-child relationship between the child and his or her parent or parents.

(xi)    "Domestic violence regardless whether the violence is directed against or witnessed by the child."

(xii)   Any other factor considered by the court to be relevant to a particular dispute regarding termination of a guardianship, removal of a guardian, or parenting time.

## 15.13. FAILED GUARDIANSHIP AS A BASIS FOR CHILD PROTECTION JURISDICTION; GUARDIANSHIP AS A DISPOSITIONAL ALTERNATIVE

---

[30]. MCL 700.5209(c)

[31]. MCL 700.5101(a)

The Juvenile Code allows the court to appoint a guardian for a minor once the case has been adjudicated and a petition for guardianship filed with the court.[32] If a guardianship is ordered by the court, the juvenile neglect or delinquency petition may be dismissed.

A petition for neglect may be filed with the Family Court if the guardianship placement plan or court-structured plan has not been complied with by the parent.[33] Similarly, the Juvenile Code permits termination of parental rights when the parent has substantially failed to comply with a limited guardianship placement plan or a court-structured plan where such non-compliance has resulted in a disruption of the parent-child relationship.[34] The court also has authority to terminate parental rights where the child has a guardian and the parent has failed to support the child or visit the child for two years or more without good cause.[35]

## 15.14. EMANCIPATION OF MINORS

### 15.14.1. *Generally*

Emancipation may be an appropriate legal strategy for a youngster over 16, who wish to live independently, is able to live independently, and who does not wish to work toward reunification with his/her family. The effect of emancipation is to allow the minor to acquire a domicile separate from the parents, and to allow the minor to control his/her own money. In some cases, the teen may be able to make a gradual transition to independence by paying room and board to a placement family member.

### 15.14.2. *Emancipation by Law*

Emancipation occurs by operation of law when a minor is validly married, when a person reaches the age of 18 years, the period when the minor is on active duty with the armed forces of the United States, and for purposes of consenting to routine, nonsurgical medical care or emergency medical treatment to a minor when the minor is in the custody of a law enforcement agency and the minor's parent or guardian cannot be promptly located.[36] A problem of securing emergency medical treatment for minors in the custody of police officers that prompted this amendment to the statute.

### 15.14.3. *Emancipation by Court Order*

---

[32]. MCL 712A.18(1)(h)
[33]. MCL 712A.2(b)(5)
[34]. MCL 712A.19b(3)(d)&(e)
[35]. MCL 712A.19b(3)(f)
[36]. MCL 722.4(2)(d)&(e)

A minor seeking emancipation shall file a petition for emancipation in the family division of Circuit Court in the county where the minor resides. The petition shall be signed and verified by the minor, and shall include all of the following information[37]:

(a) The minor's full name and birth date, and the county and state where the minor was born.

(b) A certified copy of the minor's birth certificate.

(c) The name and last known address of the minor's parents, guardian, or custodian.

(d) The minor's present address, and length of residency at that address.

(e) A declaration by the minor indicating that he or she has demonstrated the ability to manage his or her financial affairs. The minor may include any information he or she considers necessary to support the declaration.

(f) A declaration by the minor indicating that he or she has the ability to manage his or her personal and social affairs. The minor may include in this section any information he or she considers necessary to support the declaration.

The petition shall include an affidavit by any of the following individuals declaring that the individual has personal knowledge of the minor's circumstances and believes that under those circumstances emancipation is in the best interests of the minor[38]:

(a) Physician.

(b) Nurse.

(c) Member of the clergy.

(d) Psychologist.

(e) Family Therapist.

(f) Certified social worker.

(g) Social worker.

(h) Social work technician.

(i) School administrator.

(j) School counselor.

(k) Teacher.

(l) Law enforcement officer.

(m) Duly regulated child care provider.

A copy of the petition and a summons to appear at the hearing shall be served on the minor's parents or guardian. A notice of hearing shall also be sent to the individual who provided the affidavit required under subsection (2).[39]

After a petition is filed, the court may do 1 or more of the following[40]:

---

[37]. MCL 722.4a(1)

[38]. MCL 722.4a(2)

[39]. MCL 722.4a(3)

[40]. MCL 722.4b

(a)    Assign an employee of the court to investigate the allegations of the petition and to file a report containing the results of the investigation with the court.

(b)    Appoint legal counsel for the minor.

(c)    Appoint legal counsel for the minor's parents or guardian if they are indigent and if they oppose the petition.

(d)    Dismiss the petition if the minor's custodial parent does not consent and is providing support.

The hearing shall be before a judge or referee sitting without a jury. If the minor requests that the hearing be before a judge, the hearing shall be before a judge and not before a referee. The court shall issue an emancipation order if it determines that emancipation is in the best interest of the minor and the minor establishes all of the following[41]:

(a)    That the minor's parent or guardian does not object to the petition; or if a parent or guardian objects to the petition, that the objecting parent or guardian is not providing the minor with support.

(b)    That the minor is at least 16 years of age.

(c)    That the minor is a resident of the state.

(d)    That the minor has demonstrated the ability to manage his or her financial affairs, including proof of employment or other means of support. "Other means of support" does not include general assistance or aid to families with dependent children administered under the social welfare act, Act No. 280 of the Public Acts of 1939, being sections 400.1 to 400.121 of the Michigan Compiled Laws.

(e)    That the minor has the ability to manage his or her personal and social affairs, including, but not limited to, proof of housing.

(f)    That the minor understands his or her rights and responsibilities under this act as an emancipated minor.

A minor who petitions the court for emancipation shall have the burden of showing by a preponderance of evidence that emancipation should be ordered.[42]

### 15.14.4. *Granting or Denying Petition; Appeal Rights*

If the court issues an emancipation order, the court shall retain a copy of the order until the emancipated minor becomes 25 years of age.[43] An emancipation obtained by fraud is voidable. Voiding such an order does not affect an obligation, responsibility, right, or interest that arose during the period of time the

---

[41]. MCL 722.4c(1)&(2)
[42]. MCL 722.4c(3)
[43]. MCL 722.4c(4)

order was in effect.[44] The minor or a parent or guardian of the minor may file an appeal from the court's grant or denial of an emancipation petition. This petition shall be filed in the Court of Appeals.[45]

### 15.14.5. *Petition to Rescind Order*

A parent of a minor emancipated by court order or a minor emancipated by court order may petition the Family Division of Circuit Court that issued the order to rescind the order. If the order of emancipation is entered by the Probate Court before January 1, 1998, the parent or minor may petition the Family Division of the Circuit Court in the county in which the order was entered to rescind the order. A copy of the petition for rescission and a summons shall be served on the minor or the minor's parents. The court shall grant the petition and rescind the order of emancipation if it determines 1 or more of the following[46]:

(a) That the minor is indigent and has no means of support.

(b) That the minor and the minor's parents agree that the order should be rescinded.

(c) That there is a resumption of family relations inconsistent with the existing emancipation order.

If a petition for rescission is granted, the court shall issue an order rescinding the emancipation order and retain a copy of the order until the minor becomes 25 years of age.[47] Rescission of an emancipation order does not alter any contractual obligations or rights or any property rights or interests that arose during the period of time that the emancipation order was in effect.[48] The minor or a parent of the minor may file an appeal from the court's grant or denial of a petition for rescission of an emancipation order. The appeal shall be filed in the Court of Appeals.[49]

### 15.14.6. *Rights and Responsibilities of Emancipated Minors*

A minor emancipated by operation of law or by court order shall be considered to have the rights and responsibilities of an adult, except for those specific constitutional and statutory age requirements regarding voting, use of alcoholic beverages, and other health and safety regulations relevant to him or her because

---

44. MCL 722.4c(5)
45. MCL 722.4c(6)
46. MCL 722.4d(3)
47. MCL 722.4d(4)
48. MCL 722.4d(5)
49. MCL 722.4d(6)

of his or her age. A minor shall be considered emancipated for the purposes of, but not limited to, all of the following[50]:

(a) The right to enter into enforceable contracts, including apartment leases.

(b) The right to sue or be sued in his or her own name.

(c) The right to retain his or her own earnings.

(d) The right to establish a separate domicile.

(e) The right to act autonomously, and with the rights and responsibilities of an adult, in all business relationships, including, but not limited to, property transactions and obtaining accounts for utilities, except for those estate or property matters that the court determines may require a conservator or guardian ad litem.

(f) The right to earn a living, subject only to the health and safety regulations designed to protect those under the age of majority regardless of their legal status.

(g) The right to authorize his or her own preventive health care, medical care, dental care, and mental health care, without parental knowledge or liability.

(h) The right to apply for a driver's license or other state licenses for which he or she might be eligible.

(i) The right to register for school.

(j) The right to marry.

(k) The right to apply to the medical assistance program administered under the social welfare act, Act No. 280 of the Public Acts of 1939, being sections 400.1 to 400.121 of the Michigan Compiled Laws, if needed.

(l) The right to apply for other welfare assistance, including general assistance and aid to families with dependent children administered under Act No. 280 of the Public Acts of 1939, if needed.

(m) The right, if a parent, to make decisions and give authority in caring for his or her own minor child.

(n) The right to make a will.

The parents of a minor emancipated by court order are jointly and severally obligated to support the minor. However, the parents of a minor emancipated by court order are not liable for any debts incurred by the minor during the period of emancipation.[51]

---

50. MCL 722.4e(1)
51. MCL 722.4e(2)

Revised: 9/1/2007

# APPENDIX

# 7

**Release of CPS
Case
Information or
Records**

Children's protective services case information and records are confidential. Unless the case information or records are released to the public by the DHS director as specified information, children's protective services case information or records may only be released **after proper redaction** to the following:

- Parents whose parental rights are intact (custodial, non-custodial, birth or adoptive) and legal guardians of children who are the subject of children's protective services com-. plaints. Individuals seeking information may request it in person or in writing to the local office. If a written request is from an individual regarding their own records, it must include a copy of the individual's picture identification.

- Legally mandated child protective agency to investigate a report of known or suspected child abuse or neglect.   Out-of-state agencies, military and American Indian tribal children's protective services unit requests should be directed to the local office.

- Legally mandated foster care agency to prosecute a disciplinary action against its own employee involving children's protective services or foster care records. A "child protective or foster care agency" includes a child caring institution. The agency may seek an order from the court having jurisdiction over the child or from the Ingham County Family Division of the Circuit Court to allow the agency to release confidential children's protective services or foster care information to pursue sanctions for alleged dereliction, malfeasance or misfeasance of duty. The court can only order that the records be released to a recognized labor union representative of the employee's bargaining unit or to an arbitrator or administrative law judge who conducts a hearing involving the allegations and used solely in connection with that hearing. The information must be released in a manner that maintains the greatest degree of confidentiality while allowing review of employee performance.

- Law enforcement agency to investigate a report of known or suspected child abuse or neglect. The department must

# APPENDIX

# 8

Michigan Department of Human Services
Children's Protective Services Program
PO Box 30037
Lansing, MI 48909
Fax: (517) 241-7047
Phone: (517) 335-3704

**Note:** The Child Protection Law allows a public or private child protective or foster care agency to access CPS records to prosecute a disciplinary action against its own employee. A child protective or foster care agency includes a child caring institution. A child protective or foster care agency, including a child caring institution, does not need to request a Central Registry clearance on an employee to obtain the results of an investigation of the employee's alleged abuse or neglect of a child in the custody of the agency.

**FOSTER CARE
RECORDS**

**When children's protective services information is included as part of a Foster Care case record, the confidentiality standards set by the Child Protection Law apply. Foster care records of an adopted child become adoption records and must be treated as such when the final order of adoption is entered.**

**Except as otherwise stated in this section, any other confidential information in a foster care record (such as mental health, substance abuse, medical, law enforcement, educational, Social Security numbers, etc.) must be treated as outlined above.**

**Release of
Foster Care
Information or
Records**

Records about children and their parents and relatives are confidential and release of this information must be safeguarded by the child placing agency, DHS or other entity in possession of the information.

Foster care case information or records may only be released after proper redaction to the following:

- The case service plan and any materials prepared by a service provider pursuant to the parent agency treatment

plan must be submitted to the court prior to a dispositional review hearing or permanency planning hearing.

- Primary care or attending physician: As required by MCL 712A.18f(6), a worker must review a child's case with the child's attending physician of record during a hospitalization or with the child's primary care physician to ensure that the service plan addresses the child's medical needs in relation to the abuse or neglect, if a physician has diagnosed the child's abuse or neglect as involving one or more of the following conditions:

    1. Failure to thrive.

    2. Medical child abuse.

    3. Abusive head trauma (also called shaken baby syndrome or inflicted traumatic brain injury).

    4. Bone fracture that is the result of child abuse or neglect.

    5. Drug exposure (exposure in utero, child found in methamphetamine lab, etc.).

- Legislative Committee: A standing or select committee or appropriations subcommittee of either house of the legislature having jurisdiction over children's protective service matters.

- Office of Children's Ombudsman: See Record Release to the Office of Children's Ombudsman in this policy.

- Foster Parent/Relative/Unrelated Caregiver.

**Prior to Foster Care Placement**

Child Placing Agency rule 400.12417 and MCL 722.954(2) require DHS or the private child placing agency to provide a foster parent or relative caregiver with the DHS-90, Placement Outline/Child and Family Social History (RFF 90), and all of the following information before the placement of a child:

- Child's name.

- Child's date of birth.

- Available information about the child's health, including the DHS-221, Medical Passport.

- Any known history of abuse or neglect of the child.

- All known emotional and psychological problems of the child.

- All known behavioral problems of the child.

- Circumstances necessitating placement of the child.

- Any other known information to enable the foster parent to provide a stable, safe and healthy environment for the foster child and the foster family.

- Name of assigned foster care worker.

- DHS-3762, Authorization to Provide Routine and Emergency Medical Care.

**Emergency Foster Care Placement**

In cases of an emergency placement, if any of the information specified above is not available at the time of placement, the information must be provided to the foster parent within **seven calendar days** of placement.

**Information Regarding Foster Children**

In accordance with MCL 712A.13a(13), if a child is placed in foster care, within 10 days after receipt of a written request, the agency shall provide the person providing foster care with copies of all initial, updated, and revised case service plans and court orders relating to the child and all of the child's medical, mental health, and education reports, including reports compiled before the child was placed with that person.

In addition, when there is a DHS-1555-CS, Authorization to Release Confidential Information, signed by the client, client's guardian with authority to consent, parent with legal custody of a child, court-appointed personal representative or executor of the estate of a deceased client and the checkbox in Section 2 is selected, DHS and the parties listed in Section 2 may release information regarding the youth's care, supervision and treatment to law enforcement when law enforcement is responding to a call

involving the child and/or his or her family that could impact the court-ordered case service plan.

**Foster Parent Access to Information Regarding Biological Parents**

All protected information regarding the child's parents must be properly redacted prior to release and/or review with the foster parents.

**JUVENILE JUSTICE RECORDS**

The confidentiality of juvenile justice (JJ) records is governed by the Child Care Organization Act (MCL 722.120), the Youth Rehabilitation Services Act (MCL 803.308) and the Crime Victim's Rights Act (1985 PA 87, as amended, MCL 780.751 et seq.). **When children's protective services information is included as part of a JJ case record, the confidentiality standards set by the Child Protection Law apply.**

**In addition, any other confidential information in a JJ record must be redacted before release. If a juvenile is in a community placement, the confidentiality provisions governing foster care information or records applies. If the juvenile is in a residential placement, see JR1 120 for applicable law and policy.**

When there is a DHS-1555-CS, Authorization to Release Confidential Information, signed by the client, client's guardian with authority to consent, parent with legal custody of a child, court-appointed personal representative or executor of the estate of a deceased client and the checkbox in Section 2 is selected, DHS and the parties listed in Section 2 may release information regarding the youth's care, supervision and treatment to law enforcement when law enforcement is responding to a call involving the child and/or his or her family that could impact the court-ordered case service plan.

**ADOPTION RECORDS**

**When children's protective services information is included as part of an adoption case record, the confidentiality standards**

# APPENDIX

# 9



# CHILDREN'S PROTECTIVE SERVICES
## Safety Assessment - Initial
### Department of Human Services of Michigan

| | |
|---|---|
| PS Case #: V3143455P | Log Number: 2575997 |
| Case Name: Sherrie Brent | Complaint Date: 01/17/2010 |
| Worker Name: Mia Wenk | Load Number: 8227037106 |
| County Name: WAYNE | Assessment Date: 01/27/2010 |

## SECTION 1: Safety Assessment

| ☐ Yes | ☒ No | 1. Caretaker(s) caused serious harm to the child and/or made a plausible threat to cause serious physical harm in the current investigation, indicated by: |
|---|---|---|
| | | ☐ Severe injury or abuse to child other than accidental. |
| | | ☐ Threat to cause harm or retaliate against child. |
| | | ☐ Excessive discipline or physical force. |
| | | ☐ Potential harm to child as a result of domestic violence. |
| | | ☐ One or more caretaker(s) fear they will maltreat child. |
| | | ☐ Alcohol/drug exposed infant. |

| ☐ Yes | ☒ No | 2. Caretaker(s) has previously maltreated a child in their care and the severity of the maltreatment or the caretaker(s)' response to the previous incident AND current circumstances suggest that child safety may be an immediate concern. There must be both current immediate threats to child safety and related previous maltreatment that was severe and/or represents an unresolved pattern of maltreatment. |
|---|---|---|
| | | ☐ Prior death of a child. |
| | | ☐ Previous maltreatment that caused severe harm to any child. |
| | | ☐ Prior termination of parental rights. |
| | | ☐ Prior removal of any child. |
| | | ☐ Prior confirmed CPS case. |
| | | ☐ Prior threat of serious harm to child. |

| ☐ Yes | ☒ No | 3. Caretaker fails to protect child(ren) from serious harm or threatened harm. |
|---|---|---|
| | | ☐ Yes ☐ No Live-in partner found to be a perpetrator. |

| ☐ Yes | ☒ No | 4. Caretaker(s)' explanation of any injury to a child is unconvincing and the nature of the injury suggests that the child's safety may be of immediate concern. |
|---|---|---|

| ☐ Yes | ☒ No | 5. The family refuses access to the child, or there is reason to believe the family is about to flee, or the child's whereabouts cannot be ascertained. |
|---|---|---|

| ☐ Yes | ☒ No | 6. Child is fearful of caretaker(s), other family members, or other people living in or having access to the home. |
|---|---|---|

| ☐ Yes | ☒ No | 7. Caretaker(s) does not provide supervision necessary too protect child from potentially serious harm. |
|---|---|---|

| ☐ Yes | ☒ No | 8. Caretaker(s) does not meet the child's immediate need for food, clothing, shelter and/or medical or mental health care. |
|---|---|---|

| ☒ Yes | ☐ No | 9. Child's physical living conditions are hazardous and immediately threatening based on the child's age and developmental stage. |
|---|---|---|

There are rifles within the reach of the children, paint was observed peeling from the walls in the bathroom and the children's rooms and the parents were not sure if it was lead based paint. Youngest child lives in the basement which is not suitable for human being. The basement is not finished and his "bedroom" walls are cinder block. The "room" is in the basement along with dad's tools.

| ☐ Yes | ☒ No | 10. Caretaker(s)' current substance use seriously affects his/her ability to supervise, protect or care for the child. |
|---|---|---|

| ☐ Yes | ☒ No | 11. Caretaker(s)' behavior toward child is violent or out-of-control. |
|---|---|---|

| ☐ Yes | ☒ No | 12. Caretaker(s) describes or acts toward child in predominantly negative terms or has extremely unrealistic expectations. |
|---|---|---|

| ☐ Yes | ☒ No | 13. Child sexual abuse is suspected and circumstances suggest that child safety may be an immediate concern. |
|---|---|---|

| ☐ Yes | ☒ No | 14. Caretaker(s)' emotional stability seriously affects current ability to supervise, protect or care for the child. |
|---|---|---|

| ☒ Yes | ☐ No | 15. Other (specify): |
|---|---|---|

There are rifles within the reach of the children, paint was observed peeling from the walls in the bathroom and the children's rooms and the parents were not sure if it was lead based paint. Youngest child lives in the basement which is not suitable for human being. The basement is not finished and his "bedroom" walls are cinder block. The "room" is in the basement along with dad's tools.

**If no Safety factors are present, go to Section 3: Safety decision and check "Safe"**

## SECTION 2: Safety Response – Protecting Interventions

A protecting intervention is a safety response taken by staff or others to address the unsafe situation identified in the assessment. These interventions help protect the child from present or imminent danger. **A protecting intervention must be deployed if any safety factor is indicated.** If one or more safety factors are present, it does not automatically indicate that a child must be placed outside the home, in many cases, it will be possible to initiate a temporary plan that will mitigate the safety factor(s) sufficientl so that the child may remain in the home while the investigation continues. Consider the relative severity of the safety factor(s), the caregiver(s)' protective capacities and response to the investigation/situation, and the vulnerability of the child when identifying protecting interventions.

For each safety factor identified in Section 1, consider the resources available in the family and the community that might help to keep the child safe. Check each protecting intervention taken to protect the child and explain below. Describe all protecting safety interventions taken or immediately planned by you or anyone else, and explain how each intervention protects (or protected) each child.

| ☐ | 1. Monitoring or direct services by DHS worker. |
|---|---|
| ☐ | 2. Use of family resources, neighbors, or other individuals in the community as safety resources. |

| | | |
|---|---|---|
| ☒ | | 3. Use of community agencies or services as safety resources (check one). |
| | | ☒ Intensive home based    ☐ Other community services |
| ☐ | | 4. Recommend that the alleged perpetrator leave the home, either voluntarily or in response to legal action. |
| ☐ | | 5. Recommend that the non-maltreating caretaker move to a safe environment with the child. |
| ☐ | | 6. Recommend that the caretaker(s) place the child outside the home. |
| ☐ | | 7. Other. |
| ☐ | | 8. Legal action must be taken to place child(ren) outside the home, e.g., placement with a relative or a licensed foster home. |

## Explain Safety Response – Protecting Interventions

Family needs to fix up the house or possibly move to another suitable home. Youngest child has to come out of the basement. Youngest child has severe speech impediment. He may possibly have some form of hearing problem to have caused this and the parents will have to take him to the doctor and get a referral.

**If CPS is initiating legal action and placing the child: 1) explain why responses 1 – 7 could not be used to keep the child safe in the reasonable efforts section of the Transfer to Foster Care module of SWSS CPS; and 2) describe your discussion with the caretaker(s) regarding placement in SWSS CPS.**

**If services were recommended but caretakers refused to participate, briefly describe the services that were offered.**

## SECTION 3: Safety Decision

Identify your safety decision by checking the appropriate box below. Check one box only. This decision should be based on the assessment of all safety factors, protecting interventions and any other information known about this case. "A" (Safe) should be checked only if no safety factors were identified in Section 1, Part A, Safety Factor Identification.

| | | |
|---|---|---|
| ☐ | A. Safe | Children are safe; no safety factors exist. |
| ☒ | B. Safe with services | At least one safety factor is indicated and at least one protecting intervention has been put in place. |
| ☐ | C. Unsafe | At least one safety factor is indicated and placement is the only protecting intervention possible for the child. Without placement, the child will likely be in danger of imminent harm. |

**If the investigation is not confirmed and any safety factor is present, briefly explain the safety intervention or plan.**

## Injury to the child

| ☐ Yes | ☒ No | Was any child injured in this case? (NOTE: Prenatal drug exposure is considered an injury to a child) |
|---|---|---|

If yes, indicate the age of youngest child with most serious injury. |

If yes, indicate what was the most serious injury to the child:

- ☐ 1. Death of a child.
- ☐ 2. Hospitalization required.
- ☐ 3. Medical treatment required, but no hospitalization.
- ☐ 4. Exam only of alleged injuries. No medical treatment required.
- ☐ 5. Bruises, cuts, abrasions or other injuries: no medical exam or treatment.

CONFIDENTIAL

"The confidentiality of information in this document is protected by the Michigan Child Protection Law. Anyone who violates this protection is guilty of a misdemeanor and is civilly liable for damages. (Act No. 238, Public Acts of 1975, as amended, being sections 722.621-722.636, Michigan Compiled Laws, Sections 7 and 13.)"

# APPENDIX

# 10

PS Case Name: _Brent, Sherrie_

PS Case Number: _V3143455P – CPS Log# 2575997_

Load Number: _8227037105_

Assessment Date: _01/27/2016_

| NEGLECT | Score |
|---|---|
| N1. Current complaint and/or finding is for neglect | |
|    A. No.....0 | |
|    B. Yes.....2 | 2 |
| N2. Number of prior assigned neglect complaints and/or findings | |
|    A. One or less.....0 | |
|    B. Two or more.....2 | 2 |
| N3. Number of children in the household | |
|    A. Three or less.....0 | |
|    B. Four or more.....1 | 1 |
| N4. Primary caretaker's social support | |
|    A. Appropriate and available social support.....0 | |
|    b. Limited or negative support *(check all that apply)* | |
|     ☒ No or limited social support from relatives /friends/neighbors.....1 | |
|     ☐ Relatives/friends/neighbors have negative impact.....1 | 1 |
| N5. Primary caretaker is unable/unwilling to control impulses | |
|    A. No.....0 | |
|    B. Yes.....1 | 0 |
| N6. Primary caretaker provides inadequate physical care and/or inadequate supervision of child(ren) | |
|    A. No.....0 | |
|    B. Yes *(check all that apply)* | |
|     ☐ Provides inadequate physical care | |
|     ☐ Provides inadequate supervision of child.....1 | 0 |
| N7. Primary caretaker currently has a mental health problem | |
|    A. No.....0 | |
|    B. Yes.....1 | 0 |
| N8. Primary caretaker involved in harmful relationships | |
|    A. No.....0 | |
|    B. Harmful relationships or one domestic violent incident.....1 | |
|    C. Two or more domestic violence incidents.....2 | 0 |
| N9. Primary caretaker currently has a substance abuse problem | |
|    A. No.....0 | |
|    B. Yes.....1 | 0 |
| N10. Family is homeless or children are unsafe due to housing conditions | |
|    A. No.....0 | |
|    B. Yes *(check all that apply)* | |
|     ☐ Family is homeless | |
|     ☒ Housing is physically unsafe.....2 | 2 |
| N11. Primary caretaker able to put child needs ahead of own | |
|    A. Yes.....0 | |
|    B. No.....1 | 0 |

| ABUSE | Score |
|---|---|
| A1. Current complaint and/or finding includes mental injury | |
|    A. No.....0 | |
|    B. Yes.....1 | 0 |
| A2. Number of prior assigned abuse complaints and/or finding | |
|    A. None.....-1 | |
|    B. One or two.....0 | |
|    C. Three or more.....1 | 0 |
| A3. Age of youngest child | |
|    A. Seven years or older.....0 | |
|    B. Six years or younger.....1 | 0 |
| A4. Number of children in the home | |
|    A. Two or less.....0 | |
|    B. Three or more.....2 | 2 |
| A5. Either caretaker was abused and/or neglected as a child | |
|    A. No.....0 | |
|    B. Yes.....2 | 0 |
| A6. Secondary caretaker has low self-esteem | |
|    A. ☒ No secondary caretaker *(check if applicable)* | |
|     ☐ No.....0 | |
|    B. Yes.....1 | 0 |
| A7. Either caretaker is domineering, and/or employs excessive and/or inappropriate discipline | |
|    A. No, neither caretaker.....0 | |
|    B. Yes *(check all that apply)* | |
|     ☐ Domineering | |
|     ☐ Inappropriate discipline.....1 | 0 |
| A8. Either caretaker has current or a history of domestic violence | |
|    A. No, neither caretaker.....0 | |
|    B. Yes.....1 | 0 |
| A9. A child in the household has one or more of the following characteristics | |
|    A. No characteristics below are present.....0 | |
|    B. Yes *(check all that apply and indicate highest score)* | |
|     ☐ Developmental disability.....1 | |
|     ☐ History of delinquency.....1 | |
|     ☐ Mental health issue.....2 | |
|     ☐ Behavioral issue.....2 | 0 |
| A10. All caretakers are motivated to improve parenting skills | |
|    A. Yes, all caretakers motivated or improvement not needed.....-1 | |
|    B. Yes, caretakers are willing to participate.....-1 | |
|    C. No, one or both caretakers needs to improve parenting skills but will not participate.....0 | -1 |
| A11. Primary caretaker views incident less seriously than agency | |
|    A. No.....0 | |
|    B. Yes, views incident less seriously.....1 | 0 |

**TOTAL NEGLECT RISK SCORE**    8          **TOTAL ABUSE RISK SCORE**    1

**SCORED RISK LEVEL.** Assign the family's scored risk level based on the highest score of the neglect or abuse assessments, using the following:

| Neglect Score | | Abuse Score | | Risk Level | |
|---|---|---|---|---|---|
| ☐ | 0 – 2 | ☐ | -2 – 0 | ☐ | Low |
| ☐ | 3 – 6 | ☒ | 1 – 3 | ☐ | Moderate |
| ☒ | 7 – 9 | ☐ | 4 – 6 | ☒ | High |
| ☐ | 10 + | ☐ | 7 + | ☐ | Intensive |

**POLICY/DISCRETIONARY OVERRIDES.**

# APPENDIX

# 11

# CHILDREN'S FOSTER CARE

## INITIAL SERVICE PLAN
### Michigan Department of Human Services

County of Referral    WAYNE    Court Jurisdiction    3rd Circuit Court, Family Division

## IDENTIFYING INFORMATION

Child(ren):

| Child Name | | | | |
|---|---|---|---|---|
| | Birth Date | | Log Number | 2617123 | Case Number | Y1448782A |
| | Child Age | | Child Gender | Male | Court Docket/File # | 10492704 |
| | Child Race | White | | | | |

| | | | | |
|---|---|---|---|---|
| Height | 5'6" | Weight | 120 | |
| Hair color | Dirty blond | Eye Color | Hazel | |
| Religion | Unknown | Federal Permanency Plan Goal | Reunification | |

Current Legal Status: Temporary Court Ward-Neglect

| | | | | | |
|---|---|---|---|---|---|
| Date of current Placement | 03/03/2010 | Date Entered Care | 02/18/2010 | Current placement type | Lic/Unlic Relatives |
| Anticipated Next Placement | Parental Home | Date Anticipated Next Placement | 06/24/2010 | | |
| Native American Question Asked | Yes | Tribe | NA | | |

Provider Name: Chinavare Noel & Chinavare Michael
Provider Address: 328 Swan Creek Dr., Carleton MI 48117
Child Address: 328 Swan Creek Dr., Carleton, MI, USA 48117

| Child Name | | | | |
|---|---|---|---|---|
| | Birth Date | | Log Number | 2617124 | Case Number | Y1448787A |
| | Child Age | | Child Gender | Male | Court Docket/File # | 10492704 |
| | Child Race | White | | | | |

"CONFIDENTIAL"    PB CHILDREN'S CENTER 000299

| | | | | |
|---|---|---|---|---|
| **Height** | 5'6" | **Weight** | 175 | |
| **Hair color** | Dirty blond | **Eye Color** | Blue | |
| **Religion** | Unknown | **Federal Permanency Plan Goal** | Reunification | |

| | |
|---|---|
| **Current Legal Status** | Temporary Court Ward-Neglect |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Date of current Placement** | 03/03/2010 | **Date Entered Care** | 02/18/2010 | **Current placement type** | Lic/Unlic Relatives |
| **Anticipated Next Placement** | Parental Home | **Date Anticipated Next Placement** | 06/24/2010 | | |
| **Native American Question Asked** | Yes | **Tribe** | NA | | |

**Provider Name** Chinavare Noel & Chinavare Michael
**Provider Address:** 328 Swan Creek Dr., Carleton MI 48117

**Child Address:** 328 Swan Creek Dr., Carleton, MI, USA 48117

**Child Name**

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Birth Date** | | **Log Number** | 2817125 | **Case Number** | Y1449039A |
| | **Child Age** | | **Child Gender** | Female | **Court Docket/File #** | 10492704 |
| | **Child Race** | White | | | | |

| | | | | |
|---|---|---|---|---|
| **Height** | 5'3" | **Weight** | 120 | |
| **Hair color** | Brown | **Eye Color** | Blue | |
| **Religion** | Unknown | **Federal Permanency Plan Goal** | Reunification | |

| | |
|---|---|
| **Current Legal Status** | Temporary Court Ward-Neglect |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Date of current Placement** | 03/03/2010 | **Date Entered Care** | 02/18/2010 | **Current placement type** | Lic/Unlic Relatives |
| **Anticipated Next Placement** | Parental Home | **Date Anticipated Next Placement** | 06/24/2010 | | |
| **Native American Question Asked** | Yes | **Tribe** | NA | | |

**Provider Name** Chinavare Wendy & Chinavare Thomas
**Provider Address:** 4485 Bedford, Dearborn Heights MI 48125

**Child Address:** 4485 Bedford, Dearborn Heights, MI, USA 48125

**Child Name**

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Birth Date** | | **Log Number** | 2822093 | **Case Number** | Y1449199A |

DHS 65

PB CHILDREN'S CENTER 000300

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Child Age | ██████ | | Child Gender | Female | Court Docket/File # | 10452704 | |
| Child Race | White | | | | | | |

| | | | |
|---|---|---|---|
| Height | 52" | Weight | 130 |
| Hair color | Blond | Eye Color | Blue |
| Religion | Unknown | Federal Permanency Plan Goal | Reunification |

| | |
|---|---|
| Current Legal Status | Temporary Court Ward-Neglect |

| | | | | | |
|---|---|---|---|---|---|
| Date of current Placement | 03/03/2010 | Date Entered Care | 02/18/2010 | Current placement type | Lic/Unlic Relatives |
| Anticipated Next Placement | Parental Home | Date Anticipated Next Placement | 06/24/2010 | | |
| Native American Question Asked | Yes | Tribe | NA | | |

Provider Name Chinchak Wendy & Chinchak Thomas
Provider Address: 4485 Bedford, Dearborn Heights MI 48125
Child Address: 4485 Bedford, Dearborn Heights, MI, USA 48125

Child Name

| | | | | | | |
|---|---|---|---|---|---|---|
| ██████ | Birth Date | ██████ | ██ Number | 2620002 | Case Number | Y1449135A |
| | Child Age | | Child Gender | Male | Court Docket/File # | 10492704 |
| | Child Race | White | | | | |

| | | | |
|---|---|---|---|
| Height | 5' | Weight | 110 |
| Hair color | Blond | Eye Color | Blue |
| Religion | Unknown | Federal Permanency Plan Goal | Reunification |

| | |
|---|---|
| Current Legal Status | Temporary Court Ward-Neglect |

| | | | | | |
|---|---|---|---|---|---|
| Date of current Placement | 03/03/2010 | Date Entered Care | 02/18/2010 | Current placement type | Lic/Unlic Relatives |
| Anticipated Next Placement | Parental Home | Date Anticipated Next Placement | 06/24/2010 | | |
| Native American Question Asked | Yes | Tribe | NA | | |

Provider Name Chinavare Noel & Chinavare Michael
Provider Address: 328 Swan Creek Dr., Carleton MI 48117
Child Address: 328 Swan Creek Dr., Carleton, MI, USA 48117

"CONFIDENTIAL"

PB CHILDREN'S CENTER 000301

Parents (Caretakers):

| Name/ Address | Date Of Birth | | Relationship | Child(ren) | | Participating? | Reason not participating |
|---|---|---|---|---|---|---|---|
| **HOUSEHOLD #1** | | | | | | | |
| ███████████████ | | | Biological Parent | ██████████ | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |
| | | | Biological Parent | | | Yes | |

CPS Risk Level: Moderate
Household Address: 536 South Livernois
Detroit, MI 48209
Phone: ()

## I. LEGAL

### A. Reason child(ren) entered care

Brent, Sherrie Household

the children were removed from the home due to environmental neglect.

| A. Court History: Child | Petition Date | Petition Type | Hearing Date | Hearing Outcome | Order date | Order type |
|---|---|---|---|---|---|---|
| ████████ | 02/18/2010 | Initial | 02/18/2010 | | 02/18/2010 | Removal |

Requirements of the court through its order
Removal

| | | | 02/19/2010 | | 02/19/2010 | Preliminary |

Requirements of the court through its order
COURT APPOINTED A GAL TO REPRESENT MOTHER AND FATHER. BOTH
EXHIBITED UNUSUAL BEHAVIOR THROUGHOUT THE COURT HEARING.
BOTH FATHER AND MOTHER HAVE REQUESTED TO REPRESENT
THEMSELVES. THE COURT APPOINTED AN ATTORNEY TO REPRESENT
EACH OR ASSIST MOTHER AND FATHER IN REPRESENTING
THEMSELVES. PROBABLE CAUSE HEARING IS SET FOR 02/24/2010 @
08:30AM ON THE PRELIM DKT.

| | | | 02/24/2010 | | 02/24/2010 | Preliminary |

"CONFIDENTIAL"

PB CHILDREN'S CENTER 000302

Requirements of the court through its order
MOTHER AND FATHER WS PRESENT/SERVED. COURT APPOINTED
COUNSEL TO REPRESENT THE MOTHER AND FATHER. MS. KIMBERLY
BELL WAS APPOINTED TO REPRESENT MOTHER AND FATHER. COURT
HELD A PCH AND HEARD TESTIMONY FROM PSW, MS. WENK. COURT
APPOINTED A GAL TO REPRESENT MOTHER AND FATHER AS WELL B/C
BOTH EXHIBITED BEHAVIOR THAT SPEAKS TO MENTAL HEALTH ISSUES.
HEARING EVAL IS ORDERED FOR JAMES BRENT.

| | | | | |
|---|---|---|---|---|
| Brent, Robert | | 02/18/2010 | 02/18/2010 | Removal |

Requirements of the court through its order
Removal

| | | 02/19/2010 | 02/19/2010 | Preliminary |
|---|---|---|---|---|

Requirements of the court through its order
COURT APPOINTED A GAL TO REPRESENT MOTHER AND FATHER. BOTH
EXHIBITED UNUSUAL BEHAVIOR THROUGHOUT THE COURT HEARING.
BOTH FATHER AND MOTHER HAVE REQUESTED TO REPRESENT
THEMSELVES. THE COURT APPOINTED AN ATTORNEY TO REPRESENT
EACH OR ASSIST MOTHER AND FATHER IN REPRESENTING
THEMSELVES. PROBABLE CAUSE HEARING IS SET FOR 02/24/2010 @
08:30AM ON THE PRELIM DKT.

| | | 02/24/2010 | 02/24/2010 | Preliminary |
|---|---|---|---|---|

Requirements of the court through its order
MOTHER AND FATHER WS PRESENT/SERVED. COURT APPOINTED
COUNSEL TO REPRESENT THE MOTHER AND FATHER. MS. KIMBERLY
BELL WAS APPOINTED TO REPRESENT MOTHER AND FATHER. COURT
HELD A PCH AND HEARD TESTIMONY FROM PSW, MS. WENK. COURT
APPOINTED A GAL TO REPRESENT MOTHER AND FATHER AS WELL B/C
BOTH EXHIBITED BEHAVIOR THAT ███████████████████ MENTAL HEALTH ISSUES.
HEARING EVAL IS ORDERED FOR ████████████

| | | | | |
|---|---|---|---|---|
| Brent, Jamie | | 02/18/2010 | 02/18/2010 | Removal |

Requirements of the court through its order
Removal

| | | 02/19/2010 | 02/19/2010 | Preliminary |
|---|---|---|---|---|

Requirements of the court through its order
COURT APPOINTED A GAL TO REPRESENT MOTHER AND FATHER. BOTH
EXHIBITED UNUSUAL BEHAVIOR THROUGHOUT THE COURT HEARING.
BOTH FATHER AND MOTHER HAVE REQUESTED TO REPRESENT
THEMSELVES. THE COURT APPOINTED AN ATTORNEY TO REPRESENT
EACH OR ASSIST MOTHER AND FATHER IN REPRESENTING
THEMSELVES. PROBABLE CAUSE HEARING IS SET FOR 02/24/2010 @
08:30AM ON THE PRELIM DKT.

| | | 02/24/2010 | 02/24/2010 | Preliminary |
|---|---|---|---|---|

Requirements of the court through its order
MOTHER AND FATHER WS PRESENT/SERVED. COURT APPOINTED
COUNSEL TO REPRESENT THE MOTHER AND FATHER. MS. KIMBERLY
BELL WAS APPOINTED TO REPRESENT MOTHER AND FATHER. COURT
HELD A PCH AND HEARD TESTIMONY FROM PSW, MS. WENK. COURT
APPOINTED A GAL TO REPRESENT MOTHER AND FATHER AS WELL B/C
BOTH EXHIBITED BEHAVIOR THAT ███████████████ TAL HEALTH ISSUES.
HEARING EVAL IS ORDERED FOR ████████████

| | | | | |
|---|---|---|---|---|
| Brent, Samantha | | 02/18/2010 | 02/18/2010 | Removal |

Requirements of the court through its order
Removal

| | | 02/19/2010 | 02/19/2010 | Preliminary |
|---|---|---|---|---|

Requirements of the court through its order
COURT APPOINTED A GAL TO REPRESENT MOTHER AND FATHER. BOTH
EXHIBITED UNUSUAL BEHAVIOR THROUGHOUT THE COURT HEARING.
BOTH FATHER AND MOTHER HAVE REQUESTED TO REPRESENT
THEMSELVES. THE COURT APPOINTED AN ATTORNEY TO REPRESENT
EACH OR ASSIST MOTHER AND FATHER IN REPRESENTING
THEMSELVES. PROBABLE CAUSE HEARING IS SET FOR 02/24/2010 @
08:30AM ON THE PRELIM DKT.

| | | |
|---|---|---|
| 02/24/2010 | 02/24/2010 | Preliminary |

Requirements of the court through its order
MOTHER AND FATHER WS PRESENT/SERVED. COURT APPOINTED
COUNSEL TO REPRESENT THE MOTHER AND FATHER. MS. KIMBERLY
BELL WAS APPOINTED TO REPRESENT MOTHER AND FATHER. COURT
HELD A PCH AND HEARD TESTIMONY FROM PSW, MS. WENK. COURT
APPOINTED A GAL TO REPRESENT MOTHER AND FATHER AS WELL B/C
BOTH EXHIBITED BEHAVIOR THAT ▮▮▮▮▮ TO MENTAL HEALTH ISSUES.
HEARING EVAL IS ORDERED FOR ▮▮▮▮▮▮▮

Brent, James

| | | |
|---|---|---|
| 02/18/2010 | 02/18/2010 | Removal |

Requirements of the court through its order
Removal

| | | |
|---|---|---|
| 02/19/2010 | 02/19/2010 | Preliminary |

Requirements of the court through its order
COURT APPOINTED A GAL TO REPRESENT MOTHER AND FATHER. BOTH
EXHIBITED UNUSUAL BEHAVIOR THROUGHOUT THE COURT HEARING.
BOTH FATHER AND MOTHER HAVE REQUESTED TO REPRESENT
THEMSELVES. THE COURT APPOINTED AN ATTORNEY TO REPRESENT
EACH OR ASSIST MOTHER AND FATHER IN REPRESENTING
THEMSELVES. PROBABLE CAUSE HEARING IS SET FOR 02/24/2010 @
08:30AM ON THE PRELIM DKT.

| | | |
|---|---|---|
| 02/24/2010 | 02/24/2010 | Preliminary |

Requirements of the court through its order
MOTHER AND FATHER WS PRESENT/SERVED. COURT APPOINTED
COUNSEL TO REPRESENT THE MOTHER AND FATHER. MS. KIMBERLY
BELL WAS APPOINTED TO REPRESENT MOTHER AND FATHER. COURT
HELD A PCH AND HEARD TESTIMONY FROM PSW, MS. WENK. COURT
APPOINTED A GAL TO REPRESENT MOTHER AND FATHER AS WELL B/C
BOTH EXHIBITED BEHAVIOR THAT ▮▮▮▮▮ TO MENTAL HEALTH ISSUES.
HEARING EVAL IS ORDERED FOR ▮▮▮▮▮▮▮

C.    Next Court Date:



03/23/2010 08:30 AM
03/23/2010 08:30 AM
03/23/2010 08:30 AM
03/23/2010 08:30 AM
03/23/2010 08:30 AM

## II.   REASONABLE EFFORTS

A.    Services that were provided to the child(ren) and parent(s) to prevent removal.

Families First was provided to the family.

B.    If services were not provided to the family to prevent removal, briefly describe why the services were not
provided to prevent the removal of child(ren) from his/her home.

services were provided

"CONFIDENTIAL"

C.     Likely harm to child(ren) if separated or returned to from parent(s), guardian, or custodian.

Likely harm to the children if they continue to be separated from their parents is the loss of the parent/child bond.

## III. SOCIAL WORK CONTACTS

| Date | Contact Type | Contact Method | Contact Location | Scheduled N/A | Kept/Unkept N/A |
|---|---|---|---|---|---|
| 02/19/2010 Person(s) Contacted: | Case Conference | Phone | | | |
| 02/19/2010 Person(s) Contacted: | Case Conference | Phone | | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Case Contact | Phone | Parental Home | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Case Contact | Phone | Parental Home | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Case Conference | Other | Other | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Case Conference | Other | Other | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Case Contact | Phone | | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Case Contact | Phone | | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Collateral | Email | | N/A | N/A |
| 02/19/2010 Person(s) Contacted: | Collateral | Email | | N/A | N/A |
| 02/19/2010 | Case Contact | Other | Other | N/A | N/A |

DHS 65

PB CHILDREN'S CENTER 000305

worker is able to communicate with James.

7. Placement Information
   a. Placement Selection Criteria(Ranking each from 1 – 4; 1 being the reason(s) most important to the placement decision, 3 the least important and 4 not applicable.)

| | Aaron James | Robert | Jamie | Samantha |
|---|---|---|---|---|
| The case plan which includes the goal of permanence | 1 1 | 1 | 1 | 1 |
| The physical, emotional, and safety needs of the child(ren). | 1 1 | 1 | 1 | 1 |
| Proximity to the child(ren)'s family. | 1 1 | 1 | 1 | 1 |
| Placement with kinship family network of the child(ren). | 1 1 | 1 | 1 | 1 |
| Placement with siblings of the child(ren). | 2 2 | 2 | 2 | 2 |
| The child(ren)'s or the child(ren)'s family's religious preference | 1 1 | 1 | 1 | 1 |
| The least restrictive, i.e., most family-like setting. | 1 1 | 1 | 1 | 1 |
| The continuity of relationships. | 1 1 | 1 | 1 | 1 |
| Availability of placement resources for the purpose of timely placements. | 1 1 | 1 | 1 | 1 |
| Expressed preferences for placement by the foster child. | 1 1 | 1 | 1 | 1 |

   b. If any Placement Selection Criteria are not met, explain why not.

   Placement with siblings of the child(ren). ████████████████████████████████

   ████████ placed with his brothers, however, his sisters are with another relative.
   placed with his maternal cousin. However, his sisters are placed with another maternal
   ████ placed with her sister. However, her brothers are placed with ████████ sister.
   ████ placed with her sister, however, her brothers are placed in the home of another maternal cousin.
   ████████ placed with his brothers, however, ████ sisters are placed with another maternal cousin.

8. Placement Resources

   a. Sibling Placement

   Siblings are not placed together
   Lack of available bedroom space.

   b. Sibling and Kinship Visitation

   Requires the aware that the child or should visit at least on a monthly basis. According to the ____ relative may visit on a similar arrange basis. ____ ____ ____ ____ The maternal resource is to visit the placement for ____ ____ ____ ____

   c. Kinship Resources and Placement

DHS 65

"CONFIDENTIAL"

PB CHILDREN'S CENTER 000306

Have efforts made to obtain a placement with relatives been pursued? - Yes

All children are placed with their maternal cousins.

    d.    Best Interests or Current Placement

████████ currently placed with his maternal cousin. This placement is in the best interest of the child. This is the most family like setting and least restrictive placement. The relatives are willing to allow for ██████████ there until they are able to return home.

████████ currently placed with his maternal cousin. ██████████████████ is placed ██████████████. This is the most family like and least restrictive.

████████ currently residing with her maternal cousin ██████████████. This is the most ████████ restrictive placement. ████ is also placed in the same home as her sister, ██████ willing to meet all of ██████ needs.

████████ currently placed with her maternal cousin. ██████████████ is also placed with her sister. This is the most family like setting and least restrictive. This relative is willing to allow for ██████ main in the home until she is able to return home.

████████ currently placed with his maternal cousin. This is the least restrictive and most family like setting. ██████ placed with his brothers and will be able to visit with his sisters at least once a month. ████████

9.     Residential Care

████████████
Not Applicable
████████████
Not Applicable
████████████
Not Applicable
████████████
██████████
Not Applicable

E.     Foster Parent/Kinship Caregiver Input

████████████
██████████████████████████ also is stating that he do not want to go to school.
██████████████████████████████████████████████████

The ██████ has stated that ██████████ wants to go return home.

The relative has stated that ██████████ wants to return home.

The relatives has stated that children wants to return home.

F.     Progress to Date

████████████ Household

Mr. and Mrs. has made significant progress regarding the improvements made to the home

PB CHILDREN'S CENTER 000307

*Please see the attached Parent-Agency Treatment Plan and Service Agreement for specific treatments or services.

V. RECOMMENDATION TO COURT

A. Should Child(ren) Remain In Out of Home Placement?

The children should be returned home.

B. Mandatory Petition for Termination of Parental Rights
This recommendation applies to all children:  Yes  X  No

Recommendation for: ▮▮▮▮▮
A mandatory petition is not required.

Recommendation for: ▮▮▮▮▮
A mandatory petition is not required.

Recommendation for: ▮▮▮▮▮
A mandatory petition is not required.

Recommendation for: ▮▮▮▮▮
A mandatory petition is not required.

Recommendation for: ▮▮▮▮▮
A mandatory petition is not required.

C. Recommended Court Orders

Not Applicable

By signing below on behalf of the Department of Human Services we agree to those activities outlined above and will assist the family in their efforts to facilitate the Permanency Planning goal.

Worker Name and Title: Trice, Shavonne -Children Services Specialist      Date: 3-22-10
Signature:

Supervisor Name and Title: Mcgahee, Charlotte -Children's Services Supervisor      Date: 3-29-10
Signature:

Second Line Supervisor's Name and Title: THEODORE J. SELL (FC FIELD. SECT. MGR.) SIB-SPLIT APPROVAL

Date: 05/23/10
Signature:

For Purchase of Service only:

DHS Local Office Name:
DHS Local Office Approval:

"CONFIDENTIAL"                     PB CHILDREN'S CENTER 000308



# EXPRESS MAIL
**UNITED STATES POSTAL SERVICE**

## Mailing Envelope
**For Domestic and International Use**



U.S. POSTAGE
PAID
DETROIT, MI
48233
FEB 16 14
AMOUNT

1007

**$25.55**
00036903-37

**EXTREMELY URGENT**   **Please Rush To Addressee**

When used internationally
affix customs declarations
(PS Form 2976, or 2976A).

## Visit us at usps.com



EI 833926292 US

# EXPRESS MAIL
**UNITED STATES POSTAL SERVICE®**

**Mailing Label**
Label 11-B, March 2004

**Post Office To Addressee**

| DELIVERY (POSTAL USE ONLY) | | | |
|---|---|---|---|
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |
| Delivery Date | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |

**CUSTOMER USE ONLY**
PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

### ORIGIN (POSTAL SERVICE USE ONLY)
PO ZIP Code **48233**

Day of Delivery
☐ Next ☒ 2nd ☐ 2nd Del. Day

Postage **$25.55**

Date Accepted **2/6/14**

Scheduled Date of Delivery
**Tues**

Return Receipt Fee **$**

Time Accepted **553** ☐ AM ☒ PM

Scheduled Time of Delivery
☐ Noon ☒ 3 PM

COD Fee **$**   Insurance Fee **$**

Flat Rate ☐ or Weight
**1 lb 14.00 ozs.**

Military
☐ 2nd Day ☐ 3rd Day

Int'l Alpha Country Code

Total Postage & Fees **$25.55**

Acceptance Emp. Initials **CAD**

**FROM: (PLEASE PRINT)** PHONE ( **313, 841-4591** )

Nathaniel Brent
538 S. Liverpois Ave
Detroit, MI 48209

**TO: (PLEASE PRINT)** PHONE (

Office of the Clerk
United States Court of Appeals
for the Sixth Court
540 Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202-3980

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)
**4 5 2 0 2 + 3 9 8 0**

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

  

### FOR PICKUP OR TRACKING
Visit **www.usps.com**
Call 1-800-222-1811



Please
Recycle

EP-13C

Place Mailing Label Here